```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,
                                        Criminal Action
 4              Plaintiff,              No. 1: 23-184

 5         vs.                          Washington, DC
                                        November 7, 2024
 6    JARED LANE WISE,
                                          9:43 a.m.
 7              Defendant.
      _____/
 8

 9               TRANSCRIPT OF DAUBERT HEARING
             BEFORE THE HONORABLE RANDOLPH D. MOSS
10               UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Plaintiff:       Sarah Wilson Rocha
                               DOJ-CRM
13                             219 S. Dearborn Street
                               5th Floor
14                             Chicago, IL 60604

15                             Taylor Fontan
                               DOJ-USAO
16                             601 D Street, N.W.
                               Washington, DC 20530
17

18

19               APPEARANCES CONTINUED ON NEXT PAGE

20

21

22    Court Reporter:         SHERRY LINDSAY
                               Official Court Reporter
23                             U.S. District & Bankruptcy Courts
                               333 Constitution Avenue, NW
24                             Room 6710
                               Washington, DC 20001
25
```

```
 1                    APPEARANCES CONTINUED

 2

 3    For the Defendant:      Kurt David Hermansen
                              FEDERAL PUBLIC DEFENDER
 4                            DISTRICT OF OREGON
                              Eugene Office
 5                            859 Willamette Street
                              Suite 200
 6                            Eugene, OR 97401

 7                            Peyton Elizabeth Lee
                              FEDERAL PUBLIC DEFENDER
 8                            District of Oregon
                              101 SW Main Street
 9                            Suite 1700
                              Portland, OR 97204

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

WITNESSES

Chuck Rylant

        Direct examination by Mr. Hermansen            6
        Cross-examination by Ms. Fontan                23
        Direct examination continued by Mr. Hermansen  49
        Cross-examination continued by Ms. Fontan      51

Joshua Cohen

        Direct examination by Mr. Hermansen            69
        Cross-examination by Ms. Fontan                85
        Redirect examination by Mr. Hermansen          109

```
 1                    P R O C E E D I N G

 2              THE COURTROOM DEPUTY:  Good morning, Your Honor.  We

 3   are here on criminal case number 23-184, *United States of

 4   America versus Jared Lane Wise*.

 5              Would counsel please state their name for the record

 6   starting with government counsel.

 7              MS. FONTAN:  Good morning, Your Honor.  Taylor

 8   Fontan with the government and also in the room with me is

 9   Sarah Rocha for the government and paralegal, Taylor Wilbert,

10   also in the room with me is one of our interns for this

11   semester which is Rami Kirio.

12              THE COURT:  All right.  Good morning to all of you.

13              MR. HERMANSEN:  Good morning, Your Honor.

14   Supervisory Assistant Federal Public Defender Kurt Hermansen

15   in Eugene, Oregon.

16              THE COURT:  Good morning to you.

17              MS. LEE:  And good morning, Your Honor.  Assistant

18   Federal Public Defender Peyton Lee from our Portland, Oregon

19   office.

20              THE COURT:  All right.  Good morning.

21              MR. RYLANT:  Good morning, Your Honor.  This is

22   Chuck Rylant in California.

23              THE COURT:  All right.  Thank you for being here.

24   And we also have with us, Mr. Wise.  And everyone is appearing

25   by Zoom today, but since this is Mr. Wise's case, let me
```

1    confirm with him it is his request that we proceed by Zoom

2    today rather than doing this in person.

3              THE DEFENDANT:  Yes, sir.  Thank you.

4              THE COURT:  All right.  So this morning we are here

5    for the *Daubert* hearing for Dr. Rylant.  What would be helpful

6    for me is if the defense wants to just remind me to start with

7    the propositions that they would like Dr. Rylant to attempt to

8    establish at trial.  And then we can hear from Dr. Rylant On

9    both direct and cross.  And I will remind the parties once

10   again here that this shouldn't be treated as a discovery

11   proceeding, but it really is just a question of deciding

12   whether the expert testimony on each of the proposed topics is

13   appropriate under *Daubert*, Rule 702 and the other *Daubert*

14   cases.

15             So who has this one for the defense?

16             MR. HERMANSEN:  Your Honor, I do, Kurt Hermansen.

17             THE COURT:  Okay.  So do you want to start with

18   giving me the propositions that you would like Dr. Rylant to

19   help establish at trial?

20             MR. HERMANSEN:  Yes, Your Honor.  I will start both

21   with the propositions that we intend to establish at trial and

22   also the proposition that we do not intend to establish at

23   trial, but which is included as an opinion in his report.

24             We met there in Washington, DC in your courtroom on

25   October 21st.  And at that time, the Court -- we discussed

1   testimony a bit.  And the Court expressed a concern about the

2   trial turning into like basically a grading of police officers

3   on that day.  And that that would be 403 if we started to get

4   into testimony about there were better ways of doing things,

5   other ways of controlling the crowd, they could have used

6   fencing instead of bike racks, things of that sort.  So there

7   is one -- the second opinion in the report, would fall into

8   that category where Dr. Rylant is prepared to testify about the

9   various failings and how things could have been done better or

10  how thing were done wrong.

11          So given the Court's concern, we won't be seeking to

12  admit testimony of that nature.  So the first opinion is going

13  to be opinion number 1 in his report.  And that is --

14                        DIRECT EXAMINATION

15  BY MR. HERMANSEN:

16  Q.   Dr. Rylant, can you please describe your first opinion in

17  your report?

18  A.   I think that we modified it, so correct me if I didn't,

19  but essentially that a training and experienced police officer

20  or law enforcement officer given the totality of the

21  circumstances of that day could reasonably perceive there was

22  excessive force occurring during that day.

23          MR. HERMANSEN:  And that --

24          Your Honor, would you like me to go into the basis

25  for that opinion?

DIRECT EXAMINATION OF DR. RYLANT

1          THE COURT:  Yes, please.

2    BY MR. HERMANSEN:

3    Q.   So when given the opinion that an experienced former law

4    enforcement officer would reasonably perceive certain events as

5    improper excessive force, what is the basis for that opinion?

6    A.   So in general, it was a very challenging and chaotic

7    situation for the law enforcement officers.  They, obviously,

8    were overwhelmed.  And so as they were working within the

9    limitations that they have.  I had to look at this through the

10   lens of someone in the audience, not through the lens of what

11   the officers were doing, what they were thinking or their

12   tactics.  So some of the examples were, if you were in the

13   audience at certain perspectives, you could see, as an example,

14   officers striking with batons overhead downward strikes.  Now

15   that could be perceived as a deadly force option, meaning there

16   is a baton strike that could ultimately be striking someone in

17   the head.  Again, I am not judging the officers.  I did not do

18   an analysis of this.  I don't have the officers' point of view.

19   So, again, I am trying to look at this how it could be

20   perceived from an individual within the crowd.

21        Some other examples were the use of projectile devices --

22   in other words, these grenade-type things that were thrown into

23   the protesters into the crowd.  And so many of those that I --

24   that I observed and that someone in the audience or the

25   protesters would perceive is that you had protesters who were

1    passive, meaning perhaps they had not left immediately if they

2    had heard the warnings that is in question as well.  But

3    regardless of whether they heard the warning, at best many of

4    the times the protesters were passive, were standing there,

5    just standing there not presenting any immediate harm to the

6    officers and projectile, explosive-type devices were being

7    thrown into the audience or into the group of protesters.

8         Another example that I saw was, again, a passive

9    individual, at best someone just standing there not presenting

10   an immediate threat to an officer who was pepper sprayed in the

11   face.  Those were some of the examples that came to mind that

12   could lead an officer or an experienced officer to perceive

13   that excessive force was occurring given the chaos of the

14   challenging situation for the officers.

15   Q.    So turning to -- can you describe the levels of force

16   and -- can you first describe the different levels of force?

17   And then I am going to ask you about appropriate responses to

18   those levels of force, so we can kind of put some meat on the

19   bones.

20   A.    Sure.

21        THE COURT:  I just before you do that,

22   Mr. Hermansen, it would be helpful for me to know where and

23   when we are talking about.  So, obviously, something happening

24   on the other side of the building three hours before Mr. Wise

25   was there is not of any relevance here.  I assume what you are

1    talking about is actually on the terrace in front of where

2    Mr. Wise was standing.  But knowing precisely which officers

3    or which group of officers or clusters of officers we are

4    talking about at what time would be very helpful for me.

5              THE WITNESS:  Is that question directed to me, Your

6    Honor?

7              THE COURT:  It was directed to Mr. Hermansen, but

8    probably through him back to you, I assume.

9    BY MR. HERMANSEN:

10   Q.   I think, Dr. Rylant, we can go chronologically and

11   starting with either the use of pepper spray or the stinger

12   balls at what I believe was 1:35 p.m. and the way the stinger

13   balls were set off in the middle of a crowd.

14   A.   Sure.  So I agree, Your Honor, that is the perfect

15   question, the question that was an issue and a challenge for

16   me.  And the challenge is multiple fold.  There is an

17   overwhelming amount of footage in this case.  It is hard to

18   know exactly what is occurring where and when, when looking at

19   this from a broad perspective.  And then it is also -- the next

20   question that is, what was actually seen by the defendant or

21   someone similar to the defendant in this case?  And so it was a

22   challenge to answer that question.  So my effort was to look at

23   this from a broad perspective and say, what could some

24   hypothetical person perceive to be excessive, not necessarily

25   say for sure that the defendant or someone like the defendant

1    actually observed, because that was difficult to determine with

2    the evidence that we have.

3         But having said that, there were some examples, the one

4    that you just brought up, Kurt, and that was those pepper

5    balls -- -- not pepper balls, but stinger ball grenades that

6    were being thrown indiscriminately into the middle of the

7    crowd.

8         Is that what your question is, Kurt?

9    Q.   Yes.

10   A.   Can you ask -- can you elaborate is your question -- do

11   you want me to answer more than that or --

12   Q.   Yeah.  So from the perspective of a trained law

13   enforcement officer, hypothetically assuming that officer is on

14   the west side of the Capitol at about 1:35 p.m. and sees the

15   way the stinger balls are thrown into the middle of the crowd,

16   would it be reasonable for a well-trained law enforcement

17   officer to view that as improper or excessive force?

18   A.   It would.  And it probably would be helpful if at this

19   point I describe the different levels of resistance, if you

20   would like me to.

21   Q.   Yes, please.

22   A.   So, in general, in law enforcement, different agencies

23   sometimes use different terms but the concepts are relatively

24   similar in how law enforcement officers analyze an individual's

25   level of resistance.  And at the very bottom of the level would

1   be somebody who is compliant.  So when an officer tells an

2   individual to do something and they comply.  There is no

3   resistance in that example.  Or if an officer does not provide

4   any instruction and the individual does nothing, that would be

5   considered compliant as well.  In other words, no resistance at

6   all.

7       The next level up would be a passive level of resistance.

8   So an example of this would be an officer telling an individual

9   to do something, telling them to step out of the car, telling

10  them to leave, telling them to put their hands behind their

11  back and the individual simply does not comply.  The individual

12  does not run, does not resist in any way, but they are just not

13  complying, so it is the lowest level of resistance.

14      The next level would be active resistance.  An example of

15  this would be an officer grabs on individual's arm, the

16  individual pulls away or tenses up, but does not do anything

17  that presents an imminent danger to the officer, whereas the

18  next level would be assaultive where the individual actually

19  assaults an officer in some way by kicking, punching, tackling,

20  biting, et cetera.

21      Then the final level would be deadly force.  And that is

22  where an individual presents an officer with an imminent danger

23  of death or great bodily injury such as firearm or a baton

24  strike to the head or something similar.  And so in this case,

25  at the 1:35 I think Mr. Hermansen said there is pretty clear

1    evidence where the stinger ball devices are being thrown into

2    the crowd.  And from what I can see where these devices are

3    being thrown into the crowd, the crowd is just standing there

4    passively, whether they are compliant at that moment or whether

5    it is passive resistance is not exactly clear.  And that

6    depends on whether the crowd could reasonably have been

7    expected to have heard commands to leave or not.  But at worst,

8    they are passive, so they are not presenting any imminent

9    threat.  And the devices being thrown into the crowd, which I

10   think is being thrown improperly, would be kind of an

11   intermediate level of force because those devices use both some

12   sort of gas, tear gas, or pepper spray and they also shoot out

13   a projectile device.  So these would be on par somewhat similar

14   to using a pepper spray or some sort of -- kind of on the --

15   intermediate meaning like a less-lethal device lower than a

16   firearm.

17            THE COURT:  Can you describe to me where they were

18   standing?

19            THE WITNESS:  So in trial, I think we'll be able to

20   present the video.  But for now, what you have is kind of a

21   scrimmage line of the police officers.  And then immediately

22   at that line, I believe, there is or were bike racks between

23   them at the time.  That is a little bit confusing to me,

24   because there is -- the racks have been moved at different

25   times.  But then you have a group of protesters right up

1    against the officers.  And then the group of protesters goes

2    deep for it appears many thousands of people.  So these

3    projectile devices are being thrown beyond the line of

4    officers, beyond the protesters that are immediately in front

5    of the officers and somewhat deep into the crowd where they

6    are being thrown.  So the crowd that is being hit by these

7    impact devices are not anywhere near the officers at the

8    scrimmage line.

9              THE COURT:  Who is throwing the devices?  Where are

10   they coming from?

11             THE WITNESS:  They are coming from officers standing

12   somewhat behind the immediate scrimmage line.

13             THE COURT:  And the other question I had for you is,

14   I understand your point about the five levels of resistance if

15   you are talking about one or two people.  When you are talking

16   about tens of thousands of people, I am not sure how those

17   concepts apply.  Because presumably the officers have to clear

18   the space.  And everyone who is there is in some sense --

19             Now, Mr. Wise, you shake your head but that is not

20   helpful.  The officers -- you can't just say, okay, well, these

21   folks here are just standing there.  It is the people in front

22   of them that are engaged in the assaultive behavior, because it

23   is the entire crowd in some sense that is contributing to the

24   danger that the officers are facing.  So I am not quite sure

25   how you distinguish between distinct people in those crowds

1    when it really is the crowd itself that at least in part is

2    contributing to the danger that they face.

3               THE WITNESS:  I think that is a great observation,

4    Your Honor.  And when using these different tools or

5    techniques that law enforcement uses, the law enforcement

6    officer still has to discriminate between somebody who is

7    actively resisting or assaultive and somebody who is not.  And

8    so if somebody deep into the crowd is doing nothing, that is

9    very different than someone at the scrimmage line that is say

10   hitting an officer with a bottle or pushing an officer or

11   fighting.  So those techniques do need to be used somewhat

12   discriminately.

13              The second part, because I agree with your point --

14   but the second part is that the tactic or the method that these

15   are deployed.  And so when you throw that explosive projectile

16   device into the middle of the crowd who is passive, what it

17   actually does -- it is -- it creates a problem rather than

18   solving a problem.  So it doesn't really serve a law

19   enforcement goal.

20              What needs to be done with these type of devices is

21   thrown in front of the crowd, down low at their lower

22   extremities so these explosive devices will kind of go off at

23   the legs and so forth so they are not impacting people in the

24   face.

25              The other thing is the method that these were

 1    deployed actually drive the protesters towards the officers,

 2    rather than towards -- pushing them towards some sort of

 3    predetermined exit path.  So when these are used properly,

 4    there is a predetermined exit path and they drive the

 5    protesters towards that exit rather than driving them towards

 6    the officers.  And so it is a misapplication of the technique

 7    and it is also being applied on people who are passive

 8    resisting at best.  And so I think that is a great point, Your

 9    Honor, that you are bringing up.

10         THE COURT:  So this is a question for Mr. Hermansen.

11    But is this evidence intended to go to demonstrate that

12    Mr. Wise had a psychological reaction that is inconsistent

13    with him having the requisite mens rea for the crime or is

14    this being offered as part of a third-party self-defense

15    theory?

16         MR. HERMANSEN:  So what we are talking about now is

17    not part of a third-party self-defense theory this early at

18    1:35.  At -- what we -- so we will be discussing different

19    events through the day where we believe Mr. Wise viewed them

20    and experienced them.  As the Court knows, we have done

21    everything we can to try to determine where he was every

22    minute of that day and it is just not possible.  But we have

23    done our best to determine where Mr. Wise was, what he would

24    have seen.  And so the opinion will go to how a reasonable law

25    enforcement officer would view certain events throughout the

 1    day.

 2             And so those go to both to explain why he said Nazi,

 3    Nazi, Gestapo, you are acting like the Gestapo, because that is

 4    something that a totalitarian regime like Tiananmen Square

 5    where you used too much force against a crowd to control them

 6    or improper force against a crowd would then result in what --

 7    you know, the government intends to put in those comments that

 8    he made directly to a law enforcement officer about Nazi,

 9    Gestapo.

10             THE COURT:  What time were those comments made?

11             MR. HERMANSEN:  Those were on the upper west terrace

12    at about 4:22:10, I want to say.  So the main times in this

13    case are 4:22:16, when officers fall over and he says "Kill

14    'em."  And then the next time is 4:22:38 at the -- moving 8 to

15    10 feet toward the line of scrimmage and saying those comments

16    again.  So it directly precedes the -- what I believe what the

17    government is alleging are the assaults and the civil

18    disturbance.

19             THE COURT:  But we are talking about with the

20    stinger balls, we are talking about hours earlier then?

21             MR. HERMANSEN:  Yes.  So there is events throughout

22    the day that he is experiencing.  We'll also -- Dr. Rylant's

23    opinion is also based on passive people who are passively

24    resistant or just passive being pepper sprayed.  And at

25    4:22:38, we are going to see, you know, the videos show

1    overhead strikes.  So that gets to Your Honor's question about

2    the words being in defense of others.

3           THE COURT:  Well, I just need to think about each of

4    these separately.  And it does strike me that it is more

5    challenging from your perspective if the argument here is that

6    I should allow in evidence that a reasonable officer would

7    view what happened at 1:35 as being either imprudent or

8    excessive force at 1:35 and the reason I should allow that in

9    is to explain comments that the use of the word -- Mr. Wise

10   calling police officers Nazis at 4:22, that is more

11   challenging just given the temporal difference.  And

12   presumably they are not the same officers hours later in a

13   different place.

14          MR. HERMANSEN:  Yes, Your Honor.  I think he is

15   speaking collectively to all of the officers, basically just,

16   you know, he picks the officer who is right next to him.  And

17   at that time, the officers are -- there is row after row after

18   row of officers who instead of saying, you need to leave, they

19   just start pushing.  And they are all lining up.  So I don't

20   know -- I mean, we'll hear from Mr. Wise what was in his head

21   if he has a recollection of that moment or why he said that.

22   But the -- it is a cumulative -- again, it is a cumulative

23   effect.  And Dr. Best will testify about that as well.  Of all

24   of the events throughout the day -- and we have done our very

25   best to pick events that, you know, Mr. Wise would have seen.

1          There are many, many worse events that we aren't

2   using.  Because we can't, you know -- it is hard for us to say

3   where Mr. Wise was.  But we know -- or from videos that he is

4   in the area at the time of the events that Dr. Rylant is

5   relying on.

6          THE COURT:  Okay.

7          MR. HERMANSEN:  So moving -- let me pull up --

8   BY MR. HERMANSEN:

9   Q.    And then, Dr. Rylant, your other opinion concerns

10  emotional stress and cognitive load caused by the chaos of

11  protestors at the US Capitol building and your opinion that

12  auditory exclusion would be a normal human response that should

13  be expected due to the unconscious cognitive impact of

14  selective attention.  That is a lot of words.  Can you unpack

15  that, please?

16  A.    Sure.  In basic language, it means, it is normal to expect

17  someone not to hear everything that is occurring.  And to

18  explain it in scientific terms of why that occurs -- I will

19  start briefly with attention.  Attention -- we all kind of

20  understand attention from a common sense point of view, what it

21  is I am looking at or what it is I am focused on hearing and so

22  forth.  But the concept of selective attention is where we --

23  the brain is overwhelmed with too much stimulus input from our

24  senses.  So it is not just our eyes, not just our ears, but it

25  is also what we sense, what we feel and what we smell and also

1    what we are cognitively processing.

2         It is difficult to process complex things in our mind

3    while simultaneously receiving input from our senses.  And so

4    what our brains do to try to manage the overload of input is it

5    tries to prioritize what is important in the moment, especially

6    under some degree of stress that shifts -- the importance

7    becomes survival, in other words.  So we have all heard of a

8    fight or flight response.  And the fight or flight part of that

9    is our brain adapting to survival by shifting attention or

10   cognitive resources from thing that are less important and

11   focusing them on things that are more important.

12        And an example that is not related to this incident, but

13   that helps understand is that phenomenon often called the

14   cocktail party effect where if we all go to some sort of

15   Christmas party for work, if you stop and walk into the room,

16   you will overhear kind of a buzz of all of the individual

17   conversations taking place and you do not necessarily hear

18   specific conversations.

19        But then when you engage in a one-on-one conversation at

20   this cocktail party, your brain automatically kind of filters

21   out the buzz of all of the other conversations to allow you to

22   hear that one-on-one conversation.  But then let's say perhaps

23   your spouse is across the room and then mentions your name,

24   your brain will automatically divert attention from that

25   one-on-one conversation over to try to pick up the conversation

1    that you overheard with your spouse.

2            MR. HERMANSEN:  Your Honor -- I'm sorry, Dr. Rylant.

3    I need to interrupt.  I think we are having a technical

4    difficulty.

5            Can everyone hear Dr. Rylant?

6            THE COURT:  Yes.

7            MR. HERMANSEN:  Mr. Wise, can you hear me?

8            Mr. Wise, I am guessing you cannot hear me.

9            THE WITNESS:  He is on mute.

10           MR. HERMANSEN:  Yeah.  But he is not hearing.

11           THE COURT:  Why don't you call him, Mr. Hermansen.

12           MR. HERMANSEN:  Yeah, I am going to tell him to

13   disconnect and reconnect.

14           THE COURT:  Okay.

15           (Pause.)

16           THE DEFENDANT:  Can you hear me, Kurt?

17           MS. LEE:  We can hear you.  Can you hear us, Jared?

18           THE DEFENDANT:  I can't hear anybody at all.

19   Peyton, I could hear you, but I couldn't before that.

20           MR. HERMANSEN:  So you are in the meeting.

21           THE DEFENDANT:  Okay.  I hear you, Kurt.

22           MS. LEE:  Okay.  So it seems like we are okay now.

23           MR. HERMANSEN:  Yeah.

24           THE COURTROOM DEPUTY:  Mr. Wise, are you able to

25   turn on the camera?  Your camera is not on.

1    THE DEFENDANT:  I'm sorry about that.  I can hear

2  you.  Thank you.

3    THE COURT:  Okay.

4    THE WITNESS:  Is anybody -- do I need to repeat

5  anything or would you like me to continue?

6  BY MR. HERMANSEN:

7  Q.   If you could just -- I don't even remember where you were.

8  I'm sorry.

9  A.   I will do a short summary.  I was describing the cocktail

10  party effect where the brain automatically shifts our auditory

11  attention depending on where it is necessary in the moment,

12  whether we are having a one-on-one conversation or trying to

13  listen to somebody across the room.  Another example is in law

14  enforcement shootings, the overwhelming majority of the time

15  officers report not hearing their gunfire or hearing a muted

16  sound.  And this is without any kind of ear protection.  This

17  is a common effect of auditory exclusion where, in the moment

18  of stress and in the moment of the shooting, the brain just --

19  it is just not important to hear, so it limits the resources

20  from the hearing and prioritizes those limited resources

21  elsewhere.

22    So that is a long way of describing why during this

23  protest situation, I would expect all parties involved -- both

24  law enforcement and the protesters to not hear everything,

25  because it is a normal part of the brain.  On top of the

1    obvious common sense that there is so much noise and so much

2    chaos, is it going to be hard to hear just because of the

3    volume and the mass or the high amount of different auditory

4    inputs.

5              THE COURT:  Mr. Hermansen, what point is this going

6    to?  What is this trying to establish?

7              MR. HERMANSEN:  Your Honor, at 4:22:38, we don't

8    know yet what jury instruction -- we are still grappling and

9    doing some research about causation to try to give the Court

10   supplemental briefing.  But we believe the law is or should be

11   that aiding and abetting requires that -- his -- Mr. Wise's

12   words "Kill 'em" would actually have a cause or have an effect

13   on someone and encourage them or --

14             THE COURT:  Right.  So just to -- so I just want to

15   make sure I understood.  Your point here is to show that there

16   is reason to doubt that the individuals who were assaulting

17   the officers heard Mr. Wise say "Kill 'em"?

18             MR. HERMANSEN:  There is that.  There is also --

19   people might not hear -- anyone under that stressful situation

20   might not hear -- might focus on something else and not hear

21   that they are ordered -- they might not hear the order to

22   leave or I know the government is going to argue that Mr. Wise

23   would, obviously, know that he wasn't supposed to go into the

24   Capitol because a siren is going off.  And so being able to

25   process all of that data and -- it is -- it kind of dovetails

1    in with the normal stress.  And then it also will -- yeah.  So

2    it is -- those are the ones that come to mind, Your Honor.

3               THE COURT:  All right.  Well, okay.  Again, I am

4    going to have to think these through separately.  I mean, it

5    does just sort of off the cuff -- and don't hold me to this --

6    I get the point with respect to whether the individuals who

7    were assaulting the officers heard what Mr. Wise said.  And I

8    agree with you that is an issue that I have indicated that I

9    still have to decide and I need to hear from the parties as to

10   whether as a matter of law that is required.  I think it is --

11   again, off the cuff giving you sort of initial reactions, it

12   strikes me as more of a stretch if the -- if the view is

13   that -- I don't know what the evidence will show but if the

14   evidence shows that Mr. Wise has no recollection about whether

15   he heard the siren or the alarm going off or not.  And the

16   argument is that he might not have heard it going off, because

17   people exclude certain audio sounds.  That strikes me as

18   perhaps more of a stretch under 403 under the circumstances.

19   But we can -- that is just sort of an initial reaction, but I

20   just wanted -- that is the reason I asked the question trying

21   to figure out what this is trying to show, because I think it

22   may make a difference to the analysis.

23               MR. HERMANSEN:  I am prepared to tender the witness,

24   Your Honor.

25               THE COURT:  Okay.

1          MS. FONTAN:  One moment, Your Honor.

2                    CROSS-EXAMINATION

3   BY MS. FONTAN:

4   Q.   Hi, Dr. Rylant.  Can you hear me okay?

5   A.   Good morning.  Yes, I can.

6   Q.   I want to start first to talk a little bit about your

7   background and your law enforcement training.  Do you -- have

8   you done any civil disturbance training or had any experience

9   in civil disturbance?

10  A.   Yes.

11  Q.   Okay.  And what kind?

12  A.   Well, you start with that in the police academy.  You have

13  pretty extensive training in that in the police academy.  And

14  then you have updated training periodically throughout your

15  career to discuss that.  We -- where I live, we have some,

16  relative to this, minor civil disturbance.  But I guess most of

17  them compared to this are pretty minor.  So I have a little bit

18  of hands on experience with that.  I have also taken update

19  training throughout the years on these type of weapons and so

20  forth.  I have also gone to a week-long instructor course on

21  tear gas, so I am a tear gas instructor as well.

22  Q.   And I know we have your CV, but where did you primarily

23  practice as a police officer?

24  A.   In two cities.  One would be the city of Lompoc in

25  California and the city of Santa Maria in California.

CROSS-EXAMINATION OF DR. RYLANT                    25

1    Q.   And you alluded to this a little bit before, but you said

2    you worked some minor civil disturbances.  Did you work any

3    protests?

4    A.   Yes.  I guess one of the more well-known ones which again

5    was minor in comparison to this was during the Michael Jackson

6    trial.  So we were responsible for that, managing that crowd.

7    Q.   Were there any other points in your career where you dealt

8    with large protests or large crowds?

9    A.   None that were formally -- I guess formally structured or

10   organized such as this one.

11   Q.   And in your career, have you ever been an officer in

12   Washington, DC?

13   A.   No.

14   Q.   And as part of your duties as an officer, have you ever

15   been tasked with providing security for a federal building?

16   A.   No.

17   Q.   Or maybe a state capitol building?

18   A.   Well, this courthouse where the Michael Jackson trial we

19   were -- so I am not sure -- I guess that is considered state, I

20   guess.

21   Q.   So, Dr. Rylant, I want to jump into your opinions and just

22   to clarify, what your opinion is going to be in this case.  So

23   you remember putting together a -- well, a few reports of your

24   opinions?

25   A.   Correct.

1    Q.   Okay.  And the most recent version of that report was from

2    October of this year?

3    A.   I believe that is correct, yes.

4    Q.   Okay.  And I am going to go off of the first opinion that

5    Mr. Hermansen asked you a few questions about that.  But in

6    your report it says, "It is my opinion based on a reasonable

7    degree of professional certainty, that if an experienced former

8    law enforcement officer observed what reasonably appeared to be

9    improper and/or excessive force, like the examples below, that

10   person would likely experience a psychological/emotional

11   response that would affect his or her decision making."

12        Is that still your opinion today?

13   A.   Well, that opinion has evolved.  I think Mr. Hermansen

14   kind of explained earlier, it has been limited down so it is --

15   I think what we are submitting to the Court is more narrow than

16   what you just read.

17   Q.   And help me -- I guess looking at this point, what is no

18   longer your opinion?

19   A.   Well, my understanding at the moment, based on

20   Mr. Hermansen's legal strategy -- and I would welcome him to

21   jump in if I misunderstand -- is that they already have another

22   expert dealing more with psychological aspects.  And so I am

23   being limited -- not discussing the psychology, per se, even

24   though, however, with that in mind, my -- what would be labeled

25   the third opinion about auditory exclusion is a psychological

1    factor.  So I hope that answers your question.

2    Q.   Yeah, that is very helpful.  Just so we are on the same

3    page then, it is no longer your opinion or -- you are no longer

4    going to be opining on whether a former law enforcement officer

5    would experience some sort of psychological or emotional

6    response that would affect his or her decision making?

7    A.   That is my current understanding.

8    Q.   Is that your -- I guess, I am trying to clarify.  Is that

9    your opinion or is it no longer your opinion?

10   A.   The opinion -- if I -- let me know if I misunderstand your

11   question.  The opinion I wrote there is how I -- my expert

12   opinion.  But my understanding of -- my testimony will be more

13   narrow than that.

14   Q.   Okay.  Okay.  As part of this opinion, you do cite a

15   footnote.  And I want to unpack that footnote.  And that is

16   footnote 13.  But I will break it down a little bit so it will

17   be easier to talk about.  And it says, "These incidents are

18   being cited as examples of what Jared Wise may have observed."

19   So I just want to clarify, you don't know for sure what the

20   defendant observed and didn't observe; correct?

21   A.   That is correct.

22   Q.   Okay.  And that is not part of your opinion opining on

23   what he saw or what did-- or what he did not see?

24   A.   Correct.  In fact, that footnote -- where it has Jared

25   Wise -- in looking at hindsight, that should have been revised

1   between my first and second draft, because initially we were

2   using his name and now my opinion is more generic.

3   Q.    Okay.

4   A.    Now that you bring that up, that name should be modified

5   as well.

6   Q.    Okay.  Thank you for that clarification.

7          So the second part of -- and I just, again, want to

8   clarify your opinion.  The second part of that footnote says --

9   Well, it is "These incidents are intended to be definitive

10  claims of improper and/or excessive force."

11         Just so we are clear, you are not opining on whether or

12  not officers engaged in excessive force?

13  A.    No.  In fact, I kind of opened with that initially to

14  clarify so everybody is on the same page.  It is easy to see

15  something on video or it is easy for an individual to be in the

16  audience and see an officer's action and believe -- reasonably

17  believe that it is improper or excessive.  However, as part of

18  my job is, once you dig into that -- the details and look at

19  all of the evidence and you get the officer's statement,

20  different camera angles and stuff, it is possible that what is

21  perceived to be excessive is actually reasonable.  So two

22  things can be true simultaneously.

23  Q.    Sure.  I understand.  Thank you for clarifying.

24         So I want to jump in then to your opinion which is, from

25  my understanding that an experienced law enforcement officer --

1    or it was reasonable for an experienced former law enforcement

2    officer to perceive some of these events as excessive force.

3    Can you define what experienced former law enforcement officer

4    means?

5    A.    Well, I think you're alluding to a broad range of

6    experience.  So somebody can go through the academy and learn

7    the things that I have just shared today and have a basic

8    understanding and contrast someone who just graduated to

9    somebody that has been in the career for many, many years will

10   have a different or more depth to their experience.  So I guess

11   to answer your question, somebody with minimal academy training

12   of -- that is pretty consistent throughout the United States,

13   whether it be local law enforcement or federal officers in

14   terms of what use of force is, it really wouldn't take a whole

15   lot of experience to perceive certain things as being

16   excessive.

17   Q.    So I guess then that definition of what an experienced

18   former law enforcement officer is, for purposes of your

19   opinion, is that based on any literature or is that defined

20   anywhere?

21   A.    Well, most jurisdictions have minimal requirements in

22   order to be deemed a peace officer, some basic level of

23   training academy and so forth and some sort of in-service

24   training.  So once somebody met those minimum standards, which

25   would be defined in writing, depending on the jurisdiction,

CROSS-EXAMINATION OF DR. RYLANT

1    that would be the minimum requirements to become a peace

2    officer.

3    Q.   Okay.  So then just I am understanding then, experienced

4    former law enforcement officer can be someone one day out of

5    the academy or it can be someone who was in -- as a police

6    officer for 20 years?

7    A.   Well, for the narrow scope of what I am talking about

8    today and so far essentially what I have talked about in terms

9    of use of force is the different levels of resistance and the

10   type of force that can be used.  And so yes.

11   Q.   Sure.  Dr. Rylant, I appreciate that.  I am just trying to

12   figure out when you say experienced former law enforcement

13   officer what that particularly means.

14   A.   I was trying to answer.  In the scope of what I am

15   testifying to, somebody who graduates the academy would have

16   enough experience to identify this stuff.

17   Q.   Okay.  I understand then.  So experienced former law

18   enforcement officer can mean someone who graduated from the

19   academy?

20   A.   In the scope of what --

21            MR. HERMANSEN:  Objection, Your Honor.  Asked and

22   answered.

23            MS. FONTAN:  Your Honor, I am just trying to clarify

24   what the definition of experienced former law enforcement

25   officer is.

1      THE COURT:  I think we can move on.  I get the

2  point, so I think we can move on.

3      MS. FONTAN:  Okay.  Thank you, Your Honor.

4  BY MS. FONTAN:

5  Q.   And, Dr. Rylant, does it matter whether someone is

6  current -- for purposes of your opinion, does it matter whether

7  someone is a current law enforcement officer versus a former

8  law enforcement officer?

9  A.   I think that is a fair question in that some of the laws

10 changed, some of the case laws changed, some of the tactics

11 changed, some of the tools changed with technology.  And so, in

12 general, the things that I have described are consistent 20

13 years ago until today.  Some things have changed, like I said.

14 Maybe those grenade balls might be newer, that may not have

15 existed 20 years ago.  So it would just depend on whether or

16 not somebody who is retired has the knowledge of the tactics

17 and so forth.  So I think it is a fair question.  It would

18 depend specifically on what we are talking about.  I hope I

19 answered the question.

20 Q.   Sure.  Yeah.  So it seems to me then -- or I guess I

21 should say, it is fair to say then this is a pretty

22 individualized analysis of whether someone reasonably --

23 whether a former law enforcement officer thought that something

24 was excessive force?

25 A.   I guess to answer your question you have to -- I think --

CROSS-EXAMINATION OF DR. RYLANT

1    that is a tough question that you are asking.

2         Most officers in the -- within the last two decades would

3    all have the same knowledge.  So why I am kind of stumbling is

4    I imagine an officer 100 years ago from Tombstone would have a

5    different understanding than a modern officer.  That is why I

6    am kind of stammering with my answer.

7    Q.   Sure.  You said that everybody has -- takes the same

8    training.  What is that based on?

9    A.   I don't think I said everyone takes the same training.  If

10   I did, that is not exactly correct.  What I meant is that

11   officers have the same general understanding of the levels of

12   resistance.

13        THE COURT:  On the question of definitions, let me

14   just jump in and ask you a definitional question.  What do you

15   mean by excessive force?  Because, for example, for me it is

16   pretty clear if you had somebody who was standing there

17   peacefully and a police officer came up and hit them on the

18   head with their nightstick or the baton, that would clearly be

19   excessive force.  It probably would be a criminal act by the

20   police officer to do that.  And there certainly could be a

21   Fourth Amendment civil liability claim brought against the

22   officer or the department depending on the training if the

23   officer did that.

24        Now, on the other hand, using tear gas to disperse a

25   crowd where you could have targeted it differently, you may not

1   make the best judgment of where to fire the tear gas, you may

2   not be using it most effectively.  It is less clear to me that

3   under those circumstances every member of that crowd who

4   experienced the tear gas in a place where they were not allowed

5   to be and where they were trespassing would have a

6   constitutional claim and say my Fourth Amendment rights were

7   violated because the police officers used tear gas against the

8   entire crowd when they should have targeted a more discrete

9   portion.  Maybe that is the case.  It would be helpful for me

10  to understand when you are talking about excessive force, what

11  definition are you using?  The Fourth Amendment definition from

12  the Supreme Court case law on what it means to be excessive for

13  Fourth Amendment purposes or are you using some other

14  definition just to mean that it was force that was unnecessary

15  and that was not wisely used?

16          THE WITNESS:  Your Honor, that is such a great

17  question.  And it is such a challenging question for all law

18  enforcement and all of society and we are constantly grappling

19  with that.  But to answer specifically, the officer on the

20  line level, meaning the officer in the patrol car or at the

21  protest, where do they determine what excessive force is?

22  Well, they ultimately get it from, first, their policies; and,

23  second, their trainers.  And where do the trainers get it?

24  The trainers get it from their trainers and so forth.

25          But ultimately it comes from the court decisions.  So

1    me in my role and other trainers were constantly studying what

2    the courts' decisions are.  And the courts are the ones who

3    decide very nuance specific cases.  So from a broad

4    perspective, it all comes from *Graham versus Connor*.  But

5    *Graham versus Connor* is very broad in terms of what is

6    reasonable or not.  It just doesn't say the great examples

7    where you just cited.  But there are other cases where we look

8    at how the Courts review specific incidents and we learn from

9    them.  And I will give you an example.  In the beginning days

10   when Tasers came out, if somebody was mouthing off and calling

11   me bad words, people would Tase them and that was acceptable in

12   the beginning.  But once it gets tested in the courts the court

13   say, no, you can't Tase somebody unless that person poses an

14   imminent threat to you.  And then that trickles down into

15   policy, trickles down into training.  So, your example, I agree

16   is a good one is the courts have said that you can use gas on a

17   mass group.  But when you start using impact weapons, which

18   these grenades have an impact mechanism to them where they are

19   shooting out balls.  You can't just do it indiscriminately

20   against passive protesters who are just standing there.  So

21   there are courts that -- decisions that kind of guide us on all

22   of this.

23              So what we look at is, first, look at the type of

24   passive resistance versus say assaultive resistance.  So if you

25   look at -- I have studied a lot of these protests because there

1    are so many of them since the George Floyd times.  If you have

2    crowds that are actively throwing bottles and rocks and bricks

3    at officers, that is an assaultive level of resistance.  But it

4    still doesn't mean the entire crowd is doing that.  So the

5    officers have to be very selective and go after the ones who

6    are actually doing the assaultive behavior when using, let's

7    say, baton strikes or shooting projectile devices.  And so

8    there is a lot of examples now where the police officers are

9    just randomly shooting into a crowd.

10            And let's take this to an extreme just to illustrate.

11   If you have a crowd of peaceful protestors and one protester

12   starts shooting at the officers, it would be unreasonable to

13   have a machine gun like military thing and just start gunning

14   the entire crowd down.  And I am providing a extreme example to

15   try to illustrate how officers have to look at this.

16            It is very specific what type of resistance and what

17   type of force can be used.  Tear gas is very different than

18   batoning somebody or shooting somebody.  So I think your point

19   is great and I hope I answered it sufficiently.

20            THE COURT:  Well, I think you have certainly helped

21   a lot.  And I think what you are saying is you are using the

22   Fourth Amendment standard or definition of excessive force, if

23   I understand what you are saying.  And so if that is right,

24   are there cases that say that these use of these stinger balls

25   are excessive where there are some members of the crowd that

CROSS-EXAMINATION OF DR. RYLANT

1    are behaving violently and others are not and the stinger

2    balls have been fired into a portion of crowd where the

3    violence is not occurring?

4            THE WITNESS:  I want to be careful and not cite an

5    answer that I can't back up without some research.  In general

6    terms, there are a lot of cases out with protest situations

7    with different types of weapons.  And I am going to be careful

8    to not answer specifically until me or the attorneys dig

9    deeper into that, Your Honor.

10           THE COURT:  Okay.  Fair enough.  My apologies for

11   interrupting.

12           MS. FONTAN:  It is okay, Your Honor.

13   BY MS. FONTAN:

14   Q.  Going off of Your Honor's questions, Dr. Rylant, I am

15   going to kind of break this down a little bit and maybe it will

16   be easier to talk about specific actions by the police.  So but

17   1.1 of your opinion is an example of what reasonably appeared

18   to be improper and/or excessive force is compliant and/or

19   passive non-complaint protesters were sprayed with pepper spray

20   based on your -- in your opinion, I guess I should say.  Why is

21   that -- why would a former law enforcement officer find that to

22   be excessive force?

23   A.  So if someone is compliant, meaning, I am a police

24   officer -- let's just use you as an example, Ms. Fontan.  Let's

25   pretend I am a police officer and I tell you, please step over

CROSS-EXAMINATION OF DR. RYLANT

1   here and you step over there and I spray you with pepper spray,

2   that would be excessive.

3   Q.   And, Your Honor -- I'm sorry.  Dr. Rylant, what about

4   though in this particular circumstance, because this is in the

5   middle of a riot; right?  So does that affect your opinion?

6   A.   Well, we have to be careful with the language, in the

7   middle of the riot.  Because just because -- let's make up some

8   times.  Let's say some violence occurs with some people at the

9   front line at 1:00.  At 4:00, you cannot continue using the

10   same force that would have been reasonable on those specific

11   individuals.  You can't -- you can't apply -- let me use

12   another exaggeration.  At 1:00 --

13   Q.   Dr. Rylant, can we narrow it to -- so it looks like for

14   compliant and/or non-compliant protesters were sprayed with

15   pepper spray.  And it looks like the open-source videos that

16   you are looking at, at least one of them occurs around 1:30.

17   Can we narrow it just to that 1:30 time period?

18   A.   I am happy to.  The Court said this is not supposed to be

19   a discovery session, so we weren't really prepared to go

20   through all of the slides with all of the videos.  I don't

21   remember that exactly in my head at the moment.  We would have

22   to pull up the videos and so forth, which I didn't think was

23   the intent of this today.

24        But if you want to, we can do that.  But in general, there

25   is someone standing there being sprayed who posed no threat to

1    the officers.  He wasn't doing anything wrong, anything

2    dangerous to officers.

3              THE COURT:  When you say -- I apologize for

4    interrupting.  But sort of another clarification I have about

5    language.  And I appreciate your point about this not being a

6    discovery session.  That was my direction.  But I think I do

7    need to find -- determine with some particularity what your

8    opinion is.  And some of the problems I am having is when you

9    say things like compliant and/or passive or improper or

10   excessive, I don't know which of those you are talking about.

11   And, you know, with respect to compliant, you know, at least

12   there is one theory in that there were loudspeakers blaring,

13   you must leave, you must leave, you are not allowed to be

14   there.  Anyone who was there saw the tear gas in the air.

15   They saw the conditions there.  And it was pretty clear you

16   weren't allowed to be there.  So were you compliant if you

17   were still standing there, even where most reasonable people

18   would have said to themselves, well, I am pretty sure I am not

19   supposed to be here, there is a reason that the police

20   officers are all wearing riot gear and shooting tear gas at

21   us.  I think it is probably not because we are welcome here.

22   I think it is probably because they want us to leave.  If that

23   person doesn't leave, is that person compliant still if they

24   are just standing there?

25              So I am struggling a little bit with how some of the

1    categories you are talking about apply when we are talking in

2    very vague terms about compliant and passive or passive,

3    excessive or improper.  That is what I am trying to drill down

4    on, because as I said, I get the point where it is not hard to

5    reach the conclusion where someone is just standing there, not

6    assaulting anybody or posing any danger and the officer comes

7    up and hits them on the head with a nightstick, that is

8    excessive force.

9            I am struggling more with the question of how I think

10   about the use of tear gas, for example, on a crowd where it is

11   pretty clear the people are not supposed to be there?  Are they

12   compliant?  Are they passive at that point?  Or, no, they are

13   not compliant because they know they are not supposed to be

14   there?

15           THE WITNESS:  I appreciate the questions.  Because

16   they are really helpful for me to think about where you guys

17   are thinking.

18           The reason that particular bullet point says

19   passive -- I mean, compliant or passive non-compliant is

20   specifically because of what the Court just said.  I am not

21   here to decide whether or not those individuals heard or should

22   have heard the commands.  So let's assume they did hear the

23   commands and chose not to leave, then the language is passive

24   noncompliant, which is why I used both language.  So now let's

25   assume, which I am not arguing one way or the other -- but

1    let's assume they heard the commands and refused to leave.

2    That would be passive noncompliance.

3            So it is -- it is improper, without question, to

4    directly spray an individual with pepper spray who is passive

5    non-compliant.  We have many, many examples in the courts where

6    you have a bunch of protesters holding hands around a tree

7    because they want to saw the tree down.  And the officers come

8    down and pepper spray them individually, not a mass tear gas.

9    That is a different circumstance, but individual pepper spray

10   on individual people who are imposing no imminent harm to the

11   officers.  That is excessive force.  So I hope that answered

12   that question.

13           THE COURT:  I think it does with respect to the

14   pepper spray.  I think I understand that point.

15           I guess, I am less clear about the tear gas.

16           MR. HERMANSEN:  Your Honor --

17           THE WITNESS:  To clarify, if I may, there is a

18   distinction in my mind between spraying an individual one an

19   one with pepper spray versus a mass tear gas device that is --

20   the fog is sprayed on many people.  I am not sure I was clear

21   on that.

22           THE COURT:  I have to say also, this is a little bit

23   of a struggle.  And it may be that I am going to have to just

24   decide some of this at trial.  Because it is a little hard for

25   me to know without -- like this is what I am talking about.

1   Here is the picture, Judge.  This is the picture I am talking
2   about this is what I think here.  Because, again, I don't
3   know, but I can imagine circumstances in which the police
4   officers are being assaulted brutally.  The only thing that is
5   protecting them is a bike rack.  They are trying to push the
6   bike rack forward to protect themselves as they are being
7   assaulted.  And there is somebody who is standing there and
8   saying, I am not moving, you can go to hell.  And that person,
9   because they are not moving is preventing the police officers
10  from protecting themselves by moving the bike rack.  On the
11  one theory, I can imagine a world in which you say the person
12  is like the person standing around the tree.  They are just
13  standing there holding hands not doing anything.  On the other
14  hand, they may be directly endangering the lives of those
15  police officers by refusing to leave in response to a direct
16  command.  And they do so where the officers need them to leave
17  in order to move the bike rack in order to protect themselves.

18          I don't offer that to say that is actually any
19  particular fact in this case.  I am just raising that to say it
20  is very hard for me to evaluate this without saying, here is
21  the picture I am talking about, Judge, and this is what I
22  think.  And this is what I think that Mr. Wise may have seen,
23  because he was very close to this area.  Here is what was going
24  on.  And if you look at this, this is, in my view, excessive
25  force, that if he saw it, would have triggered the response

1    that some other expert may testify about.

2          MR. HERMANSEN:  Your Honor, just to -- so that we

3    can focus on what trial is going to look like, these examples

4    that are under opinion number 1 are to support his opinion

5    that an officer could reasonably view it as excessive force.

6    We are not going to play these for the jury.  I mean, his --

7    any videos that we play will be few.  And so, I mean, it would

8    be -- yeah.  So we are going to play the ones that are

9    relevant to this case that would show that it is likely that

10   Mr. Wise viewed excessive force.  And the original opinion was

11   that Mr. Wise would reasonably conclude that he viewed it as

12   excessive force.  And we have pared that opinion down to be a

13   reasonable officer viewing these events would reasonably

14   conclude that it is excessive force.

15         THE COURT:  But these events -- Mr. Hermansen, these

16   events are the ones that you are going to play for the jury?

17         MR. HERMANSEN:  No, we are not.  Like I -- no, we

18   have disclosed to the government our exhibits.  So they know

19   what exhibits we are going to rely on.

20         THE COURT:  Yeah.  So that is hard for me to

21   evaluate whether it is a reasonable expert opinion to say that

22   I have looked at this video and I think that there was

23   excessive force here that a reasonable officer would have

24   viewed as excessive force.  But I -- I am going to tell you

25   that in the abstract and I am not going to point to anything

CROSS-EXAMINATION OF DR. RYLANT

1    in particular to do that.  That is challenging for me to

2    evaluate.

3              MR. HERMANSEN:  So I guess just to clarify, so

4    these -- there is a lot of videos in here that he viewed.  And

5    he is giving his opinion -- he has listed those as support for

6    his ultimate opinion.  Trial will be his ultimate opinion

7    backed by specific videos that go to Mr. Wise's -- or what

8    Mr. Wise would have seen and experienced and whether or not a

9    reasonable officer could view those as excessive force.  So we

10   don't plan on having Dr. Rylant on the stand for a day or two.

11   We want to have very short streamlined expert opinion that

12   focuses on what is relevant to this case and our defense in

13   this case.

14             THE COURT:  Yeah.  Well, I won't get involved in

15   deciding or dictating sort of what you decide to put on or not

16   put on except to the extent there are evidentiary limitations

17   on that.  I am just making the point that from my perspective

18   of deciding whether this opinion is an opinion that satisfies

19   Rule 702, I may need to look at each of those videos myself

20   then and need the help of knowing something from you all

21   about, okay, where was this?  Where was Mr. Wise at this time?

22   What is the relationship?  What is the point you are trying to

23   make with this particular video.  And, you know, I can go look

24   at these videos, assuming I have them all and figure this out.

25   But it is a little hard for me -- if the testimony is just

1    going to be, I looked at a lot of video that day.  And I

2    looked at video that I think was probably in the same area

3    where Mr. Wise was and I saw excessive force there, that is

4    challenging to evaluate whether that is an appropriate expert

5    opinion or not.

6            MR. HERMANSEN:  Well, he is not opining that what

7    the officers did was wrong just that it could be viewed that

8    way.

9            THE COURT:  Fair enough.  Same point though.

10           MR. HERMANSEN:  I mean, it seems, Your Honor, to go

11   to the weight of the evidence.  And that cross-examination

12   could bring out whether or not the videos are relevant or 403

13   objections at the time.  I mean, Dr. Rylant has -- is clearly

14   qualified as the use of force expert and has testified as one

15   many times.  And so he -- so his opinions are his.  And courts

16   don't -- I believe that for *Daubert*, courts don't have to

17   agree with their opinion.  Because you can have a battle of

18   the experts.  And normally *Daubert* hearings is when you have a

19   battle of the experts.  And then they are -- so it is -- I

20   have -- it is a little weird to me --

21           THE COURT:  I need to know for 702 purposes whether

22   it is based on a sort of sound foundation and that it is an

23   appropriate expert opinion to draw from that.  And if I

24   don't -- I mean, as I said, I can go look at all of these

25   myself.  But I don't think I simply say -- I don't doubt that

1    he is knowledgeable about what constitutes excessive force.

2    But if I don't know what he was actually looking at and

3    drawing those conclusions, that that did constitute excessive

4    force, it may be that, you know, what he is looking at just

5    doesn't have a sound foundation to it.  I am not suggesting

6    that is the case.  But I have an obligation under 702 to make

7    that assessment and whether his opinion is based on the type

8    of data that a reasonable expert would rely upon in making

9    those types of judgments.

10           MR. HERMANSEN:  So I agree whether he is viewing

11   videos is a reasonable data for him to rely on for something

12   is part of 702.  But I would analogize what the Court is

13   considering is going to view those videos would be like a

14   judge saying, I am going to look at the X-rays and see if I

15   agree with the radiologist.  This is why we have experts.  We

16   rely -- courts have a role in making sure the expert is

17   qualified, but I don't think -- I would respectfully disagree

18   that the Court, even if, you know -- I think courts are

19   ill-equipped to be an expert on every single subject.

20           THE COURT:  This is one where courts are -- I'm

21   sorry, Mr. Hermansen.  This is one where courts are uniquely

22   qualified to be experts.  Because as your own expert testified

23   the standard that he applies is the standard that courts apply

24   as to what constitutes excessive force.  So I don't think --

25   this is not a case in which you are asking me to be a DNA

1    expert.

2           But in any event, even putting that aside for 403

3    purposes, I am not going to allow it without knowing whether,

4    for example, the video was anywhere near where Mr. Wise was or

5    whether looking at the video it actually supports the argument

6    in any way.  Even putting aside 702, under 403, I don't see how

7    I could do that.

8           MR. HERMANSEN:  Right.  And I am representing to the

9    Court that we are only going to play videos that --

10          THE COURT:  Fine.  We are talking past each other.

11   I will make my decision.  You have made your argument.  Go

12   ahead.  Move on.

13          MR. HERMANSEN:  And we --

14          THE COURT:  You are not listening to me at all.

15          MR. HERMANSEN:  I hear that the Court -- we are

16   happy to give you any videos the Court wants to review, Your

17   Honor.

18          THE COURT:  Your choice is that or I exclude the

19   evidence, so that is the choice.  Because I think under 403 I

20   told you already, I can't make the judgment as to whether his

21   opinion is an appropriate opinion even under 403 purposes much

22   less 702 without knowing what he is relying upon.  He could be

23   looking at video for all I know from the other side of the

24   building on a different day.  I just don't know.  I have to

25   see the video to know whether it has anything to do with this

1    case.  It would be completely prejudicial for him to be

2    relying on and asking the jury to draw an inference that

3    Mr. Wise saw some assault where it was nowhere near where

4    Mr. Wise was or if it wasn't an assault.

5                MR. HERMANSEN:  We will provide the videos to the

6    Court.

7                THE COURT:  Okay.

8                MS. FONTAN:  Your Honor, if it is helpful, I do have

9    the video pulled -- at least one of the videos pulled up.  I

10   do think though the missing piece is that we don't know where

11   Mr. Wise is throughout the -- throughout the entire duration

12   of this time period.  So I don't know if it would be helpful

13   to wait to watch the video until the defense maybe proffers if

14   there was a more exact location or -- we can proceed how the

15   Court would like to proceed with that.

16               THE COURT:  If there is video you want to offer,

17   that would be fine.  It would be helpful as I have indicated

18   what it is we are talking about, because I don't know what the

19   opinion is based on because I haven't seen any of the video.

20               MR. HERMANSEN:  So, Your Honor, I am happy to show

21   the videos right now.  I am ready if the Court would like to

22   turn to them now.

23               THE COURT:  That would be fine.

24               MR. HERMANSEN:  Okay.  Let me go to -- so I am going

25   to try to share my screen.  Am I sharing my screen?

 1              THE COURT:  Yes.

 2              THE WITNESS:  Yes.

 3              MR. HERMANSEN:  So --

 4              MS. FONTAN:  Mr. Hermansen, before you play this,

 5    which video is this?

 6              MR. HERMANSEN:  It is 1:35 p.m.  It is the west

 7    front.  It will say on some slide.

 8              (Video played.)

 9              MR. HERMANSEN:  So this is not -- this is a work in

10    progress, so this is only at 1:35.  So that.

11              THE COURT:  What is your best estimate of where

12    Mr. Wise was at 1:35?

13              MR. HERMANSEN:  We have later video that shows he is

14    in that area.

15              THE COURT:  Later in what -- 10 minutes later or two

16    hours later?

17              MR. HERMANSEN:  I mean, at that time, at that time.

18              THE COURT:  Later, you mean you are going to show me

19    later.  Okay.

20              MR. HERMANSEN:  Correct.  And then the next key time

21    is -- does the Court want to see that?  So the LRAD is the

22    device that is supposed to tell everyone to leave.  So we have

23    on -- videos on those that show it is not very loud and they

24    actually turn it down.  As far as the -- let me go to this.

25    Now I will go to 4:20 on the upper west terrace.

DIRECT EXAMINATION CONTINUED OF MR. RYLANT

1          (Video played.)

2          MR. HERMANSEN:  See also, Your Honor, we have -- we

3    are working through stipulations with the government.  We have

4    a proposed stipulation that shows -- the phone records for

5    Mr. Wise's phone show that he would have been around the upper

6    west terrace at 1:35.

7          THE COURT:  At 1:35.  Okay.  But that was -- the

8    video wasn't -- the 1:35 video was from the west front, it

9    wasn't on the upper terrace, was it?

10         MR. HERMANSEN:  I misspoke.  He was on the -- yeah,

11   west front.  So it is cell site phone records, so, you know,

12   they are only as accurate as they are, but they do put him on

13   the west side.

14         THE COURT:  Okay.

15         (Video played.)

16              DIRECT EXAMINATION CONTINUED

17   BY MR. HERMANSEN:

18   Q.   So, Dr. Rylant, why is that relevant?

19   A.   The video, the specific video; is that what you mean?

20   Q.   Yeah.  Where they are asking how to get down?

21   A.   Yeah, they are not clear on where the exit is.  And some

22   of the people are actually seeking guidance from the officers

23   and they seem to be complying with the directions to the best

24   of their ability.

25         THE COURT:  I have to say I am not at all convinced

1    that is relevant in this case, absent any indication it had

2    some effect on Mr. Wise himself.  There were probably hundreds

3    of thousands of conversations that took place that day, unless

4    there is some reason to believe that he saw it or heard it in

5    some way that affected his behavior or his state of mind, I

6    can't see how that would be relevant.

7              THE WITNESS:  Mr. Hermansen, maybe I missed

8    something.  There is a second piece of this video where the

9    guy in this video is later pepper sprayed.  Is that the next

10   video, if I remember, the guy in the orange jacket?

11             MR. HERMANSEN:  Yes.

12             (Video played.)

13   BY MR. HERMANSEN:

14   Q.   I don't know if you were able to see that.

15   A.   Are you asking me, Mr. Hermansen?

16   Q.   Yeah, is that the pepper spray you were talking about?

17   A.   My screen is frozen.  But my memory is that this is when

18   that individual in the rust-colored jacket gets sprayed.  And

19   he -- depending on perspective, he is either compliant or

20   passive noncompliant.  He is sprayed in the face.

21   Q.   Okay.  Let me --

22   A.   Am I the only one that the screen is frozen.

23   Q.   No.  I think user error.  Let me try this.

24        Did that work?

25   A.   Yes.  So that is why I am saying, it could be interpreted

1   that he is passive noncompliant or compliant depending on

2   perspective.  But either way, he is sprayed but he made no

3   active or assaultive resistance towards the officer in that

4   specific example that I could see.

5              THE COURT:  So can you back that up so I can see

6   that again?

7              (Video played.)

8              MR. HERMANSEN:  So, Your Honor, although we are

9   doing our best to pick videos that, you know, would show what

10  Jared Wise saw, he was there from 1:35 to, you know, 2:35,

11  3:35, 4:35.  So he was there like three hours.  And these --

12  as we all know, these events are taking place all over the

13  place.  Protesters and people are being bored hanging around,

14  other ones are being idiots and assaulting officers.  There is

15  a lot going on.  And so these are just representative of what

16  he would see.

17             But we specifically picked ones where Mr. Wise was.

18             And then I think every -- I don't have -- I mean, we

19  are trying to get prepared for trial, so I do have those slides

20  available.  But there is also the slide -- I don't know if Your

21  Honor has seen the video of the -- where Mr. Wise is standing

22  and there is overhead strikes at 4:22.

23             THE COURT:  If I have seen it, I don't recall.  It

24  is possible I saw it.  I don't recall as I sit here now.  If

25  you point me to it or send it to chambers, I can look at it in

CROSS-EXAMINATION CONTINUED OF DR. RYLANT

1     chambers.

2          MR. HERMANSEN:  Okay.

3          THE COURT:  All right.  I think we interrupted

4     Ms. Fontan, who was asking questions.  So do you want to

5     continue if there is something else you want to ask about?

6          MS. FONTAN:  Yes, Your Honor.

7                    CROSS-EXAMINATION CONTINUED

8     BY MS. FONTAN:

9     Q.   Okay.  Dr. Rylant, we'll back up a little bit.  So we

10    talked a little bit about how -- what a reasonable former law

11    enforcement officer depends on their training.  Is that

12    accurate?

13    A.   Is your -- repeat the question, please.  I want to make

14    sure I understand it.

15    Q.   Okay.  So whether an -- a former experienced law

16    enforcement officer perceives something as excessive force,

17    that is dependent on their policies and how they were trained.

18    Is that accurate?

19    A.   Their perception would be influenced based on their past

20    training and experience, yes.

21    Q.   Okay.  And you also said experience.  So would a former

22    experienced law enforcement officer that maybe worked civil

23    disturbance have a different perspective of what excessive

24    force is maybe than a different officer who was trained in a

25    different area?

CROSS-EXAMINATION CONTINUED OF DR. RYLANT

1  A.    That is a broad question.  So I will give a broad, no.  I

2  mean, the level of force that can be used on an individual is

3  dependent on their level of resistance.  That is pretty

4  consistent.

5  Q.    Even when working in a crowd?

6  A.    Right.  I mean, I have given some examples of a passive

7  noncompliant person.  You can't shoot a passive noncompliant

8  person, whether you worked in downtown South Central LA or you

9  worked a protest situation in Berkeley.  They are pretty

10  consistent rules.

11  Q.    Sure.  So I am trying to figure out, for instance, if I am

12  a former experienced law enforcement officer and I worked all

13  of these years in CDU training in Washington, DC at the

14  Capitol, would their perspective, in your opinion, be different

15  about what improper or excessive force is compared to another

16  officer in a different city or a different -- with a different

17  background?

18  A.    Well, I kind of answered this earlier.  Tactics change,

19  the laws change, policies change.  So perhaps it would be

20  different depending on when and what you learned and what the

21  case law was at the time.

22  Q.    Sure.  Okay.  And does it matter how -- we keep talking

23  about these former law enforcement officers.  Does it matter

24  how much that former law enforcement officer remembers their

25  training after they are no longer an officer?

1   A.    Again, you are asking a very broad question, so it could

2   and it could not as well.  Like, as an example, there is a

3   photo of a guy whose face is shot.  In the middle of his cheek

4   there is a projectile sticking out of his face.  And I think

5   regardless of when and where you were trained, you would not

6   think that was reasonable in general, in general.

7   Q.    In any circumstance, it wouldn't be reasonable?

8   A.    No.  That is why I said in general.  No, you would

9   generally perceive that to be unreasonable.  But back to the

10  footnote that you brought earlier, I didn't investigate these

11  cases.  I don't have all of the facts so I am not here to

12  determine whether something was reasonable or not.  I am saying

13  a projectile to somebody's face at a protest scene, it could be

14  reasonably interpreted that it was excessive, but I am not

15  definitively saying that it was.  That individual could have

16  bent down and tied his shoe when he happened to get shot.  But

17  when he stood up, someone else could look at a projectile at

18  the side of his face and say, wow, that looks excessive.

19  Q.    Okay.  Dr. Rylant, I do want to move on to your third

20  opinion now related to auditory exclusion.  So -- and I guess I

21  will go back to this, to the opinion.  So it is opinion 3 in

22  your October opinion, which is that under the emotional stress

23  and cognitive load caused by the chaos of the protest at the US

24  Capitol building, auditory exclusion would be a normal human

25  response that should be expected due to unconscious cognitive

```
 1    impact of selective attention.  And I know Mr. Hermansen asked
 2    you to explain a little bit about what that meant.  But first I
 3    just want to ask, did you use a particular methodology or rely
 4    on any peer-reviewed articles to come to this conclusion?
 5    A.    Yes.
 6    Q.    What were those?
 7    A.    I cited them in my report.  Would you like me to look at
 8    my report?
 9    Q.    Yeah.  Sure.  And I see like the -- I guess the list of
10    all of the citations.  I wasn't sure if there were a particular
11    study or methodology that you used particular to opinion 3.
12    A.    If you give me a minute, let me look at my report.
13    Q.    Of course.
14    A.    So on page 6 under the section selective attention, I have
15    footnote number 7, footnote number 8, footnote number 9, 10,
16    and 11.  And all of these cite peer-reviewed research on the
17    concept of selective attention.
18    Q.    Okay.  I want to go through a few of these.  So the first
19    one is this article -- I guess this study by Shomstein and
20    Yantis that you relied upon.  Just so I understand this was not
21    a study done on law enforcement; correct?
22    A.    I don't have all of those memorized.  So you probably know
23    better than me, because you are looking at them.  I am not
24    looking at the study.
25    Q.    Sure.  Sure.  From your recollection then, in the studies
```

1    did any of them involve law enforcement?

2    A.    I frequently reference both law enforcement studies and

3    some that don't.  But please understand, all human beings are

4    law enforcement.  So all the non-law enforcement specific

5    studies are relevant to all human beings.

6    Q.    Okay.  Wait, I just want to make sure I understand what

7    you meant by that.  So you said all human beings are law

8    enforcement?  Is that what you said?

9    A.    No, the opposite.  Contrary to what some people believe,

10   all cops are human beings.

11   Q.    I understand.  I'm sorry.  I misheard, which is why I

12   wanted to clarify.

13        And do any of these studies that you cited to pertain to

14   situations like a protest or a riot?

15   A.    Do -- your questions are any of those studies specific to

16   protests?

17   Q.    Correct.

18   A.    No.  They are specific to how human beings behave.  And

19   particularly most -- many of those studies are how they behave

20   under stress.  So a protest situation involves human beings who

21   are often under stressful circumstances.

22   Q.    Okay.  And I just want to clarify, in your opinion, again,

23   opinion 3, it states -- you bring up emotional stress and

24   cognitive load.  What does that mean?

25   A.    Emotional stress, there is kind of two stressors that we

CROSS-EXAMINATION CONTINUED OF DR. RYLANT

1    experience, one being physical stress, i.e. exercise, physical

2    activity, which will increase the heart rate, change the

3    physiology of the body.  And emotional stress has some of the

4    similar changes, so we will notice in exercise or physical

5    stress, increased respiration, increased heart rate.  We'll see

6    the same thing in an emotional stress, so somebody about to

7    enter a stressful situation, heart rate elevates, maybe

8    respiration increases, et cetera, as examples.  But those are

9    caused by two different mechanisms.  One is by an emotional

10   fear or stress.  The other is based on physical activity.

11   Q.   And what do you use in this case, because you said it is

12   caused by the chaos of the protest at the US Capitol building.

13   Is there a particular measure that you use to, I guess, measure

14   emotional stress and cognitive load?

15   A.   There is no measure that you can do afterwards.  Like I

16   can't watch a video, I can't do a test on an individual to

17   determine what level of stress they experienced hours, days,

18   weeks in the past.  It just doesn't exist with modern

19   technology.

20   Q.   So I guess -- so in the video footage I know we have

21   talked pretty broad time periods of the video footage that you

22   watched from January 6.  In your opinion, what times were

23   individual -- or could individuals experience auditory

24   exclusion?

25   A.   Well, there is two pieces of this.  The one is the common

CROSS-EXAMINATION CONTINUED OF DR. RYLANT

1    sense one that we all understand.  Whenever there is a crowd

2    with lots of noise, we are just not going to hear everything

3    just because there is too much to hear.  One noise will

4    overwhelm or override another sound.  But from the

5    psychological point of view, it can be during a calm situation,

6    the cocktail party example I gave earlier.  But all of these

7    things are heightened or amplified during stress i.e. when

8    there is a fight or flight response.  So whenever you are in a

9    protest situation where things become hostile, every individual

10   in there, in that situation is going to experience a fight or

11   flight response, which is going to trigger some sort of

12   auditory exclusion in most instances.  So we can expect

13   psychologically that any individual under stress is likely to

14   experience auditory exclusion.  And I am talking about the

15   protesters involved, the protests who were actually involved in

16   some sort of physical altercation, the officers involved in the

17   physical altercation and perhaps somebody watching who is also

18   experiencing emotional response.  All of them have a high

19   likelihood of having some sort of auditory exclusion.

20   Q.   Are there -- are there any studies or -- I know focus

21   groups or anything that say -- or that you relied on to show

22   that in a protest scenario that that flight or fight -- or

23   fight or flight response is triggered?

24   A.   I kind of answered already.  I don't recall of any

25   specific studies that have to do specifically with protest at a

1    capitol building.  But all of the studies that I have
2    researched and in addition to my own personal lived
3    experiences.  So there is the experience of the protest but
4    each individual was having their own individual experience,
5    which is going to be true whether you are at a one-on-one fight
6    or you are at a protest or a gang fight.  These are human
7    beings involved with other human beings and stress.  So whether
8    a study was taken during a riot, which is practically
9    impossible -- in order to be a peer-reviewed study, it has to
10   be a safe laboratory environment.  So you can't create a riot
11   inside a school campus while studying these things.  But what
12   they do is try to create scenarios that mimic them, to some
13   degree and that is with lab experiments.  And then the other
14   kind of study is where you do surveys of people after.  So
15   those types of research are done with -- often with officers
16   who have been in shootings and so forth.  So they do the best
17   they can with the technology we have with current scientific
18   studies.  But it is never -- there is never going to be a study
19   that exactly mimics this scenario.
20   Q.   And you said it is partly because this is such an
21   individual experience of what you can or can't hear?  Does --
22   is that accurate?
23   A.   Well, what we do -- what we know with science is
24   generalities, what generally happens, but there is always
25   outliers.  And so to some degree, it is individual.  But,

CROSS-EXAMINATION CONTINUED OF DR. RYLANT

1    largely, all human beings have these psychological responses,

2    but we don't know to what degree an individual will because it

3    is always some what, as you say, individualized.

4              THE COURT:  Ms. Fontan, how much more time are you

5    going to need?  If you can finish up in the next 5 minutes or

6    so, I think we can go through it.

7              MS. FONTAN:  I have probably three to five more

8    questions, Your Honor.

9              THE COURT:  Okay.  Great.

10             MS. FONTAN:  Your Honor, may I just have a quick

11   moment?

12             THE COURT:  Yes.

13             (Pause.)

14   BY MS. FONTAN:

15   Q.    Apologies, Dr. Rylant.  I just have a couple more

16   questions related to -- a couple of questions related to your

17   background.  Was part of your getting your degree -- did you

18   study at all auditory exclusion?

19   A.    Yes.

20   Q.    And when did you do that?

21   A.    When I did my degree.

22   Q.    Okay.  And in what -- I guess what capacity?  Can you tell

23   me a bit about that?

24   A.    Well, my doctorate degree is clinical psychology.  And I

25   specialized in the psychological and physiological aspects of

1    law enforcement, use of force decision making.  So my entire

2    research specialization was this -- is one aspect of that.

3    Q.   Okay.  And my understanding from reading the information

4    about your dissertation this was how officers react and engage

5    in use-of-force scenarios.  Is that accurate?

6    A.   It is -- it is more specific than on the psychological and

7    physiological responses during use of force situations.

8    Q.   Okay.  And just to -- so I -- just to be clear, your --

9    you don't have any degrees or education in audiology; correct?

10   A.   No.

11   Q.   And, Dr. Rylant, you -- I think you have given three

12   separate opinions or at least produced reports of three

13   separate reports.  And I know we talked about some changes to

14   that third report in October.  But I guess, my question is, do

15   you anticipate giving any other opinions in this case?

16   A.   As we have discussed, this keeps evolving at the current

17   moment.  My understanding is, I am presenting opinion 1 in a

18   limited function and then opinion 3, as is.

19             MS. FONTAN:  Okay.  Thank you, Dr. Rylant.  I

20   appreciate it.  I don't have any other questions, Your Honor.

21             THE COURT:  Okay.  Mr. Hermansen, anything else

22   before we finish up with this?

23             MR. HERMANSEN:  No, Your Honor.  We'll send you the

24   videos on a hard drive.  Is that okay?

25             THE COURT:  On a hard drive?  Yeah, you can do it

1   that way, I suppose.  You mean on a disk?

2              MR. HERMANSEN:  On an external hard drive because it

3   is going to be big, because they are videos.

4              THE COURT:  However you want to get it to me is

5   fine.

6              MR. HERMANSEN:  Okay.

7              THE COURT:  All right.  I will see you all back here

8   at 2:00 then.  And thank you, Dr. Rylant, for being here with

9   us today.

10             THE WITNESS:  When you say you, you don't need me

11  back at 2:00, Your Honor?

12             THE COURT:  No.  No.  Just the others, not you.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Okay.  Thank you.

15             (Recess taken at 12:55 p.m.)

16             THE COURTROOM DEPUTY:  Good morning, Your Honor.  We

17  are here on criminal case 23-184, United States of America

18  versus Jared Lane Wise.

19             Counsel, please state your name for the record,

20  starting with government counsel.

21             MS. FONTAN:  Hi.  This is Taylor Fontan for the

22  government as well as Sarah Rocha, as well as paralegal Taylor

23  Wilbert.  And our intern is still in the room with us, Rami

24  Kirio.

25             THE COURT:  All right.  Thank you.

1          MR. HERMANSEN:  Good afternoon, Your Honor.

2  Supervisory Assistant Federal Public Defender Kurt Hermansen

3  in Eugene, Oregon.

4          THE COURT:  All right.

5          MS. LEE:  And good afternoon, Your Honor.  Peyton

6  Lee, Assistant Federal Public Defender in Portland, Oregon.

7          THE COURT:  Thank you.  And Mr. Wise I will note for

8  the record is with us as well, all by Zoom at the parties'

9  request.

10         All right.  So I think we are now ready for the

11 *Daubert* hearing relating to Dr. Cohen's testimony.  And why

12 don't we proceed in the same way that we did the last time.

13 Mr. Hermansen or Ms. Lee, if you can tell me what it is that

14 the testimony is being offered to demonstrate that will help me

15 in focusing on the *Daubert* issues and any related issues, 403

16 issues.

17         MR. HERMANSEN:  Your Honor, we will be calling

18 Joshua Cohen from Fat Pencil Studio to testify about five

19 things that all relate to things -- basically as a video court

20 presentation expert.  He has helped us put together videos.

21 So the first video -- and those videos and the synchronization

22 of those videos, we believe support our defense.  So the first

23 one is -- the first of five is that the video evidence

24 indicates that Jared Wise was adjacent and likely witness to a

25 variety of use of force events by police.  Should I go through

1    all five, Your Honor?

2              THE COURT:  Yes, please.

3              MR. HERMANSEN:  The second group of videos that Fat

4    Pencil has helped us put together shows that -- well, actually

5    I take that back.  So the second opinion is that in the videos

6    that Fat Pencil Studio has been able to review, none of those

7    videos show law enforcement directly confronted by police or

8    behind posted barriers.  So we were not able to find any

9    videos that showed Mr. Wise directly confronting police unless

10   the saying, Nazi, Nazi, Nazi or Nazi, Gestapo would be

11   included in that.

12             THE COURT:  I'm sorry.  Mr. Hermansen, I don't know

13   if it is your mic, but it is very hard to hear you.  I only

14   got about half of what you just said.

15             MR. HERMANSEN:  How about now?

16             THE COURT:  Much better.

17             MR. HERMANSEN:  Yeah.  I think I had something -- I

18   guess I am using the microphone on my laptop and something was

19   blocking it.

20             THE COURT:  Okay.  But if you can repeat that last

21   sentence.

22             MR. HERMANSEN:  Yeah.  So the second opinion is a

23   negative, Your Honor.  And it is based on watching lots of

24   videos.  And that is that, none of the videos we were able to

25   provide to Fat Pencil showed Mr. Wise directly confronted by

1   police or defying posted barriers.

2          THE COURTROOM DEPUTY:  Your Honor, I'm sorry.

3   Before we go forward there is a Ben Grade investigator that is

4   also on the Zoom, I am not sure he was identified.

5          THE COURT:  Is there someone else for the record,

6   Mr. Hermansen?

7          MR. HERMANSEN:  Yes, Your Honor.

8          MR. GRADE:  Hi.  Ben Grade with the Federal Public

9   Defender Office, District of New Jersey.

10          MR. HERMANSEN:  No, Oregon.  You moved.

11          MR. GRADE:  Oh, I moved.  I'm sorry.  That is right.

12   That is my old office.  I am in Oregon now.  I'm sorry about

13   that.

14          THE COURT:  I was confused for a moment.  That helps

15   things.

16          MR. GRADE:  I'm sorry about that.

17          THE COURT:  All right.  I was looking for the New

18   Jersey element.  Thank you.

19          You can continue.

20          MR. HERMANSEN:  Yes, Your Honor.  The third, when

21   Jared Wise yelled, get 'em, kill 'em it is after two officers

22   fall to the ground having tripped over a planter box.  So the

23   videos that we synced there are at 16:22:16.  And so that is

24   the timing is that the yelling, kill 'em, get 'em, kill 'em is

25   after two officers fall to the ground having tripped over a

1    planter box at 16:22:16.  The fourth set of assistance that we

2    have received is that when Jared Wise or someone -- because at

3    this point, the video doesn't show his mouth.  But when Jared

4    Wise or someone is yelling, kill 'em, kill 'em at 16:22:38,

5    that is -- the videos will show that is after the use of

6    physical force, specifically overhead baton strikes of police

7    officers on the line of scrimmage.  And that is based on video

8    synchronization and video enhancement, which includes close

9    ups and slowing down the video and things of that nature so

10   the jury can clearly see what is happening at 16:22:38 to the

11   extent possible with videos.

12        The last component of Fat Pencil's assistance is that

13   they have put together a number of videos with body-worn camera

14   audio.  And those videos and the audio, when we play those for

15   the jury, we believe that it will show that protesters that

16   were fighting police probably never heard any words yelled from

17   the area occupied by Jared Wise on the video.  So those are the

18   five areas of assistance from Fat Pencil.

19        THE COURT:  And I think you probably are very

20   deliberately using the word assistance instead of expert

21   testimony.  What --

22        MR. HERMANSEN:  The reason --

23        THE COURT:  No.  But I think I know where you are

24   going.  What in here is expert testimony?  So I think putting

25   together two videos and synchronizing them time wise is

1    unlikely expert testimony, but testifying based on my

2    expertise in the auditory senses or sciences, I can say the

3    following, that is an expert opinion.  So I am curious what,

4    if anything, in here in your view is expert in nature versus

5    the sort of thing that frankly -- with no disrespect

6    intended -- that a paralegal could do in putting together

7    videos?

8            MR. HERMANSEN:  Yeah, I would definitely push back

9    against that.  And I will let Dr. Cohen speak to that.  A

10   paralegal cannot do what Fat Pencil does.  So Fat Pencil's

11   entire enterprise is focused on helping courts -- helping

12   attorneys, whether it is at a deposition or civil case or a

13   criminal case, putting together videos -- and this case is

14   similar -- is easier than some of their videos, because they

15   can do three dimensional reconstruction.  So we are not

16   dealing with super fancy reconstructions here.  But we are

17   dealing with years and years of expertise, since 2004 in

18   synchronizing videos, which I have learned from our paralegals

19   is not -- it is not an easy thing to do.  So it is -- so under

20   *Kumho*, that experience --

21           THE COURT:  So I didn't mean to offend anybody or

22   suggest a lack of experience, but I guess my question still

23   stands though, because even if it takes years of experience to

24   do something doesn't necessarily mean the testimony is expert

25   testimony.  So I guess I am just curious.  If you think it is

1    all expert testimony, that is fine and I will consider it in

2    that way.  But if you think that actually it is not actually

3    calling for an opinion -- an expert opinion, that is another

4    matter.

5              MR. HERMANSEN:  So I would say it is -- we erred on

6    the side of caution, in an abundance of caution in giving

7    expert notice, because they have so many years of experience

8    putting this together.  And then I did notice in reviewing

9    some transcripts from prior trials that the government just

10   calls someone and says, we did a mash up.  So I like -- so our

11   goal is to present the jurors with the most reliable

12   information.  And as a juror, I would want to know, is this

13   guy really qualified to synchronize these together.  How do

14   you know this is reliable?  So that is our aim, Your Honor, is

15   to put -- is to have someone who does this for a living

16   testify about how that is -- how those videos are

17   synchronized.

18             THE COURT:  Well, so that is fair enough.  I am

19   still struggling a little bit with portions of this that may

20   still be opinion in nature versus excellent technical skills

21   in putting together.  So, for example, it just strikes me

22   there is a major difference between testimony that says, I put

23   these videos together and synchronized the timing on this in a

24   way that, you know, I can now play for you.  And you can hear

25   him say, kill 'em at X time.  And then if you look at the

DIRECT EXAMINATION OF MR. COHEN                    69

```
1    other video here, you can see that before that time, the

2    police officers fall over the planter and look at the time up

3    here.  That strikes me as questionable as to whether that is

4    expert testimony or not versus testimony that, for example,

5    that Mr. Wise likely witnessed the use of force, which does

6    sound like an opinion versus someone who has just performed a

7    technical task, even if it is a complicated one.

8              MR. HERMANSEN:  Correct.  So he doesn't -- I don't

9    think it will be necessary -- I don't think it will be

10   necessary for Joshua Cohen on the stand to say, and see there,

11   Jared Wise is viewing excessive force.  He is viewing the

12   overhead strikes.  That video specifically will speak for

13   itself.

14             THE COURT:  Okay.

15             MR. HERMANSEN:  Again, those five -- I wanted the

16   government and the Court to have a clear blueprint of the

17   relevance of -- you know, and we are basically showing our

18   entire hand.

19             THE COURT:  Okay.  You can proceed, then.

20                        DIRECT EXAMINATION

21   BY MR. HERMANSEN:

22   Q.   So, Mr. Cohen, would you please describe your education?

23   A.   Yes, thank you.  I have an undergraduate degree in civil

24   engineering from Brown University.  And I achieved that in

25   1993.  And I also have a graduate degree in architecture,
```

1   master of architecture degree at the University of Oregon in

2   2003.  And some of the things that were done in those degrees

3   that are relevant to the work I do today.  In undergraduate, I

4   had a class on holography, which is basically like 3D

5   photography.  It includes coursework on optics, perspective.

6   Then in grad school for architecture, I had several perspective

7   drawing classes and just to work in -- the nature of the work

8   in general lends itself to understanding perspective.  And that

9   is a big part of my work today.

10            THE COURT:  What was your graduate degree?

11            THE WITNESS:  Master of architecture.

12            THE COURT:  Okay.  Thank you.

13   BY MR. HERMANSEN:

14   Q.   How long has Fat Pencil studio been in existence?

15   A.   I started the company in 2024.  And in the early years, we

16   primarily worked on projects related to real estate,

17   construction, energy and visualizing sites and transportation

18   planning, construction logistics, infrastructure.  We had our

19   first opportunity to work on a court case, which was an eminent

20   domain case in 2009.  And since that time, litigation related

21   projects have grown to be over 80 percent of our business.

22   Currently the company has nine people on staff.

23   Q.   So does this case that we are talking about here, are you

24   tapping into some of the 3D visualization or is it more video

25   analysis in this case?

1    A.    We do a lot of cases that include video visualization.    In

2    this case, we did not need to build a digital 3D model.    But

3    there is certainly an element of the work that related to

4    understanding 3-dimensional space.    And so for the purposes of

5    the testimony that we'll, I call it scene mapping, in other

6    words things that are seen in video, how can you put that onto

7    a map or a -- or a diagram to help the fact finders in the case

8    understand where things are happening and pull everything

9    together, understand the big picture.    So in this case, we

10   relied on an aerial photograph to provide an underlay to map

11   items onto.

12   Q.    How many -- approximately how many cases have you provided

13   that kind of analysis for?

14   A.    We have worked on sort of video and/or 3D modeling, scene

15   mapping well over 500 cases.

16   Q.    And how is your experience working on over 500 cases?    How

17   did that assist you in this case?

18   A.    I think that our techniques have been refined over time.

19   So, for example, the first time that we worked on synchronizing

20   video, I just hadn't had as much experience on what to look

21   for.    So we have gotten better and more efficient at it.    So we

22   know, for example, that the most reliable way to synchronize

23   video is to look for items that appear in more than one video

24   that are unique and can be timed very precisely, like, for

25   example, if somebody is walking, you can look at when they step

1    on a particular crack in the sidewalk.

2         And if you can see that from multiple perspectives, it

3    allows you to get a very reliable synchronization as compared

4    with, for example, just synching up the time stamps and

5    figuring you are done, because that is something that I have

6    learned over time, you know, the way that time stamps are

7    recorded on video is not necessarily precisely synchronized,

8    even if it is on the same camera system.  It may be close, but

9    not down to the individual 30th of a second.

10   Q.   So in this case, were the time stamps -- were all of the

11   time stamps perfect or was adjustment needed?

12   A.   There is never perfect.  That is not something that ever

13   occurs.  And, yeah, we did find situations where different

14   cameras -- the time stamps were slightly off from each other.

15   And when we synchronize the two videos such that items that

16   appear simultaneously were synchronized, we notice there was

17   some differential in the time stamp.

18   Q.   And in the 500 -- in the more than 500 cases you have

19   worked on, have you presented sworn testimony in any of those

20   cases?

21   A.   Yes.

22   Q.   About how many cases have you provided sworn testimony?

23   A.   About 30.

24   Q.   Could you generally describe the work you and your

25   testimony have performed in cases generally?

1    A.    Yeah.   The way that we talk to attorneys about what we do

2    is we are developing visual stories around the case.   And we

3    have a whole variety of tools and, you know, every case is

4    different.   So in some cases, we might primarily be working

5    with developing timeline, a visual timeline of events that

6    occurred.   Other times we might be mostly working on maps.   We

7    do a lot of work with video.   And that is both enhancing,

8    synchronizing and compiling video in a way that is going to

9    help, you know, a particular party be effective at pointing out

10   the important parts of their narrative that exists that are

11   available to be seen in that video.   And then we do quite a bit

12   of digital 3D modeling to reconstruct scenes, both criminal and

13   civil cases.

14   Q.    And have you trained others?

15   A.    Yes.   Like I said, we have nine people on staff now, eight

16   of those nine are designers.   And so I have trained all of

17   those people as well as some people that have worked with Fat

18   Pencil Studio in the past and have moved on to bigger and

19   better things.

20   Q.    Outside of Fat Pencil, have you participated in trainings

21   as a trainer?

22   A.    I am not sure I would use the word trainer because that

23   implies a particular type of engagement where people are paying

24   to specifically get trained by me.   But I will say that I

25   frequently look for opportunities and have had a number of

1   opportunities every year to speak at conferences.  So these are

2   conferences where people are coming and paying to be at the

3   conference.  And that ranges from sort of attorney conferences

4   and CLE events, as well as conferences about laser scanning and

5   conferences about 3D modeling.

6   Q.   Do the cases you work on often require that you depict

7   events in a real -- like a real world location?

8   A.   I would -- almost every case has some kind of scene

9   associated with it, some kind of a location, so, yes.

10  Q.   Have you previously testified -- in federal -- in state

11  court?

12  A.   In state court, yes.

13  Q.   In federal?

14  A.   Yes.

15  Q.   Can you tell us about the -- your video evidence symposium

16  training?

17  A.   So I think you are referring to a training that I attended

18  to learn more about video evidence; is that correct?

19  Q.   Yes, specifically iNPUT-ACE.

20  A.   Correct.

21  Q.   A video analysis software?

22  A.   No.  INPUT-ACE is a software that was developed, I think,

23  primarily to give law enforcement professionals more tools to

24  investigate, enhance and compile video.  We -- we didn't have

25  many opportunities to use iNPUT-ACE, but I did appreciate the

1    fact that they brought together on an annual basis a number of

2    experts in the field to have a training as a remote training.

3    And they I think had 10 sessions over the course of three or

4    four days.  So I went along with some of my staff to some of

5    the sessions where I felt like there was lot to learn from the

6    the speaker.  So I did that over the course of three years.

7    Q.    And would we know it as, Axon, A-X-O-N?  Did that -- is

8    that -- did they buy them?

9    A.    Yeah.  Axon is the company that makes body cams and I

10   think Tasers and a lot of other equipment that is used by law

11   enforcement professionals.  They did buy iNPUT-ACE a few years

12   ago.  So that is the current owner of that software.  And they

13   primarily are now marketing to large police agencies.

14   Q.    And did you go to trainings in 2020, 2021 and 2022?

15   A.    That sounds right, yes.

16   Q.    And have you presented on the topic of discovering visual

17   stories using visual evidence and 3D visualization to enhance

18   your theory of the case at the National Police Accountability

19   Project?

20   A.    Yes.  That was in Atlanta, I believe.  And I have given a

21   similar presentation to that several times over the past few

22   years to -- that was for civil rights attorneys, but I have

23   also given that presentation to investigators, to paralegals,

24   to juvenile law practitioners and to, you know -- you know,

25   just to general attorney audience.

DIRECT EXAMINATION OF MR. COHEN

1    Q.    What is the SketchUp 3D base camp conference?

2    A.    The program, SketchUp, is published by a company called

3    Trimble.  And it is the most widely used 3D modeling software

4    in the world in terms of number of individual activations.  It

5    is a tool that we use for 3D visualization as a first step in

6    any case.  So we have used it for a long time.  That

7    conference, 3D base camp, is something they put on every two

8    years.  And I have been going to that for 10 years and speaking

9    at that since 2013.  So there is actually one coming up next

10   week in Las Vegas.  And I am going to be presenting twice on

11   the topic of creating crime scenes and doing forensic

12   investigations using SketchUp as a tool.

13   Q.    Have you also presented on the topic of demonstrative

14   evidence in 2020 through 2023 here in Oregon?

15   A.    Yeah.  That is a trial skills college that is run by the

16   Oregon Criminal Defense Lawyers Organization.  They get about

17   30 or so mostly early career attorneys.  And they train them on

18   a whole range of trial skills.  They have got a great faculty.

19   And I have been training on the topic of demonstrative evidence

20   for that cohort and for a cohort each year for the past 5

21   years.

22   Q.    And did you attend the 29th Annual Association for

23   Criminal Reconstruction Conference in Nashville, Tennessee?

24   A.    Yes.

25   Q.    In 20 --

1          And then I think in Portland, can you tell us about the

2     Police Bureau?

3     A.    Yeah.  This is going a ways back now.  But I did organize

4     and present at a short symposium at the Police Bureau office in

5     Portland, Oregon.  That included criminalists on the Police

6     Bureau staff as well as some attorneys from the Multnomah

7     County District Attorney's Office, talking about different

8     tools that are available for 3D visualization of crime scenes.

9     Q.    So if someone is just watching a video, is all of the

10    important relevant information going to be readily apparent

11    during the initial viewing?

12    A.    Okay.  Different topic.  My experience is that in office,

13    we often watch videos dozens or even hundreds of times and

14    there can be new things that come out on the later end.  So the

15    answer is, no, it would be unusual to be able to watch a video

16    and just know everything you need to know after the first

17    watching.

18    Q.    For example, if you had what I will call a scrum or line

19    of scrimmage and you have multiple people on each side and a

20    lot of things going on, would -- how could your -- how could

21    what you do for a living assist the trier of fact at trial in

22    reviewing that kind of video?

23    A.    You know, for any case that we work on, some of the first

24    things we are going to want to do is understand, you know, what

25    do we know about the reliability of the video?  What are the --

1    what is the resolution and frame rate?  And then how many video

2    angles do we have?  If there is more than one camera, can we

3    synchronize them?  Because oftentimes you can learn quite a bit

4    more by being able to watch two synchronized views, maybe

5    something is obscured briefly in one view by an officer's arm

6    or shield.  But in the other view, you can gain information

7    about what was happening during that time.  And then, just the

8    ability to slow things down to, you know, try to, you know,

9    zoom in to particular areas of interest to adjust brightness

10   and contrast, all of those things can really help us learn more

11   about what is in -- what is available to learn from the video.

12       And then it is a matter of putting together a compilation

13   so that the trier of fact who wouldn't necessarily have the

14   luxury or the tools to be able to do that lengthy investigation

15   will be able to understand those issue -- those key bits of

16   narrative the first time they see them.

17   Q.   What does video enhancement mean and include and how is

18   that done?

19   A.   So I touched on that a little just now.  But it is a

20   process that we use to enhance what is able to be seen in a

21   video in several ways.  One would be adjusting the brightness

22   and contrast.  So the things that might be in a dark area of

23   the video, to the extent that there are details in the camera,

24   we could bring it into the midrange of tones where it is more

25   easily seen.  And another thing would be changing the

1    magnification or zoom level to see one small part of a video

2    larger.  Again, we are not able to magically invent details

3    that were not captured by the camera.  But sometimes making

4    them larger on the screen does make it easier for the viewer to

5    understand what they are saying.

6         And then, finally, because things often happen very

7    quickly in video, being able to slow down or pause at a

8    specific moment and look at something carefully frame by frame

9    can make a huge difference in understanding what is available

10   to be seen in the video.  So those are things we do most often

11   for our enhancement.  And they all are in the category of

12   things that don't change the sort of the nature of the events

13   that is happening in the video.  It just allows us to be

14   clearer on what the video is telling us.

15   Q.   So we have talked about video enhancement and focusing on

16   what is important for the case.  Can you contrast that with

17   video manipulation or deep fake?

18   A.   Right.  I mean, the word manipulation is one that carries

19   with it a bias.  I think manipulation is generally understood

20   to be activity where you make changes with the intent to

21   deceive.  And the word deep fake is sometimes used in

22   connection with videos that are created to be deceptive.  So we

23   don't do that work.  I find it to be unethical, so I would

24   never use the word manipulation in relation to work that we

25   were doing in a case.

DIRECT EXAMINATION OF MR. COHEN                    80

1    Q.    Can you now explain video synchronization and what that

2    entails and how that is helpful?

3    A.    Yeah.  So synchronizing video would be, you know, making

4    two or more camera sources that are happening in the same time

5    period and then looking at those sources frame by frame to

6    identify points that would allow us to reliably synchronize it,

7    so that when you play those two videos together side by side

8    you know that something you are seeing in one camera and

9    something you are seeing in a different camera are both

10   happening at the same time.  And so that would be looking for

11   landmarks that are, you know, unique and identifiable in both

12   videos and then trying to line up the reference points that we

13   see to be able to play those at the same time.

14   Q.    So in this case, in particular, were you able to

15   synchronize videos that also had body-worn camera audio?

16   A.    Yes.  That's another thing we have used in the past as a

17   way to synchronize things, if you hear someone chanting USA,

18   USA, you know, there is a -- if you are very close in time and

19   you are able to line up exactly when those things start, that

20   is another tool we could use absent other or in conjunction

21   with visual cues.  I find that the visual cues are generally

22   the most reliable.  But the audio can also give us information

23   to verify that we have got things correct.

24   Q.    You also helped us with scene mapping to help us try to

25   approximate how far Jared Wise was, how tall a wall that he is

1    standing at is and how big a planter is and other important

2    landmarks in the area of the upper west terrace in a very

3    isolated area -- well, a specific area of the upper west

4    terrace at 4:22:16 and 4:22:58 and a little bit after then.

5         Would it be helpful if the -- if everyone was to agree on

6    what those measurements are, would that make it -- your --

7    would it be helpful to know that information?

8    A.    I mean, yes and no.  I think when -- in the earliest part

9    of our work in the case when we hadn't yet had an opportunity

10   to develop the map diagram and finish the synchronization, one

11   of the questions that came up was what are the general

12   dimensions of this area and how far away were the protestors

13   from the area where Mr. Wise was standing?  We do have the

14   ability through use of aerial photographs that can be reliably

15   measured down to a precision of plus or minus 6 inches to

16   collect those measurements.  And that is a part of the scene

17   mapping work that we were doing.  But in the end, I think a

18   more effective way to explain these issues to a fact finder is

19   to just look at the resulting map and the locations of the

20   different cameras that were investigated and just see sort of

21   where they fall on this map.  And so, you know, it is less of

22   an issue trying to like argue about measurements and the exact

23   specificity of those measurements.  And more of like once you

24   have the map and you understand that it is reliable, that

25   becomes an easier way to make a finding of fact.

1    So we can talk about the measurements, but I would say

2    that -- and I would be happy to talk about the level of

3    precision.  But my guess is that is not going to be the

4    deciding factor for a fact finder in this case.

5    Q.   So how did you -- so what is scene mapping?  Is that what

6    you used to do approximate measurements, since you are not

7    allowed to measure?

8    A.   So I have not -- so my understanding is we were not

9    allowed to collect measurements on site like with a tape

10   measure.  I can explain how we did collect measurements that

11   were used in the report that was submitted back in June.  And

12   to the extent those measurements are things we would present in

13   testimony, I will explain how we got those.  And that is one

14   part of scene mapping is we can collect these measurements.

15   But I think the other part that is equally important is being

16   able to identify things that are happening in the video and

17   show them on a map, so that people can understand the big

18   picture.  Because I am just going to pause here.  Is everyone

19   able to hear me okay still?

20             THE COURT:  Yep.

21             MR. HERMANSEN:  Yes.

22             THE WITNESS:  Okay.  So you can watch a video.  And

23   in this case, there is hundreds of videos.  And it becomes

24   very difficult to remember what is in one video and the next

25   one and how it is all part of a big picture.  So having a

1    reliable map and being able to identify where people were in

2    those videos and showing them on a map, becomes really

3    important in terms of a fact finder being able to understand

4    the big picture and being able to make a decision confidently

5    that they have got those facts understood correctly.  So that

6    is another part of scene mapping.  So taking what we see in

7    the videos, putting them on the map in a reliable way and

8    presenting that to the fact finder to help them in their

9    decision.

10   BY MR. HERMANSEN:

11   Q.   Well, it sounds like it would be a lot of testimony about

12   scene mapping and why it is reliable.  And I am kind of lost.

13   So if you did have the measurements, it would be more

14   efficient; is that right?

15   A.   To the extent that people want to talk about the

16   measurements and it is important, I think it is reasonable to

17   want to know how we collected them.  So for sure, I am prepared

18   to offer testimony about that.  I guess what I want to just

19   make sure is clear to the Court is that this is not a situation

20   where we went out and collected some measurements and then

21   applied some kind of formula and, therefore, we spit out an

22   answer.  It is not about that at all.  It is about being able

23   to look at what is in the videos and map it in a reliable way,

24   which, you know, in some cases just like, okay, we can see

25   there is a ramp and Mr. Wise is standing near that ramp.  And

1   we know where that ramp is based on this aerial photograph and,

2   therefore, we can place him on that map.  And so that is the

3   sort of thing where, yeah, we didn't go out and measure

4   Mr. Wise during the event or measure the ramp in person.  We

5   are doing this because we saw the video, we can reliably place

6   things that we see in the video into a bird's eye view of the

7   scene.  Does that make sense?

8   Q.   It makes sense.  And I am going to switch to auditory,

9   right.  So I guess what I am -- is a long way of getting at,

10  you are not being called as an expert to testify about people's

11  ability to hear; is that right?

12  A.   Yes, that is correct.

13  Q.   You don't have a background or training on -- or you are

14  not an audiologist, I think may be the word?

15  A.   I am not an audio expert, no.

16  Q.   Okay.  So if the jurors want to know -- let's

17  hypothetically assume that the jurors need to determine that

18  people who assaulted cops heard Jared Wise and were encouraged

19  by that.  So assuming that, the jurors are going to want to

20  know if they could hear.  So I know you are going to explain

21  how you estimated and came up with measurements, but if the

22  jurors were given reliable measurements that would beyond --

23  their ability to hear would be beyond anything that you would

24  testify to, other than presenting the Court with body-worn

25  camera videos that are synced?

1          That was a long question.  I hope it made sense.

2     A.    Here is the way I think makes the best way to respond to

3     that question.  We provided an opinion about whether it was

4     likely that a protester fighting the police at a particular

5     location on the upper west terrace would have been able to hear

6     Jared Wise or whoever was yelling these words down on the lower

7     terrace.  The opinion that we gave is not based on an audio

8     expertise for how far sound would travel and thereby depending

9     on the measurements -- the opinion is based on careful review

10    of all of the body-worn camera footage that we were provided

11    and identifying which cameras picked up those words and which

12    ones didn't.  And that is what we were -- we are presenting as

13    part of our findings.  And, you know, the scene mapping helps

14    bring all of that story together.  But it will be up to the

15    jurors to decide how to use that information.

16             THE COURT:  Can I ask a question about that?  Did

17    you in any way account for the sensitivity of the microphones?

18             THE WITNESS:  I think that is beyond my expertise.

19    I can listen to the video.  And I can tell you whether or not

20    the words are audible.

21             THE COURT:  Right.

22             THE WITNESS:  And that is something the jurors may

23    want to consider, but I would not be qualified to give an

24    opinion on -- an expert opinion on exactly how what a

25    microphone picked up compares to what a particular officer

1    heard through their ears.  And I would even go as far to say

2    it would be difficult for any expert to say, without

3    performing detailed hearing tests on each officer what they

4    could or could not have heard compared to the microphones.

5             THE COURT:  Thank you.

6             MR. HERMANSEN:  Your Honor, I will tender the

7    witness.

8             THE COURT:  Okay.

9                         CROSS-EXAMINATION

10   BY MS. FONTAN:

11   Q.   Hi.  Mr. Cohen, you hear me okay?

12   A.   I can.  Thank you.

13   Q.   Okay.  Great.  We are going to jump right in.  I am going

14   to go through your written opinion so we can stay organized.

15   So I am going to go through your first opinion.  And that is

16   "Video evidence indicates that Jared Wise was adjacent and

17   likely witness to a variety of use of force events by police,

18   including the use of explosive gas devices, pepper spray and

19   batons while in the lower west plaza and batons in the upper

20   west terrace."

21        That is where I am at.  So in order to form your opinion,

22   just this particular opinion, did you rely on these three

23   videos that are listed in the footnotes of that opinion?

24   A.   We tried to in the report list out -- and I think there is

25   subsequent discovery of all of the different videos we

CROSS-EXAMINATION OF MR. COHEN

1   reviewed.  So that would be the list of videos that went into

2   the presentation of materials we are prepared to use in court.

3   I would have to go through and -- if you want to know

4   specifically about which video is which, we could talk about

5   that.  But, in general, the materials that we would be

6   testifying about in court were listed in that list of materials

7   provided that we relied on.  So, again, when we are making that

8   finding about, you know, seeing use of force, that would be

9   based on those videos that were in that list.

10   Q.   When you say, when you see use of force, what do you mean

11   by that?

12   A.   I think that is a good question.  Because it is definitely

13   true that we are not experts in police practices or use of

14   force.  So in that respect, I would be commenting on if I see a

15   police officer swinging a baton or contacting a protestor with

16   a baton, that to me looks like some kind of use of force.  If I

17   see pepper spray or gas being deployed, I would understand that

18   to be some type of use of force.  So but, you know, in terms of

19   like the practices and in the gradations of force, that would

20   not be something I would feel qualified to testify about.

21   Q.   Sure.  No, I understand that.  So with that first opinion

22   then for the videos that you did rely on in order to form that

23   opinion, what kind of enhancement did you make to those videos

24   to form this first opinion?

25   A.   I think with those it was primarily the synchronization.

1    So like if we see a use of force on a video, but we don't see

2    Mr. Wise in that video, the question is, you know, was he

3    nearby.  And if we have two synchronized videos and through

4    that synchronization and scene mapping we are able to

5    determine, oh, he was just, you know, very close to that area,

6    then it would be reasonable he would be aware that that was

7    happening.  And --

8    Q.    So -- okay.  I'm sorry.  I didn't mean to interrupt you.

9          Go ahead, Mr. Cohen.

10   A.    I was going to say, in terms of enhancements though I

11   think the only thing I would say is when we are preparing to

12   show a portion of that clip in court, there may be one or more

13   videos where we are either zooming in a little bit to make

14   something appear larger on screen or providing a freeze frame

15   and a circle so that the audience can see, oh, that is where

16   Mr. Wise was.

17   Q.    Sure.  And actually what might be the most helpful is if

18   we go through some of the exhibits then you can see what I am

19   talking about and we can all be on the same page.  So I am

20   going to pull up Defendant's Exhibit --

21         Mr. Cohen.  I think I lost you.  Did I --

22             THE COURT:  It looks like he froze.

23             He is back.

24   BY MS. FONTAN:

25   Q.    I'm sorry, Mr. Cohen, I think I froze or you froze.

CROSS-EXAMINATION OF MR. COHEN

1    A.    Yeah.  I might just -- if I do freeze and it doesn't get

2    better instantly I might kick my internet connection and I will

3    be right back, but don't worry I will be here.

4    Q.    Okay.  Can we please pull up Defendant's Exhibit 14.  And

5    can we go to slide 1, please.  Thank you.

6         So, Mr. Cohen, I think this is the slide that corresponds

7    to your first opinion.  Does that sound correct?

8    A.    Yeah.  There was a couple clips running with this opinion,

9    so, yes.

10   Q.    Okay.  Now, these couple of clips, what enhancements did

11   you make to those couple of clips in order to form that opinion

12   that Jared Wise was adjacent to and likely witness to a variety

13   of use of force events by police?

14   A.    I guess easiest thing for me to do would be to watch it

15   briefly and make sure I am being complete.  Is that something

16   that I could do real quick?

17   Q.    Yeah.  We can pull up the video if -- we can pull it up if

18   that would make things easiest.

19   A.    Yeah.  If you are willing to do that.  I have it here and

20   I could watch it real quickly myself.  But if you want to pull

21   it up, then everybody is going to be able to see it.  I think

22   that might be better.

23   Q.    Yeah.  I think that makes the most sense.

24        MS. FONTAN:  Can we please pull up -- it is Cohen

25   footnote 1.  And thanks Ms. Wilbert for toggling back and

CROSS-EXAMINATION OF MR. COHEN

1    forth.

2            Can we go to 13:19, please?  Thank you.

3    BY MS. FONTAN:

4    Q.    So this is the video that is in the first footnote of that

5    opinion.  So I am just asking if there were any enhancements

6    made to this video in order to form your opinion?

7    A.    I don't think we did any.  I would want to look at our --

8    because you have shown me a screenshot from the presentation.

9    The actual PowerPoint presentation does have a video embedded.

10   You know, as far as enhancements go, I would want to check and

11   see if we cropped into it at all.  I don't know that we did any

12   kind of adjustments in brightness or contrast.  I could do a

13   quick check here.  This is the first one.  Let me just play.

14   Q.    Mr. Cohen, so I am understanding in that -- we have it in

15   a PDF form, so in these I guess the bottom corner of that,

16   those are all videos in those --

17   A.    Where you see end of clip, there is video that is being

18   played.  The video is what you have on screen here, I believe.

19   So if you wanted to play it, I can tell you if I see anything

20   that we have enhanced.  But I think what your question is, this

21   is the original video and have we done anything else to it

22   beyond what this video is; right?

23   Q.    Mr. Cohen, you are exactly right.  I am just trying to

24   figure out what enhancements were made to which videos to

25   support which conclusions.

CROSS-EXAMINATION OF MR. COHEN

1    A.    I think in the case of these, there wasn't any

2    enhancements other than just the synchronization that is

3    occurring.

4    Q.    Okay.

5    A.    It is more later when we get to -- there is a couple that

6    we zoom into and I can go over that when we get to it.

7    Q.    Perfect.  That sounds great then.  So then in order to

8    form that first opinion, you synchronized the videos and

9    watched the videos and that is how you came up with that

10    conclusion?

11    A.    Right.  And knowing -- you know, the ability to watch

12    multiple times allows us to look for reference points that clue

13    us into where the different people are in the lower area, the

14    lower plaza.

15    Q.    Okay.  Understood.

16        And Ms. Wilbert, you can take that down.  Thank you so

17    much.  I appreciate it.

18        So going to the next opinion, which is, "In footage we

19    reviewed, Jared Wise was not being directly confronted by

20    police or defying posted barriers."

21        In forming that opinion, which video -- I guess did you --

22    how did you form that opinion?

23    A.    So you have the list of all of the videos that we were

24    provided.  And in those videos that we were provided, we didn't

25    see Mr. Wise being confronted by police or going past any

1  posted barrier.  Now, were there confrontations by the police

2  to protestors and were there barriers in the Capitol grounds?

3  Probably.  It is just that we didn't see in what we were

4  provided any of those things.

5  Q.   So you came to that conclusion based on watching the video

6  footage that defense provided to you?

7  A.   Correct.

8  Q.   Okay.  Okay.  I am going to move to the third opinion,

9  which we are kind of -- we started to talk about a little bit.

10  And that is Jared Wise yells, get 'em, kill 'em after two

11  officers fall to the ground having tripped over a planter box.

12  And I know that we have discussed you have done a lot of video

13  synchronization in order to come up with that conclusion; is

14  that correct?

15  A.   Correct.

16  Q.   Okay.  And you did the -- one of the enhancements you said

17  was synchronization.  Another one was slowing down the videos;

18  correct?

19  A.   That was -- there was some slowing in a -- I don't know if

20  we slowed down those videos.  There was one a bit later on that

21  we have slowed down.  I think for that portion, you know, there

22  is several different clips that are played sequentially to make

23  it clear that this is when those -- when he was talking to the

24  officers and then he turns and there is a pause in the video.

25  And then, you know, you can sort of realize, okay, he is

1   turning his head and then he is seeing these officers falling.

2   And that is when he yells, get 'em, kill 'em.

3   Q.   Okay.  And, again, so that -- what you just said and your

4   conclusion was based on you watching the videos and putting

5   together this summary of videos to present to a jury?

6   A.   Right.  We needed to watch them, see the multiple angles

7   to be able to correctly sequence them and understand the

8   timing.  But, yeah, that is -- it is really what we saw -- what

9   you can see from those multiple videos that allowed us to make

10   that conclusion.

11   Q.   And jumping around -- I know I said I was going to go

12   through the opinion, but now I am going to jump around a little

13   bit.

14       So Mr. Hermansen asked if you have testified in federal

15   court before.  Was that in *USA versus Lorenzo Jones*, do you

16   remember?

17   A.   That was one of two federal cases that I have testified

18   in, yes.

19   Q.   Okay.  And in the *Lorenzo Jones* case, were you certified

20   as an expert in that case?

21   A.   That is a good question.  I don't really remember.  I know

22   what I did --

23   Q.   Sure.

24   A.   -- which was I came into court and talked about the

25   digital 3D model we created and how we created it.  And used

1    that model to demonstrate several things.  And, in particular,

2    there was a forensic expert who was, you know, primary

3    expertise was on ballistics.  And he had a bunch of testimony

4    that we were able to help him deliver with the use of a 3D

5    model.  So I don't remember what the actual ruling about

6    whether our participation was classified as expert testimony or

7    if it was just, you know, we are going to explain to the jury,

8    what we are doing here so that they are not confused about it.

9    Q.    Understood.  So you view your testimony as like a

10   compilation of the videos to communicate to the jury what

11   happened?

12   A.    I mean, every case is a little different.  And I think I

13   got an article about this I wrote in a different case I did.  I

14   feel like a lot of work that you -- that we might do, you could

15   view it as simultaneously -- an expert's work that is, you

16   know, like an animation versus simulation.  But anyways, there

17   is a lot of expertise that goes into the work, but there is

18   also a goal of making sure that the narrative that is presented

19   in court is clear and that the fact finders are able to utilize

20   that information effectively.  So we are not telling them what

21   they should think about the video.  But the process of

22   delivering the narrative does have a lot of expertise behind

23   it.  And there is value in making sure they understand how that

24   was arrived at so they can know that they should believe it.

25   Q.    And you mentioned that you testified -- I brought up the

CROSS-EXAMINATION OF MR. COHEN

1    *Lorenzo Jones* case.  Do you remember what the other federal

2    case was?

3    A.    Yeah.  It is a gentleman by the name of -- last name is

4    Flores-Haro.  And the lawsuit was against Washington County,

5    Oregon.  And it is a federal civil rights case.  This gentleman

6    was -- kind of ended up caught in the crossfire of a police

7    action.  The police had showed up to a neighborhood to serve a

8    warrant with a very large number of SWAT agents.  And they

9    didn't properly announce themselves, so he thought there was a

10   robber in his yard and came out with a gun to scare them away.

11   And as soon as officers saw a gun, he was shot.  So that was

12   the nature of the case.  It was an unlawful use of force case

13   and it was a federal court case.

14   Q.    And you said in the other case you didn't remember if you

15   testified as an expert or not.  Do you remember in this case

16   whether it was expert testimony or layperson testimony?

17   A.    Yeah.  There was a *Daubert* hearing in that case and then

18   our actual testimony in front of the jury, so I think there was

19   a classification as an expert in that one.

20   Q.    In that -- I know you said you went through a *Daubert*

21   hearing on that.  Do you remember the expertise that you

22   testified about in that case?

23   A.    That case involved both 3D visualization, so that would be

24   the 3D version of scene mapping, developing a 3D model to place

25   subjects within.  And it was going to be an accurate model

CROSS-EXAMINATION OF MR. COHEN

1    according to measurements of the scene.  And there was also a

2    portion of the case that relied on video, because the police

3    had an aerial vehicle, you know, like a plane circling the

4    property to provide aerial surveillance during the action so

5    there was a need to carefully review the contents of that video

6    and then corroborate with what the video saw with what was in

7    the 3D model to determine if flashes that are seen on screen

8    that were understood to be muzzle flashes could have possibly

9    come from the plaintiff or if it was from the two police

10   officers that were involved in the shooting.

11   Q.   Understood.  And for the 3D modeling, have you done that

12   in this case?

13   A.   In this case, we didn't do any 3D modeling because we felt

14   that the aerial photograph of the scene was sufficiently

15   detailed to provide a reliable underlay to indicate locations

16   of subjects.

17           MS. FONTAN:  Ms. Gilbert, do you mind pulling up

18   Exhibit 14 one more time, please.

19           Thank you, Ms. Gilbert.

20   BY MS. FONTAN:

21   Q.   Mr. Cohen, I just have a couple of questions about some of

22   the slides and I realize it doesn't show the video, but I am

23   hoping to talk about what we see on the slide.  So my first

24   question is for this first slide about what time does this

25   depict?

1    A.    In general, we tried to indicate a time with -- so you see

2    it says 14:04 down by the lower west, so that would be the

3    indication it happened around 2:04.

4    Q.    And you come up with that -- how did you determine what

5    time it was?

6    A.    So you will see in each of these slides, there will be

7    some icons to reference the sources that we used to, you know,

8    to -- underlying our findings.  So here we have YT1 and YT2.

9    It is indicating two different YouTube videos.  Those did not

10   have a time stamp on the videos.

11   Q.    So 14 --

12   A.    But --

13   Q.    I'm sorry, Mr. Cohen.  I didn't mean to interrupt you.

14   A.    Up at the top, you can see there is a little icon.  It

15   looks like a movie camera.  It says CC1.  And then that is

16   indicative of a surveillance camera.  And those do have time

17   stamps on them.  And what we are able to do by synchronizing

18   that surveillance camera with these two YouTube videos is

19   identify the timing of what is being depicted in these videos

20   as well as the proximity to each other.

21             MS. FONTAN:  Can we go to the second slide, please,

22   Ms. Gilbert.  Thank you.

23   BY MS. FONTAN:

24   Q.    And, Mr. Cohen, I assume it is same thing with 14:20 and

25   the surveillance camera.  That is you determined 14:20 from

CROSS-EXAMINATION OF MR. COHEN

1    watching surveillance -- the CCTV footage; is that right?

2    A.    Right.  And specifically there is -- you see there is a

3    dotted line and there is also a solid arrow.  And the

4    surveillance footage here covers the area where that solid

5    arrow is present.  That is what the 14:20 can be attached to.

6    There is going to be portions of this route that occur both

7    before and after the arrow that might be before and after

8    14:20.

9    Q.    Understood.  And that estimated path that you were talking

10   about, you created that based on, you know, CCTV and other

11   footage that -- where you knew where he was; is that correct?

12   A.    Yeah.  We knew where he started.  We knew where he ended

13   up.  We knew there was this one spot along the way where he is

14   captured by CCTV.  And we also knew that he was generally not

15   right next to, but adjacent to a person who filmed the entire

16   route that the protesters took to get from the lower west plaza

17   to the northwest doors.  So that is what this assumed route is

18   based on.  We don't know precisely how he zigged or zagged

19   along the way, but just that was the general approach.

20          MS. FONTAN:  And can we please go to the third

21   slide, thank you.

22   BY MS. FONTAN:

23   Q.    And then I should have asked this before.  But it pertains

24   to this slide too.  It indicates in the key of this slide,

25   there is a path on camera, estimated path and police.  In like,

1    for instance, in this slide, this doesn't account for all of

2    the police presence on Capitol grounds in this moment; correct?

3    A.    That is right.  In fact, I don't actually see any blue

4    dots on this slide.  And I wonder if that particular part of

5    the legend is a holdover from previous slides.  So we were not

6    trying to -- in fact, it would have been impossible to depict

7    the position of every single person on the grounds that day.

8    But just in general where there was a question of, you know,

9    where was a police line at a given moment that is relevant to

10   the slide, that is what the blue dots would have been for.  But

11   in this case we are just talking about entrance to the Capitol,

12   turning around at a certain point and exiting.  That is what is

13   caught on the security cameras.

14   Q.    Sure.  So, for instance, it captured -- we talk about the

15   CCTV in the Capitol.  There were -- there are no blue dots on

16   this slide, but there were police in the Capitol; right?

17   A.    Probably.  Yeah.  We didn't try to identify that for this

18   particular slide.

19   Q.    Understood.  Can we please go to slide 4.

20         And just to be clear, again, I -- we talked about the

21   police blue dots.  This, again, is just based on your -- you

22   viewing the footage that you were provided and approximately

23   placing where police lines were?

24   A.    Yeah.  And I am guessing there may have been other police

25   lines elsewhere.  This was just at the moment that Mr. Wise was

1    seen in this kind of courtyard, upper west terrace area, which

2    we indicated is 14:46.  There was a police line that, you know,

3    he would not have been able to easily pass.  And then he is

4    seen turning and going the opposite direction.

5    Q.    Can we please pull up Defendant's Exhibit 16.

6          So, Mr. Cohen, I just want to go through some of these

7    exhibits just to get what enhancements you made to each

8    exhibit.

9          So we are going to pull up Exhibit 16 first.  And it is

10   slide 5A, but I figured it would be easiest if we watched the

11   video.

12               (Video played.)

13   BY MS. FONTAN:

14   Q.    Mr. Cohen -- I'm sorry about that.  Can you just tell us

15   what enhancements you made to this video?

16   A.    Yes.  So first of all, in the synchronization category,

17   you are seeing two different body cams played side by side.

18   And they are synchronized.  And then additionally, with respect

19   to enhancements, we have got a few things going on.  One is, we

20   have some freeze frames added to the video to allow us to --

21   what I call add annotations or I guess in this case circles to

22   direct the attention of the viewers to Mr. Wise's position, as

23   well as to an officer that was about ready to fall or get up

24   from the ground.

25          And then there is a little bit of a slow-motion effect

1    applied to the fall.  It happened very quickly.  So we have

2    used that slow motion to give the audience enough time to see

3    the timing of that fall in relation to Mr. Wise turning,

4    becoming aware of that and then yelling those words.

5    Q.    Thank you.  Can we please pull up Exhibit 17.

6          Mr. Cohen, I will have you go through the same exercise.

7    We'll watch the video and if you could let us know what

8    enhancements you made to that video.

9    A.    Okay.

10         (Video played.)

11   BY MS. FONTAN:

12   Q.    And, Mr. Cohen, what enhancements did you make to this

13   video?

14   A.    So there is a few things going on.  The most obvious is

15   that the speed of the playback you can see in the lower-left

16   corner of the video, there is a little label indicating when we

17   are playing back at 1 times or normal speed versus .5 times or

18   half speed.  And when you have video that is slowed down to

19   half speed and there is audio playing, if you don't do anything

20   to the audio and you are playing it at that slow speed, it

21   starts to sound really low and funny.  Right?  So we did a tone

22   change to the audio to get it back to the normal sort of range

23   of tone that you would hear if you played it at full speed.

24   That is something that people who have probably listened to

25   audiobooks at higher than normal rates, they are probably

1    familiar with, because that is something that is done as part

2    of that process too.

3    Q.    And, Mr. Cohen --

4    A.    And then --

5    Q.    I'm sorry.  I didn't mean to interrupt you again.

6    A.    That is okay.  Go ahead and ask the question.

7    Q.    Were there any other enhancements?  I didn't mean to cut

8    you off.

9    A.    Yeah.  So there is a couple more things going on there.

10   One is that for that particular video we were trying to

11   initially understand and then communicate to the audience what

12   is Mr. Wise doing with his phone.  And the phone is a small

13   object, so we really needed to zoom in on that.  So there is a

14   zoom happening where we are seeing a smaller area of the video

15   larger on screen.  So we are zooming into that phone.  Because

16   the phone is moving around, it is a little blurry.  There was a

17   small amount of sharpen filter applied to the phone area.  I

18   mean, that I don't think really made that much of a difference

19   in the video.  But the biggest thing is we are zooming in and

20   we are slowing it down.  You can see this is Jared's phone.

21   And you can see on the screen not in detail what is being

22   looked at.  You can see the big large areas like flags,

23   colorful areas and get a pretty clear picture of where the

24   phone is pointed.

25   Q.    And as part of just forming your opinions generally, did

1    you review the video from the phone?

2    A.    I don't know that we ever had the video from the phone.  I

3    don't think we ever received it.

4    Q.    Can we please pull up Exhibit 18.

5          Thanks, Ms. Gilbert.

6                (Video played.)

7    BY MS. FONTAN:

8    Q.    Mr. Cohen, I think, I am learning you synchronized these

9    videos; correct?

10   A.    Yes.

11   Q.    And then another enhancement that you made is highlighting

12   certain audio from different videos?

13   A.    Yeah.  The objective with this exhibit is to help the

14   jurors understand that we are going to look at the exact same

15   time period from four different perspectives, four different

16   cameras and two of the cameras that are close to Mr. Wise's

17   position, you do hear those words, kill 'em, kill 'em, along

18   with the USA chant afterwards.  And then two of the cameras

19   that are closer to the area that we understood there was, you

20   know, a fight happening, violence, those cameras do not hear

21   the kill 'em, kill 'em or the USA chant.  And by sequentially

22   playing the same time period, but with the varying audio

23   sources, you can understand the nature of what might or might

24   not have been able to be heard from that area of the fight.

25   Q.    So just -- and I know you touched on this a little bit

1    with your, I guess -- with an audio opinion.  Your audio

2    opinion is based on listening to the videos; right?

3    A.    Yeah.  I mean, I think to the extent the opinion was it

4    was unlikely that someone in that fight would have heard any

5    words uttered from before is based on us being able to watch

6    all of the videos, know where they were filmed and realizing

7    that only the cameras that were close to where Jared was

8    standing ever picked up those words.

9    Q.    And you -- I'm sorry again, Mr. Cohen.

10   A.    That is okay.  So I think that is the important takeaway

11   there.  It is not that we have some special -- I don't have any

12   special knowledge about how audio works that would say, you

13   know, it only travels a certain distance or, you know, if there

14   is too much background noise you wouldn't be able to hear it.

15   I mean, I could guess at those things, but I don't have

16   expertise in that area, our expertise is in organizing the

17   video in such a way that it would be more possible for an

18   audience to get clarity on that issue and to make an informed

19   decision.

20   Q.    So in part of your opinion it says that someone from 12 to

21   14 feet away from Mr. Wise could hear his voice.  But that is

22   just based on what you heard from the video of the officer 12

23   to 14 feet away; is that correct?

24   A.    That is the conclusion based on the evidence that we had

25   available to us to review, yeah.

1    Q.    Understood.

2          And when you are determining positioning of -- we'll start

3    with Mr. Wise.  When you determined the position of Mr. Wise,

4    what process do you go about doing that?

5    A.    Well, we are looking for landmarks or reference points,

6    things in the video that we can see on that aerial photograph.

7    And so things like a planter wall, that is very clear in the

8    video we know where it is in the photograph.  Things like a

9    ramp, we know from that photograph I don't think there was a

10   ramp necessarily in the one photo that we used.  But there was

11   another one from a very similar time when that ramp did appear.

12   So we knew the size of the ramp.

13         And then I am trying to think if there is anything else

14   that we -- those are the big ones, but like there might have

15   been other things that we secondarily took a look at.  And

16   there was a question about, what are the cameras seeing and

17   what are the direction of people?  You can see features on the

18   building itself in terms of, you know, windows, doors, that

19   sort of thing that we are able to see on both the aerial

20   photographs and in the videos.  All of those things help us to

21   place people.

22              MS. FONTAN:  Can we please pull up Exhibit 20.

23              Thanks, Ms. Gilbert.

24   BY MS. FONTAN:

25   Q.    And, Mr. Cohen, we can --

1         If you would pause it, Ms. Gilbert.

2         For this video, is this another scenario where you

3    synchronized different body-worn camera and open-source videos?

4    A.    Yes.

5    Q.    And in this video, you also called out certain -- or I

6    guess switched different audio sources; is that right?

7    A.    Correct.  And this is something -- I don't know that we

8    would ever endeavor to show this to a jury or not.  I'm not

9    sure what the plans are on that.  This is indicative of

10   something we would use as an investigative tool.  Watching nine

11   videos at the same time can be a little bit challenging the

12   first time you see it.  But it is quite valuable as an

13   investigative tool because you can then start to look at, if we

14   can see somebody in this view, do we have another angle on it

15   that would give us another landmark to help place people.

16   Yeah, what you see as far as the yellow square would indicate

17   the audio source for those -- it is playing at the time that

18   you are playing the video and then the multiple synchronized

19   views.

20             MS. FONTAN:  Okay.  Thank you.

21             And the last one, could we pull up Exhibit 21,

22   please.  And if you could just pause it once you share.

23             Thanks, Ms. Gilbert.

24             (Video played.)

25             MS. FONTAN:  Actually this one might be helpful if

1    we played a couple of seconds, Ms. Gilbert.  Thank you.

2    BY MS. FONTAN:

3    Q.   Mr. Cohen, in this video it looks like one of the

4    enhancements was Mr. Wise was circled; is that correct?

5    A.   Yes.

6    Q.   And then the other enhancement is that it was put at .5

7    speed or slowed down; is that correct?

8    A.   Yes.

9         MS. FONTAN:  Okay.  And then could we go back to

10   Exhibit 14, please.  Thanks, Ms. Gilbert.

11        Can we scroll down to 5D?  Slide 5D.  Actually, oh,

12   yeah, this is perfect now.

13   BY MS. FONTAN:

14   Q.   Mr. Cohen, what does the yellow circle represent in this

15   slide?

16   A.   Are you talking about the circle with white dots and a

17   yellow filling or yellow filled, near where Officer Dean is

18   labeled.

19   Q.   So I am talking about the --

20   A.   Oh, the yellow circle, the yellow line that is around

21   Mr. Wise's position.

22   Q.   Yes.  What is that?

23   A.   It is labeled 12- to 17-foot radius.

24   Q.   Yes, that is correct.  And what does that represent?

25   A.   I think I might have froze there for a second.

CROSS-EXAMINATION OF MR. COHEN

1   Q.    Yeah, I did not hear your answer.  So what does the yellow

2   outline circle represent?

3   A.    So I think you are talking about the one that is labeled

4   12- to 14-foot radius; is that right?

5   Q.    That's correct.

6   A.    So that is meant to represent that there is an area around

7   this little human figured icon that is meant to indicate Jared

8   Wise.  And our initial finding in this case was that something

9   that is further away than 12 -- or in this case we are putting

10  12 to 14 feet.  And the reason we added that little bit of

11  uncertainty because we realized that at the time that the

12  subject words were being uttered, Jared Wise is moving.  And

13  so, you know, to account for that and be totally transparent we

14  are saying 12 to 14 feet.

15          But beyond that area, it would be unlikely that you would

16  hear those words.  Now, I will say, you know, that maybe a

17  radius is not necessarily the best way to represent this -- you

18  know, to answer this question.  Because we are not suggesting

19  that if you went out there with a sound meter and recorded

20  around that radius that it would sound exactly the same at each

21  point on that radius.  But what we are saying is that January 6

22  Archive, Officer Linwood, both inside that radius, both heard

23  the words.  Veizaj and Dean, they are outside that circle, did

24  not hear the words.  So, you know, a circle is a simple way to

25  make the point on the slide.  But we are not trying to suggest

CROSS-EXAMINATION OF MR. COHEN

```
1   that it would be exactly the same at any point on that circle.
2              MS. FONTAN:  Your Honor, if I could just have one
3   moment.
4              (Pause.)
5   BY MS. FONTAN:
6   Q.   Mr. Cohen, just one follow-up question.  So we were just
7   looking at that slide and we talked about the orange
8   confrontation circle.  Did you look at any other -- or I guess
9   did you look at any other confrontations on that line?
10             THE COURT:  You are on mute.
11             You are on mute.
12             THE WITNESS:  I'm sorry about that.
13  BY MS. FONTAN:
14  Q.   That is okay.
15  A.   We were provided the names of several individuals that
16  were potential, I guess, assaulters.  I am not sure what the
17  word you are using is.  So we looked at each of those
18  individually to see whether any of them seemed like they could
19  qualify as someone who would have been incited.
20  Q.   And that -- go ahead.
21  A.   Anyway, so we went through each of those and some of them
22  were not in that circle of confrontation.  Some of them were
23  closer.  And then we had other ways of looking at -- what is
24  the timing of the nature of the -- could there have been an
25  assault there at all?  And if so, what is the timing of it and
```

1    all of that.

2    Q.   So you are doing that, again, just based on the video

3    footage that you were provided?

4    A.   Yes.

5            MS. FONTAN:  I don't have any further questions.

6    Thank you, Mr. Cohen.

7            THE COURT:  All right.  Mr. Hermansen.

8                         REDIRECT EXAMINATION

9    BY MR. HERMANSEN:

10   Q.   Mr. Cohen, you were just asked about the videos that you

11   were provided and the people you were looking at.  So if you

12   are given a list of five possible assaulters or five possible,

13   you know, victims of assault, does that guide the focus of your

14   investigation?

15   A.   Yes.

16   Q.   So if you were later given different names of different

17   police officers who were allegedly assaulted or different

18   people who might have assaulted them, would you need to do

19   additional analysis to -- would it make sense to focus on those

20   people and see if there is other people who were assaulting or

21   being assaulted?

22   A.   Yes.

23            MR. HERMANSEN:  Thank you.

24            THE COURT:  All right.  So I -- I am happy to give

25   you a preliminary view with respect to this witness'

1   testimony.  And I will say, I am not at all sure that most of

2   it is actually expert testimony under Rule 702.

3           But, regardless, it does strike me that most of it

4   is -- strikes me as permissible.  With respect to the first

5   category, video evidence indicating that Jared Wise was

6   adjacent and likely witness to a variety of use of force events

7   by the police.  It was my understanding from what Mr. Hermansen

8   said he is not intending to ask the witness for an opinion as

9   to whether it was likely that Mr. Wise actually witnessed those

10  events, but is content to simply rely on the adjacent to.  And

11  to the extent the witness simply wants to show video including

12  video that has been enhanced in some way to show a relationship

13  of where Mr. Wise was standing and where other events were

14  standing, that is fine.  And I think the witness has said

15  himself he is not an expert on use of force.  And so it may be

16  that he doesn't need to characterize the events as use of

17  force, but can simply offer the video and show, here is

18  Mr. Wise and here is the officer.  And you can see this officer

19  is pushing this individual with a baton or whatever it might

20  be, just purely descriptively without characterizing and

21  without drawing any opinions what Mr. Wise would or would not

22  have seen himself.

23          And in respect to footage we reviewed, Jared Wise was

24  not being directly confronted be police or defying posted

25  barriers.  Again, I think it is permissible for the witness to

1    testify that he reviewed the following videos.  And in those

2    videos he didn't see any of the following.  And if the

3    government wants to cross-examine by showing him any video that

4    shows something else in it, the government can do that.

5         The testimony about Jared Wise yells, get 'em, kill

6    'em, after two officers fall to the ground after having tripped

7    over the planter box, again, it strikes me as permissible to

8    make the factual points showing on the video.  And he can show

9    the timing.  And the government can cross-examine if it thinks

10   the timing is wrong or it can offer its own evidence if it

11   thinks the timing is wrong.  I think the defense is entitled to

12   to show its best assessment based on the video of the timing

13   and the audio as well.

14        The -- somebody, possibly Jared Wise, kill 'em, kill

15   'em after the use of physical force by police batons.  Again, I

16   would say, let's stick away from characterizing the nature of

17   what the police officers are doing and whether it is in any way

18   an improper use of force or even use of force, but can simply

19   describe the events and show on the video that this is when you

20   hear, kill 'em, kill 'em.  And we have synchronized that.  And

21   you see this is what is going on at the same time.  And you can

22   demonstrate what is going on at the same time.

23        And then the one where I have a little bit more

24   difficulty, but I think it is possible we can navigate this as

25   well is with respect to the protestors who are fighting with

1    the police and probably never heard any words occupied by Jared

2    Wise.  And as I understood the -- what the witness was himself

3    saying is he is not an expert on any of the auditory sciences,

4    doesn't know -- is not an expert on microphones and how

5    microphones pick up sound or don't pick up sound, sensitivity

6    things like that.  But I don't see a problem with him

7    testifying about distances and testifying about what you hear

8    on the microphones from the different body-worn camera and

9    where they are standing and their locations.  The jury can draw

10   whatever inferences it wants from that and the parties are free

11   to make whatever arguments they want from that and to offer

12   other testimony that relates to that.

13        So I think that most of this, as I said for the

14   reasons that I have described, if you just avoid some of the

15   characterizations or ultimate opinions is fine.  And I think --

16   I can't remember if it was Mr. Hermansen or the witness who

17   testified that it wasn't the purpose to tell the jury what they

18   should think about the videos, but just to show them what the

19   videos show.  And I think that is a fair statement.

20        The one question I had is where we stand with respect

21   to the question about providing the defense with access to the

22   area to perform measurements.  That did not strike me as an

23   unreasonable request.  And if there is some way to accommodate

24   that, I think it would be a prudent thing to do.  But I don't

25   know -- I haven't heard exactly what the security concerns are.

1    It is hard for me to imagine there is security concerns about

2    showing what measurement is from where Mr. Wise was standing to

3    where others were standing, because those aren't necessarily

4    otherwise salient places on the terrace.  And we are -- I can

5    imagine that, you know, there may be some security concerns

6    about some measurements on the terrace, but those are measuring

7    things that are no longer there, where people were standing at

8    that time.  So that is hard for me to understand why that would

9    present a security concern.

10              I think one of you has to mute.  Thank you.

11              Ms. Rocha.

12              MS. ROCHA:  How is that?  Is that better, Your

13   Honor?

14              If I may just briefly respond --

15              THE COURT:  Yes.

16              MS. ROCHA:  -- to that point?

17              We would like the opportunity to brief that matter.

18   But our understanding in consultation with the United States

19   Capitol Police is that that area is not regularly accessible to

20   the public.  And that the information is secured and the

21   relevant statutory information for that is 2 U.S.C. 17 -- 1979.

22   Excuse me, Your Honor.  United States Code 1979, that

23   information is security information and so protected according

24   to that.

25              I would also -- you know, my reading -- or my take

1    from Mr. Cohen's testimony is I think that he had sufficient

2    information from the aerial photograph.  So I think further --

3    you know, in this case, I don't -- from, you know, we would

4    like the opportunity to brief it, but that it doesn't seem

5    necessary to -- you know, to disclose the particular -- you

6    know, down to the particular measurements don't seem relevant

7    to his ability to form opinions for the jury about that area.

8           THE COURT:  Let me see here.  I have got 2-1979 in

9    front of me.

10          MS. FONTAN:  I'm sorry, Your Honor.  We can't hear.

11          THE COURT:  I'm sorry?

12          MS. ROCHA:  I'm sorry, Your Honor.  We weren't able

13   to hear you, so I apologize.

14          THE COURT:  I said I have 1979 in front of me and I

15   am looking at it right now.

16          MS. ROCHA:  Okay.

17          THE COURT:  You know, I have to say, I don't know

18   what Mr. Hermansen's view is on this.  I am highly dubious

19   that this is sensitive security information, because there are

20   times when those steps open.  And there have probably been

21   times when I have walked across that space myself.  And my

22   foot is a foot long.  And there is no reason in the world I

23   couldn't have just measured the distance as I walked across

24   there.  It just -- you can measure it from a photograph from

25   above.  It is just -- you are welcome to brief it to me, but

1    it seems to me like perhaps not the best use of everyone's

2    resources to spend time fighting about this --

3         Correct me if I am wrong -- as I said, I can imagine

4    a world in which the precise dimensions of some portions of the

5    Capitol may really raise security concerns.  But the question

6    of how far it was from where Mr. Wise was standing, where he is

7    no longer standing, to where someone else was standing who is

8    no longer standing there -- I just can't imagine a world in

9    which that is secure information.  And maybe someone would have

10   to accompany Mr. Hermansen if he wanted to come and do these

11   measurements or one of his experts to make sure they don't go

12   about and start measuring other things they are not supposed to

13   measure.  But I guess I am at a loss -- I am not saying, don't

14   brief it.  I do wonder whether it is the best use of everyone's

15   time to fight over something like that.

16        And I know that I have had cases and some of my

17   colleagues have had cases where people have been escorted into

18   the Capitol and been allowed to make observations into the

19   Capitol for other purposes.

20        MS. ROCHA:  Your Honor, the government has made

21   available the various Capitol tours.  Our position is based

22   on, you know, consultation with the Capitol Police and folks

23   over there.  So we would like the opportunity to put that

24   together for you.  And I think that may be -- you know, we are

25   happy to proceed from there.

1          THE COURT:  Mr. Hermansen, anything you want to add

2     on this?

3          MR. HERMANSEN:  Yes, Your Honor.

4          MS. LEE:  Yes, Your Honor.  I'm sorry.

5          MR. HERMANSEN:  So, Your Honor, can see the Court

6     see my screen with the measurements?

7          THE COURT:  Yes.

8          MR. HERMANSEN:  So this is what the measurements

9     that I am talking about.  There is also the -- there is a ramp

10    which is not on this picture, but I just -- I want to present

11    the jurors with the gold standard, right, their best ability

12    to do their jobs.  I have offered to stipulate to these

13    measurements.  Maybe the government could agree to not contest

14    them.  I don't -- so these are the measurements we are talking

15    about.

16         THE COURT:  All right.  All right.  I will let you

17    all continue to try and work this out.  And if you have to

18    brief it for me, brief it for me.  But in addition to it not

19    making a lot of sense to me, I also think that the government

20    is not going to look very good in front of the jury, when the

21    witness testifies and says, well, I had to do these best

22    estimates, because the government wouldn't allow me to go

23    there and measure it.  That is just something to think about

24    in figuring out what you want to do about this.

25         You all should let me know sooner rather than later

1    if it is something that needs to be briefed.  Because I want to

2    make sure there is enough time to resolve the issue in advance.

3         All right.  Anything else today?  Any other guidance

4    you all need from me with respect to Mr. Cohen's testimony?

5    With respect to the testimony from this morning, I think I need

6    to wait and see where we are with some of the briefing that I

7    am still waiting to get from you all.  I am not sure that any

8    of that has any bearing on Mr. Cohen's testimony, other than

9    that fact, I suppose if I were to conclude that there is no

10   causation requirement, maybe the distance doesn't matter.

11        But assuming that there is some causation

12   requirement, this all seems relevant to me and permissible.

13        Anything else you want to ask or anything else you

14   need a view from me or opinion from me on?

15        MR. HERMANSEN:  It might be help -- I know right now

16   there is a presumption that there are five people we are

17   focusing on.  It would be nice if, you know, we could narrow

18   that or maybe have a cutoff date if the government is going to

19   switch gears, I think.

20        THE COURT:  Yeah.  I think that is fair.

21        Ms. Fontan, do you want to propose a date for that?

22        MS. FONTAN:  Your Honor, it was -- I'm sorry.

23        It was my understanding that we would be addressing

24   that in our briefing related to causation.

25        THE COURT:  Okay.  Remind me when your briefs are

1    due on that?

2            MS. FONTAN:  That is November 21st.

3            THE COURT:  And do I take from what you are saying

4    there is that you do intend to argue for a broader theory, at

5    least you are leaving that open at this point?

6            MS. FONTAN:  Yes, Your Honor.  That will be our

7    position is a broader theory.  If --

8            THE COURT:  All right.  So all right.  I will do my

9    best to resolve that issue as promptly as I can, at least

10   certainly with respect to the five individuals as soon as I

11   get the briefs.  But I think, I am still of the view that

12   presumptively it should be limited to the five, but I will

13   give the government an opportunity to try to convince me I am

14   wrong about that.

15           All right.  Anything else before we adjourn?  All

16   right.  Well, thank you.

17           MS. FONTAN:  Nothing from the government, Your

18   Honor.

19           MR. HERMANSEN:  Thank you, Your Honor.

20           THE COURT:  All right.  Thank you.

21           (Proceedings concluded at 3:47 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, SHERRY LINDSAY, Official Court Reporter, certify

4    that the foregoing constitutes a true and correct transcript of

5    the record of proceedings in the above-entitled matter.

6

7

8

9

10                        Dated this 11th day of November, 2024.

11

12                        _____
                          Sherry Lindsay, RPR
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**BY MR. HERMANSEN: [11]**  6/15 7/2
9/9 18/8 21/6 49/17 50/13 69/21
70/13 83/10 110/9

**BY MS. FONTAN: [19]**  24/3 31/4
36/13 52/8 60/14 86/10 88/24 90/3
96/20 97/23 98/22 100/13 101/11
103/7 105/24 107/2 107/13 109/5
109/13

**MR. GRADE: [3]**  65/8 65/11 65/16

**MR. HERMANSEN: [68]**  4/13 5/16
5/20 6/23 15/16 16/11 16/21 17/14
18/7 20/2 20/7 20/10 20/12 20/20
20/23 22/7 22/18 23/23 30/21
40/16 42/2 42/17 43/3 44/6 44/10
45/10 46/8 46/13 46/15 47/5 47/20
47/24 48/3 48/6 48/9 48/13 48/17
48/20 49/2 49/10 50/11 51/8 52/2
61/23 62/2 62/6 63/1 63/17 64/3
64/15 64/17 64/22 65/7 65/10
65/20 66/22 67/8 68/5 69/8 69/15
82/21 86/6 110/23 117/3 117/5
117/8 118/15 119/19

**MR. RYLANT: [1]**  4/21

**MS. FONTAN: [27]**  4/7 24/1 30/23
31/3 36/12 47/8 48/4 52/6 60/7
60/10 61/9 62/21 89/24 96/17
97/21 98/20 105/22 106/20 106/25
107/9 109/2 110/5 115/10 118/22
119/2 119/6 119/17

**MS. LEE: [5]**  4/17 20/17 20/22
63/5 117/4

**MS. ROCHA: [5]**  114/12 114/16
115/12 115/16 116/20

**THE COURT: [103]**  4/12 4/16 4/20
4/23 5/4 5/17 7/1 8/21 9/7 12/17
13/9 13/13 15/10 16/10 16/19 17/3
18/6 20/6 20/11 20/14 21/3 22/5
22/14 23/3 23/25 31/1 32/13 35/20
36/10 38/3 40/13 40/22 42/15
42/20 43/14 44/9 44/21 45/20
46/10 46/14 46/18 47/7 47/16
47/23 48/1 48/11 48/15 48/18 49/7
49/14 49/25 51/5 51/23 52/3 60/4
60/9 60/12 61/21 61/25 62/4 62/7
62/12 62/14 62/25 63/4 63/7 64/2
64/12 64/16 64/20 65/5 65/14
65/17 66/19 66/23 67/21 68/18
69/14 69/19 70/10 70/12 82/20
85/16 85/21 86/5 86/8 88/22
109/10 110/7 110/24 114/15 115/8
115/11 115/14 115/17 117/1 117/7
117/16 118/20 118/25 119/3 119/8
119/20

**THE COURTROOM DEPUTY: [4]**  4/2
20/24 62/16 65/2

**THE DEFENDANT: [5]**  5/3 20/16
20/18 20/21 21/1

**THE WITNESS: [19]**  9/5 12/19
13/11 14/3 20/9 21/4 33/16 36/4
39/15 40/17 48/2 50/7 62/10 62/13
70/11 82/22 85/18 85/22 109/12

**'**

**'em [25]**  16/14 22/12 22/17 65/21
65/21 65/24 65/24 65/24 66/4 66/4
68/25 92/10 92/10 93/2 93/2
103/17 103/17 103/21 103/21 112/5
112/6 112/14 112/15 112/20 112/20

**.**

**.5 [2]**  101/17 107/6

**1**

**1.1 [1]**  36/17
**10 [4]**  48/15 55/15 75/3 76/8
**10 feet [1]**  16/15
**100 [1]**  32/4
**101 [1]**  2/8
**109 [1]**  3/9
**11 [1]**  55/16

**11th [1]**  120/10
**12 [6]**  112/4 112/4 112/6 112/8
108/9 108/10 108/14
**12:55 [1]**  62/15
**13 [1]**  27/16
**13:19 [1]**  90/2
**14 [4]**  89/4 96/18 97/11 107/10
**14 feet [4]**  104/21 104/23 108/10
108/14
**14-foot [1]**  108/4
**14:04 [1]**  97/2
**14:20 [4]**  97/24 97/25 98/5 98/8
**14:46 [1]**  100/2
**16 [2]**  100/5 100/9
**16:22:16 [2]**  65/23 66/1
**16:22:38 [2]**  66/4 66/10
**17 [2]**  101/5 114/21
**17-foot [1]**  107/23
**1700 [1]**  2/9
**18 [1]**  103/4
**184 [3]**  1/4 4/3 62/17
**1979 [4]**  114/21 114/22 115/8
115/14
**1993 [1]**  69/25
**1:00 [2]**  37/9 37/12
**1:30 [2]**  37/16 37/17
**1:35 [8]**  11/25 15/18 48/10 48/12
49/6 49/7 49/8 51/10
**1:35 and [1]**  17/8
**1:35 as [1]**  17/7
**1:35 p.m [3]**  9/12 10/14 48/6

**2**

**2-1979 [1]**  115/8
**20 [5]**  30/6 31/12 31/15 76/25
105/22
**200 [1]**  2/5
**20001 [1]**  1/24
**2003 [1]**  70/2
**2004 [1]**  67/17
**2009 [1]**  70/20
**2013 [1]**  76/9
**2020 [2]**  75/14 76/14
**2021 [1]**  75/14
**2022 [1]**  75/14
**2023 [1]**  76/14
**2024 [3]**  1/5 70/15 120/10
**20530 [1]**  1/16
**21 [1]**  106/21
**219 [1]**  1/13
**21st [2]**  5/25 119/2
**23 [1]**  3/4
**23-184 [3]**  1/4 4/3 62/17
**29th [1]**  76/22
**2:00 [2]**  62/8 62/11
**2:04 [1]**  97/3
**2:35 [1]**  51/10

**3**

**3-dimensional [1]**  71/4
**30 [2]**  72/23 76/17
**30th [1]**  72/9
**333 [1]**  1/23
**3:35 [1]**  51/11
**3:47 [1]**  119/21
**3D [20]**  70/4 70/24 71/2 71/14
73/12 74/5 75/17 76/1 76/3 76/5
76/7 77/8 93/25 94/4 95/23 95/24
95/24 96/7 96/11 96/13

**4**

**403 [8]**  6/3 23/18 44/12 46/2 46/6
46/19 46/21 63/15
**49 [1]**  3/5
**4:00 [1]**  37/9
**4:20 [1]**  41/8
**4:22 [2]**  17/10 51/22
**4:22:10 [1]**  16/12
**4:22:16 [2]**  16/13 81/4
**4:22:38 [2]**  16/14 16/25
**4:22:38, we [1]**  22/7

**4:22:58 [1]**  81/4
**4:35 [1]**  51/22

**5**

**500 [4]**  71/15 71/16 72/18 72/18
**51 [1]**  3/5
**5A [1]**  100/10
**5D [2]**  107/11 107/11
**5th [1]**  1/13

**6**

**6 inches [1]**  81/15
**601 [1]**  1/16
**60604 [1]**  1/14
**6710 [1]**  1/24
**69 [1]**  3/8

**7**

**702 [8]**  5/13 43/19 44/21 45/6
45/12 46/6 46/22 111/2

**8**

**80 [1]**  70/21
**85 [1]**  3/8
**859 [1]**  2/5

**9**

**97204 [1]**  2/9
**97401 [1]**  2/6
**9:43 [1]**  1/6

**A**

**A.m [1]**  1/6
**abetting [1]**  22/11
**ability [8]**  49/24 78/8 81/14
84/11 84/23 91/11 115/7 117/11
**able [36]**  12/19 20/24 22/24 50/14
64/6 64/8 64/24 77/15 78/4 78/14
78/15 78/20 79/2 79/7 80/13 80/14
80/19 82/16 82/19 83/1 83/3 83/4
83/22 85/5 88/4 89/21 93/7 94/4
94/19 97/17 100/3 103/24 104/5
104/14 105/19 115/12
**about [136]**
**above [2]**  115/25 120/5
**above-entitled [1]**  120/5
**absent [2]**  50/1 80/20
**abstract [1]**  42/25
**abundance [1]**  68/6
**academy [8]**  24/12 24/13 29/6
29/11 29/23 30/5 30/15 30/19
**acceptable [1]**  34/11
**access [1]**  113/21
**accessible [1]**  114/19
**accommodate [1]**  113/23
**accompany [1]**  116/10
**according [2]**  96/1 114/23
**account [3]**  85/17 99/1 108/13
**Accountability [1]**  75/18
**accurate [6]**  49/12 52/12 52/18
59/22 61/5 95/25
**ACE [4]**  74/19 74/22 74/25 75/11
**achieved [1]**  69/24
**across [4]**  19/23 21/13 115/21
115/23
**act [1]**  32/19
**acting [1]**  16/3
**action [4]**  1/3 28/16 95/7 96/4
**actions [1]**  36/16
**activations [1]**  76/4
**active [2]**  11/14 51/3
**actively [2]**  14/7 35/2
**activity [3]**  57/2 57/10 79/20
**actual [3]**  90/9 94/5 95/18
**actually [25]**  9/1 9/20 10/1 11/18
14/17 15/1 22/12 28/21 35/6 41/18
45/2 46/5 48/24 49/22 58/15 64/4
68/2 68/2 76/9 88/17 99/3 106/25
107/11 111/2 111/9
**adapting [1]**  19/9
**add [2]**  100/21 117/1

**A**

added [2]  100/20 108/10
addition [2]  59/2 117/18
additional [1]  110/19
additionally [1]  100/18
addressing [1]  118/23
adjacent [6]  63/24 86/16 89/12
 98/15 111/6 111/10
adjourn [1]  119/15
adjust [1]  78/9
adjusting [1]  78/21
adjustment [1]  72/11
adjustments [1]  90/12
admit [1]  6/12
advance [1]  118/2
aerial [9]  71/10 81/14 84/1 96/3
 96/4 96/14 105/6 105/19 115/2
affect [3]  26/11 27/6 37/5
affected [1]  50/5
after [16]  17/17 17/17 35/5 53/25
 59/14 65/21 65/25 66/5 77/16 81/4
 92/10 98/7 98/7 112/6 112/6
 112/15
afternoon [2]  63/1 63/5
afterwards [2]  57/15 103/18
again [26]  5/10 7/17 7/19 8/8
 16/16 17/22 23/3 23/11 25/4 28/7
 41/2 51/6 54/1 56/22 69/15 79/2
 87/7 93/3 99/20 99/21 102/5 104/9
 110/2 111/25 112/7 112/15
against [8]  13/1 16/5 16/6 32/21
 33/7 34/20 67/9 95/4
agencies [2]  10/22 75/13
agents [1]  95/8
ago [4]  31/13 31/15 32/4 75/12
agree [9]  9/14 14/13 23/8 34/15
 44/17 45/10 45/15 81/5 117/13
ahead [4]  46/12 88/9 102/6 109/20
aiding [1]  22/11
aim [1]  68/14
air [1]  38/14
alarm [1]  23/15
all [98]  4/12 4/12 4/20 4/23 5/4
 11/6 17/15 17/19 17/23 18/19 19/7
 19/14 19/16 19/21 20/18 21/23
 22/25 23/3 28/19 32/3 33/17 33/18
 34/4 34/21 37/20 37/20 38/20
 43/20 43/24 44/24 46/14 46/23
 49/25 51/12 51/12 52/3 53/12
 54/11 55/10 55/16 55/22 56/3 56/4
 56/5 56/7 56/10 58/1 58/6 58/18
 59/1 60/1 60/18 62/7 62/7 62/25
 63/4 63/8 63/10 63/19 64/1 65/17
 68/1 72/10 73/16 77/9 78/10 79/11
 82/25 83/22 85/10 85/14 86/25
 88/19 90/11 90/16 91/23 99/1
 100/16 104/6 105/20 109/25 110/1
 110/7 110/24 111/1 117/16 117/16
 117/17 117/25 118/3 118/4 118/7
 118/12 119/8 119/8 119/15 119/15
 119/20
allegedly [1]  110/17
alleging [1]  16/17
allow [7]  17/6 17/8 19/21 46/3
 80/6 100/20 117/22
allowed [7]  33/4 38/13 38/16 82/7
 82/9 93/9 116/18
allows [3]  72/3 79/13 91/12
alluded [1]  25/1
alluding [1]  29/5
almost [1]  74/8
along [6]  75/4 98/13 98/19 103/17
already [3]  26/21 46/20 58/24
also [35]  4/8 4/10 4/24 5/22 9/19
 12/12 15/7 16/22 16/23 18/25
 18/25 22/18 23/1 24/18 24/20
 40/22 49/2 51/20 52/21 58/17 65/4
 69/25 75/23 76/13 80/15 80/22
 80/24 94/18 96/1 98/3 98/14 106/5
 114/25 117/9 117/19
altercation [2]  58/16 58/17

although [1]  51/8
always [1]  60/13
am [110]  7/7 7/19 8/17 13/16
 13/24 18/21 18/21 20/8 20/12 23/3
 23/23 24/21 25/19 26/4 26/22 27/8
 30/3 30/7 30/11 30/14 30/23 32/3
 32/6 35/14 36/7 36/14 36/23 36/25
 37/18 38/8 38/18 38/18 38/25 39/3
 39/9 39/20 39/25 40/15 40/20
 40/23 40/25 41/1 41/8 41/19 41/21
 42/24 42/25 43/17 45/5 45/14 46/3
 46/8 47/20 47/21 47/24 47/25
 49/25 50/22 50/25 53/11 53/11
 54/11 54/12 54/14 55/23 58/14
 61/17 64/18 65/4 65/12 67/3 67/25
 68/18 73/22 76/10 82/18 83/12
 83/17 84/8 84/9 84/15 86/13 86/15
 86/21 88/18 88/19 89/15 90/5
 90/14 90/23 92/8 93/12 96/22
 99/24 103/15 105/13 107/19 109/16
 110/24 111/1 115/15 115/18 116/3
 116/13 116/13 117/9 118/7 118/7
 119/11 119/13
Amendment [5]  32/21 33/6 33/11
 33/13 35/22
AMERICA [3]  1/3 4/4 62/17
amount [3]  9/17 22/3 102/17
amplified [1]  58/7
analogize [1]  45/12
analysis [7]  7/18 23/22 31/22
 70/25 71/13 74/21 110/19
analyze [1]  10/24
angle [1]  106/14
angles [3]  28/20 78/2 93/6
animation [1]  94/16
annotations [1]  100/21
announce [1]  95/9
annual [2]  75/1 76/22
another [18]  8/8 21/13 26/21
 37/12 38/4 53/15 58/4 68/3 78/25
 80/16 80/20 83/6 92/17 103/11
 105/11 106/2 106/14 106/15
answer [13]  9/22 10/11 29/11
 30/14 31/25 32/6 33/19 36/5 36/8
 77/15 83/22 108/1 108/18
answered [6]  30/22 31/19 35/19
 40/11 53/18 58/24
answers [1]  27/1
anticipate [1]  61/15
any [63]  8/5 8/25 11/4 11/12 12/8
 21/16 24/8 24/8 25/2 25/7 29/19
 39/6 41/18 42/7 46/2 46/6 46/16
 47/19 50/1 54/7 55/4 56/1 56/13
 56/15 58/13 58/20 58/24 61/9
 61/15 61/20 63/15 64/8 66/16
 72/19 76/6 77/23 85/17 86/2 90/7
 90/7 90/11 91/1 91/25 92/4 96/13
 99/3 102/7 104/4 104/11 109/1
 109/8 109/9 109/18 110/5 111/21
 112/2 112/3 112/17 113/1 113/3
 118/3 118/7 118/8
anybody [4]  20/18 21/4 39/6 67/21
anyone [2]  22/19 38/14
anything [20]  11/16 21/5 38/1
 38/1 41/13 42/25 46/25 58/21
 61/21 67/4 84/23 90/19 90/21
 101/19 105/13 117/1 118/3 118/13
 118/13 119/15
Anyway [1]  109/21
anyways [1]  94/16
anywhere [3]  13/7 29/20 46/4
apologies [2]  36/10 60/15
apologize [2]  38/3 115/13
apparent [1]  77/10
appear [4]  71/23 72/16 88/14
 105/11
APPEARANCES [3]  1/11 1/19 2/1
appeared [2]  26/8 36/17
appearing [1]  4/24
appears [1]  13/2
applied [4]  15/7 83/21 101/1
 102/17

applies [1]  45/23
apply [2]  15/7 60/10
appreciate [6]  30/11 38/5 39/15
 61/20 74/25 91/17
approach [1]  98/19
appropriate [5]  5/13 8/17 44/4
 44/23 46/21
approximate [2]  80/25 82/6
approximately [1]  71/12 99/22
architecture [4]  69/25 70/1 70/6
 70/11
Archive [1]  108/22
are [301]  18/4 41/23 44/2 48/14
 52/25 66/17 78/22 81/2 81/3 81/3
 81/12 81/13 88/5 91/13 98/4 100/1
 102/14 102/17 103/19 103/24
 104/16 108/6 108/15 113/22 114/19
 115/7
areas [4]  66/18 78/9 102/22
 102/23
aren't [2]  18/1 114/3
argue [3]  22/22 81/22 119/4
arguing [1]  39/25
argument [4]  17/5 23/16 46/5
 46/11
arguments [1]  113/11
arm [2]  11/15 78/5
around [14]  37/16 40/6 41/12 49/5
 51/13 73/2 93/11 93/12 97/3 99/12
 102/16 107/20 108/6 108/20
arrived [1]  94/24
arrow [3]  98/3 98/5 98/7
article [2]  55/19 94/13
articles [1]  55/4
as [120]  5/10 5/23 7/4 7/8 7/13
 7/15 8/2 10/17 11/5 11/23 15/14
 15/20 17/7 17/23 23/9 23/10 23/12
 23/17 24/21 24/23 25/10 25/14
 25/14 27/14 27/18 28/5 28/17 29/2
 29/15 30/5 36/24 39/4 41/6 42/5
 42/11 42/24 43/5 43/9 44/14 44/14
 44/24 45/22 45/24 46/20 47/17
 48/24 48/24 49/12 49/12 51/12
 51/24 52/16 54/2 54/2 57/8 60/3
 61/16 61/18 62/22 62/22 62/22
 62/22 63/8 63/19 68/12 69/3 69/3
 71/20 72/3 73/17 73/17 73/21 74/4
 74/4 75/2 75/7 76/5 76/12 77/6
 77/6 80/16 84/10 85/12 86/1 90/10
 90/10 93/20 94/6 94/9 94/15 95/11
 95/11 95/15 95/19 97/20 97/20
 100/22 100/23 102/1 102/25 106/10
 106/12 106/16 106/16 109/19 111/4
 111/8 111/16 112/7 112/13 112/24
 113/2 113/13 113/22 115/23 116/3
 119/9 119/9 119/10 119/10
aside [2]  46/2 46/6
ask [9]  8/17 10/10 32/14 52/5
 55/3 85/16 102/6 111/8 118/13
asked [7]  23/20 26/5 30/21 55/1
 93/14 98/23 110/10
asking [8]  32/1 45/25 47/2 49/20
 50/15 52/4 54/1 90/5
aspect [1]  61/2
aspects [2]  26/22 60/25
assault [4]  47/3 47/4 109/25
 110/13
assaulted [6]  41/4 41/7 84/18
 110/17 110/18 110/21
assaulters [2]  109/16 110/12
assaulting [5]  22/16 23/7 39/6
 51/14 110/20
assaultive [7]  11/18 13/22 14/7
 34/24 35/3 35/6 51/3
assaults [2]  11/19 16/17
assessment [2]  45/7 112/12
assist [2]  71/17 77/21
assistance [4]  66/1 66/12 66/18
 66/20
Assistant [4]  4/14 4/17 63/2 63/6
associated [1]  74/9

**A**

Association [1]  76/22
assume [7]  8/25 9/8 39/22 39/25
 40/1 84/17 97/24
assumed [1]  98/17
assuming [4]  10/13 43/24 84/19
 118/11
Atlanta [1]  75/20
attached [1]  98/5
attempt [1]  5/7
attend [1]  76/22
attended [1]  74/17
attention [12]  18/14 18/19 18/19
 18/20 18/22 18/24 19/9 19/24 21/11 55/1
 55/14 55/17 100/22
attorney [2]  74/3 75/25
Attorney's [1]  77/7
attorneys [6]  36/8 67/12 73/1
 75/22 76/17 77/6
audible [1]  85/20
audience [10]  7/10 7/13 7/24 8/7
 28/16 75/25 88/15 101/2 102/11
 104/18
audio [18]  23/17 66/14 66/14
 80/15 80/22 84/15 85/7 101/19
 101/20 101/22 103/12 103/22 104/1
 104/1 104/12 106/6 106/17 112/13
audiobooks [1]  101/25
audiologist [1]  84/14
audiology [1]  61/9
auditory [15]  18/12 21/10 21/17
 22/3 26/25 54/20 54/24 57/23
 58/12 58/14 58/19 60/18 67/2 84/8
 113/3
automatically [3]  19/20 19/24
 21/10
available [7]  51/20 73/11 77/8
 78/11 79/9 104/25 116/21
Avenue [1]  1/23
avoid [1]  113/14
aware [2]  88/6 101/4
away [7]  11/16 81/12 95/10 104/21
 104/23 108/9 112/16
Axon [2]  75/7 75/9

**B**

back [19]  9/8 11/11 36/5 51/5
 52/9 54/9 54/21 62/7 62/11 64/5
 67/8 77/3 82/11 88/23 89/3 89/25
 101/17 101/22 107/9
backed [1]  43/7
background [5]  24/7 53/17 60/17
 84/13 104/14
bad [1]  34/11
ball [2]  10/5 12/1
ballistics [1]  94/3
balls [10]  9/12 9/13 10/5 10/5
 10/15 16/20 31/14 34/19 35/24
 36/2
Bankruptcy [1]  1/23
barrier [1]  92/1
barriers [5]  64/8 65/1 91/20 92/2
 111/25
base [2]  76/1 76/7
based [30]  16/23 26/6 26/19 29/19
 32/8 36/20 44/22 45/7 47/19 52/19
 57/10 64/23 66/7 67/1 84/1 85/7
 85/9 87/9 92/5 93/4 98/10 98/18
 99/21 104/2 104/5 104/22 104/24
 110/2 112/12 116/21
basic [3]  18/16 29/7 29/22
basically [5]  6/2 17/15 63/19
 69/17 70/4
basis [3]  6/24 7/5 75/1
baton [8]  7/16 11/23 32/18 35/7
 66/6 87/15 87/16 111/19
batoning [1]  35/18
batons [4]  7/14 86/19 86/19
 112/15
battle [2]  44/17 44/19
be [205]

**B** (second column)

bearing [1]  118/8
because [41]  1/18 7/12 11/2 13/17
 13/17 13/22 14/13 16/3 18/2 21/25
 22/2 22/24 23/24 23/14 31/22 32/15
 33/7 34/25 37/4 37/7 37/7 38/21
 38/22 39/4 39/13 39/15 39/20 40/7
 40/24 41/2 41/9 41/23 44/17 45/22
 46/9 47/18 47/19 55/23 57/11
 58/3 59/20 60/2 62/2 62/3 66/2
 67/4 67/23 68/7 72/5 73/22 78/3
 79/6 82/18 84/5 87/12 90/8 96/2
 96/13 102/1 102/15 106/13 108/11
 108/18 114/3 115/19 117/22 118/1
become [2]  30/1 58/9
becomes [4]  19/7 81/25 82/23 83/2
becoming [1]  101/4
been [30]  6/9 12/6 12/24 25/11
 25/15 26/14 27/25 29/9 36/2 37/10
 49/5 59/16 64/6 70/14 71/18 76/8
 76/19 85/5 99/6 99/10 99/24 100/3
 103/24 105/15 109/19 109/24
 111/12 115/20 116/17 116/18
before [15]  1/9 8/21 8/24 20/19
 25/1 48/4 61/22 65/3 69/1 93/15
 98/7 98/7 98/23 104/5 119/15
beginning [2]  34/9 34/12
behave [2]  56/18 56/19
behaving [1]  36/1
behavior [3]  13/22 35/6 50/5
behind [4]  11/10 13/12 64/8 94/22
being [47]  4/23 8/6 10/6 12/1
 12/3 12/9 12/10 13/3 13/6 13/6
 15/7 15/14 16/24 17/2 17/7 22/24
 26/23 27/18 29/15 37/25 38/5 41/4
 41/6 51/13 51/14 57/1 62/8 63/14
 78/4 79/7 82/15 83/1 83/3 83/4
 83/22 84/10 87/17 89/15 90/17
 91/1 91/25 97/19 102/21 104/5
 108/12 110/21 111/24
beings [5]  56/3 56/5 56/7 56/10
 56/18 56/20 59/7 59/7 60/1
believe [16]  9/12 12/22 15/19
 16/16 22/10 26/3 28/16 28/17
 44/16 50/4 56/9 63/22 66/15 75/20
 90/18 94/24
below [1]  26/9
Ben [2]  65/3 65/8
bent [1]  54/16
Berkeley [1]  53/9
best [19]  8/3 8/9 15/8 15/23
 17/23 17/25 33/1 48/11 49/23 51/9
 59/16 85/2 108/17 112/12 116/1
 116/14 117/11 117/21 119/9
better [9]  6/4 6/9 55/23 64/16
 71/21 73/19 89/2 89/22 114/12
between [6]  12/22 13/25 14/6 28/1
 40/18 68/22
beyond [7]  13/3 13/4 84/22 84/23
 85/18 90/22 108/15
bias [1]  79/19
big [9]  62/3 70/9 71/9 81/1 82/17
 82/25 83/4 102/22 105/14
bigger [1]  73/18
biggest [1]  102/19
bike [6]  6/6 12/22 41/5 41/6
 41/10 41/17
bird's [1]  84/6
bit [26]  6/1 12/23 24/6 24/17
 25/1 27/16 36/15 38/25 40/22 52/9
 52/10 55/2 60/23 68/19 73/11 78/3
 81/4 88/13 92/9 92/20 93/13
 100/25 103/25 106/11 108/10
 112/23
biting [1]  11/20
bits [1]  78/15
blaring [1]  38/12
blocking [1]  64/19
blue [1]  99/3 99/10 99/15 99/21
blueprint [1]  69/16
blurry [1]  102/16
bodily [1]  11/23
body [9]  57/3 66/13 75/9 80/15

**B/C** (third column)

84/24 85/10 100/17 106/3 113/8
body-worn [3]  66/13 80/15 84/24
 85/10 106/3 113/8
bones [1]  8/19
bored [1]  51/13
both [16]  5/9 5/20 12/11 16/2
 21/23 39/24 56/2 73/7 73/12 80/9
 80/11 95/23 98/6 105/19 108/22
 108/22
bottle [1]  14/10
bottles [1]  35/2
bottom [2]  10/25 90/15
box [4]  65/22 66/1 92/11 112/7
brain [7]  18/23 19/9 19/20 19/24
 21/10 21/18 21/25
brains [1]  19/4
break [2]  27/16 36/15
bricks [1]  35/2
brief [6]  114/17 115/4 115/25
 116/14 117/18 117/18
briefed [1]  118/1
briefing [3]  22/10 118/6 118/24
briefly [4]  18/19 78/5 89/15
 114/14
briefs [2]  118/25 119/11
brightness [3]  78/9 78/21 90/12
bring [5]  28/4 44/12 56/23 78/24
 85/14
bringing [1]  15/9
broad [9]  9/19 9/23 29/5 34/3
 34/5 53/1 53/1 54/1 54/1 57/21
broader [2]  119/4 119/7
brought [5]  10/4 32/21 54/10 75/1
 94/25
Brown [1]  69/24
brutally [1]  41/4
build [1]  71/2
building [9]  8/24 18/11 25/15
 25/17 46/24 54/24 57/12 59/1
 105/18
bullet [1]  39/18
bunch [2]  40/6 94/3
Bureau [3]  77/2 77/4 77/6
business [1]  70/21
buy [2]  75/8 75/11
buzz [2]  19/16 19/21

**C**

California [3]  4/22 24/25 24/25
call [4]  20/11 71/5 77/18 100/21
called [4]  19/13 76/2 84/10 106/5
calling [4]  17/10 34/10 63/17
 68/3
calls [1]  68/10
calm [1]  58/5
came [9]  8/11 32/17 34/10 81/11
 84/21 91/9 92/5 93/24 95/10
camera [21]  20/25 20/25 28/20
 66/13 72/8 78/2 78/23 79/3 80/4
 80/8 80/9 80/15 84/25 85/10 97/15
 97/16 97/18 97/25 98/25 106/3
 113/8
cameras [10]  72/14 81/20 85/11
 99/13 103/16 103/16 103/18 103/20
 104/7 105/16
camp [2]  76/1 76/7
campus [1]  59/11
cams [2]  75/9 100/17
can [147]
can't [18]  13/20 18/2 20/18 34/13
 34/19 36/5 37/11 37/11 46/20 50/6
 53/7 57/16 57/16 59/10 59/21
 113/16 115/10 116/8
cannot [3]  20/8 37/9 67/10
capacity [1]  60/22
capitol [19]  10/14 18/11 22/24
 25/17 53/14 54/24 57/12 59/1 92/2
 99/2 99/11 99/15 99/16 114/19
 116/5 116/18 116/19 116/21 116/22
captured [1]  79/3 98/14 99/14
car [2]  11/9 33/20
career [5]  24/15 25/7 25/11 29/9

**career... [1]** 76/1/1

**careful [4]** 36/4 36/7 37/6 85/9

**carefully [2]** 79/8 96/5

**carries [1]** 79/18

**case [70]** 4/3 4/25 9/17 9/21 11/24 16/13 25/22 31/10 33/9 33/12 41/19 42/9 43/12 43/13 45/6 45/25 47/1 50/1 53/21 57/11 61/15 62/17 67/12 67/13 67/13 70/19 70/20 70/23 70/25 71/2 71/7 71/9 71/17 72/10 73/9 73/3 74/8 75/18 76/6 77/23 79/16 79/25 80/14 81/9 82/4 82/23 91/1 93/19 93/20 94/12 94/13 95/1 95/2 95/5 95/12 95/12 95/13 95/14 95/15 95/17 95/22 95/23 96/2 96/12 96/13 99/11 100/21 108/8 108/9 115/3

**cases [21]** 5/14 34/3 34/7 35/24 36/6 54/11 71/1 71/12 71/15 71/16 72/18 72/20 72/22 72/25 73/4 73/13 74/6 83/24 93/17 116/16 116/17

**categories [1]** 39/1

**category [4]** 6/8 79/11 100/16 111/5

**caught [2]** 95/6 99/13

**causation [4]** 22/9 118/10 118/11 118/24

**cause [1]** 22/12

**caused [4]** 18/10 54/23 57/9 57/12

**caution [2]** 68/6 68/6

**CC1 [1]** 97/15

**CCTV [4]** 98/1 98/10 98/14 99/15

**CDU [1]** 53/13

**cell [1]** 49/11

**Central [1]** 53/8

**certain [9]** 7/4 7/13 15/25 23/17 29/15 99/12 103/12 104/13 106/5

**certainly [4]** 32/20 35/20 71/3 119/10

**certainty [1]** 26/7

**certified [1]** 93/19

**certify [1]** 120/3

**cetera [2]** 11/20 57/8

**challenge [3]** 9/15 9/16 9/22

**challenging [8]** 7/6 8/14 17/5 17/11 33/17 43/1 44/4 106/11

**chambers [2]** 51/25 52/1

**change [6]** 53/18 53/19 53/19 57/2 79/12 101/22

**changed [5]** 31/10 31/10 31/11 31/11 31/13

**changes [3]** 57/4 61/13 79/20

**changing [1]** 78/25

**chant [2]** 103/18 103/21

**chanting [1]** 80/17

**chaos [5]** 8/13 18/10 22/2 54/23 57/12

**chaotic [1]** 7/6

**characterizations [1]** 113/15

**characterize [1]** 111/16

**characterizing [2]** 111/20 112/16

**check [2]** 90/10 90/13

**cheek [1]** 54/3

**Chicago [1]** 1/14

**choice [2]** 46/18 46/19

**chose [1]** 39/23

**Christmas [1]** 19/15

**chronologically [1]** 9/10

**Chuck [2]** 3/3 4/22

**circle [10]** 88/15 107/14 107/16 107/20 108/2 108/23 108/24 109/1 109/8 109/22

**circled [1]** 107/4

**circles [1]** 100/21

**circling [1]** 96/3

**circumstance [3]** 37/4 40/9 54/7

**circumstances [5]** 6/21 23/18 33/3 41/3 56/21

**citations [1]** 55/10

**cite [3]** 27/14 36/4 55/16 36/16 44/7 74/3

**cities [1]** 24/24

**city [3]** 24/24 24/25 53/16

**civil [12]** 16/17 24/8 24/9 24/16 25/2 32/21 52/22 67/12 69/23 73/13 75/22 95/5

**claim [2]** 32/21 33/6

**claims [1]** 28/10

**clarification [2]** 28/6 38/4

**clarify [10]** 25/22 27/8 27/19 28/8 28/14 30/23 40/17 43/3 56/12 56/22

**clarifying [1]** 28/23

**clarity [1]** 104/18

**class [1]** 70/4

**classes [1]** 70/7

**classification [1]** 95/19

**classified [1]** 94/6

**CLE [1]** 74/4

**clear [19]** 11/25 12/5 13/17 28/11 32/16 33/2 38/15 39/11 40/15 40/20 49/21 61/8 69/16 83/19 92/23 94/19 99/20 102/23 105/7

**clearer [1]** 79/14

**clearly [3]** 32/18 44/13 66/10

**clinical [1]** 60/24

**clip [2]** 88/12 90/17

**clips [4]** 89/8 89/10 89/11 92/22

**close [7]** 41/23 66/8 72/8 80/18 88/5 103/16 104/7

**closer [2]** 103/19 109/23

**clue [1]** 91/12

**clusters [1]** 9/3

**cocktail [4]** 19/14 19/20 21/9 58/6

**Code [1]** 114/22

**cognitive [7]** 18/10 18/13 19/10 54/23 54/25 56/24 57/14

**cognitively [1]** 19/1

**Cohen [29]** 3/7 63/18 67/9 69/10 69/22 86/11 88/9 88/21 88/25 89/6 89/24 90/14 90/23 96/21 97/13 97/24 100/6 100/14 101/6 101/12 102/3 103/8 104/9 105/25 107/3 107/14 109/6 110/6 110/10

**Cohen's [4]** 63/11 115/1 118/4 118/8

**cohort [2]** 76/20 76/20

**colleagues [1]** 116/17

**collect [4]** 81/16 82/9 82/10 82/14

**collected [2]** 83/17 83/20

**collectively [1]** 17/15

**college [1]** 76/15

**colored [1]** 50/18

**colorful [1]** 102/23

**COLUMBIA [1]** 1/1

**come [8]** 23/2 40/7 55/4 77/14 92/13 96/9 97/4 116/10

**comes [3]** 33/25 34/4 39/6

**coming [4]** 13/10 13/11 74/2 76/9

**command [1]** 41/16

**commands [4]** 12/7 39/22 39/23 40/1

**commenting [1]** 87/14

**comments [4]** 16/7 16/10 16/15 17/9

**common [4]** 18/20 21/17 22/1 57/25

**communicate [2]** 94/10 102/11

**company [4]** 70/15 70/22 75/9 76/2

**compared [4]** 24/17 53/15 72/3 86/4

**compares [1]** 85/25

**comparison [1]** 25/5

**compilation [2]** 78/12 94/10

**compile [1]** 74/24

**compiling [1]** 73/8

**complaint [1]** 36/19

**complete [1]** 89/15

**completely [1]** 47/1

**complex [1]** 19/2

**compliant [19]** 11/1 11/5 12/4 36/7 38/23 38/6 38/9 38/11 38/16 38/23 39/7 39/12 39/13 39/19 39/19 40/5 50/19 51/1

**complicated [1]** 69/7

**comply [2]** 11/2 11/11

**complying [2]** 11/13 49/23

**component [1]** 66/12

**concept [2]** 18/22 55/17

**concepts [2]** 10/23 13/17

**concern [3]** 6/1 6/11 114/9

**concerns [5]** 18/9 113/25 114/1 114/5 116/5

**conclude [3]** 42/11 42/14 118/9

**concluded [1]** 119/21

**conclusion [8]** 39/5 55/4 91/10 92/5 92/13 93/4 93/10 104/24

**conclusions [2]** 45/3 90/25

**conditions [1]** 38/15

**conference [4]** 74/3 76/1 76/7 76/23

**conferences [5]** 74/1 74/2 74/3 74/4 74/5

**confidently [1]** 83/4

**confirm [1]** 5/1

**confrontation [2]** 109/8 109/22

**confrontations [2]** 92/1 109/9

**confronted [5]** 64/7 64/25 91/19 91/25 111/24

**confronting [1]** 64/9

**confused [2]** 65/14 94/8

**confusing [1]** 12/23

**conjunction [1]** 80/20

**connection [2]** 79/22 89/2

**Connor [2]** 34/4 34/5

**consider [2]** 68/1 85/23

**considered [2]** 11/5 25/19

**considering [1]** 45/13

**consistent [4]** 29/12 31/12 53/4 53/10

**constantly [2]** 33/18 34/1

**constitute [1]** 45/3

**constitutes [3]** 45/1 45/24 120/4

**Constitution [1]** 1/23

**constitutional [1]** 33/6

**construction [2]** 70/17 70/18

**consultation [2]** 114/18 116/22

**contacting [1]** 87/15

**content [1]** 111/10

**contents [2]** 3/1 96/5

**contest [1]** 117/13

**continue [5]** 21/5 37/9 52/5 65/19 117/17

**continued [6]** 1/19 2/1 3/5 3/5 49/16 52/7

**Contrary [1]** 56/9

**contrast [5]** 29/8 78/10 78/22 79/16 90/12

**contributing [2]** 13/23 14/2

**control [1]** 16/5

**controlling [1]** 6/5

**conversation [5]** 19/19 19/22 19/25 19/25 21/12

**conversations [4]** 19/17 19/18 19/21 50/3

**convince [1]** 119/13

**convinced [1]** 49/25

**cops [2]** 56/10 84/18

**corner [2]** 90/15 101/16

**correct [32]** 6/18 25/25 26/3 27/20 27/21 27/24 32/10 48/20 55/21 56/17 61/9 69/8 74/18 74/20 80/23 84/12 89/7 92/7 92/14 92/15 92/18 98/11 99/2 103/9 104/23 106/7 107/4 107/7 107/24 108/5 116/3 120/4

**correctly [2]** 83/5 93/7

**corresponds [1]** 89/6

**corroborate [1]** 96/6

**could [54]** 6/5 6/9 6/21 7/13 7/15 7/16 7/19 8/12 9/23 12/6 20/19 21/7 32/20 32/25 42/5 43/9 44/7

## C

could... [37]   44/12 46/7 46/22
50/25 51/4 54/1 54/2 54/13 54/15
54/17 57/23 67/6 72/24 77/20
77/20 78/24 80/20 84/20 86/4 86/4
87/4 89/16 89/20 90/12 94/14 96/8
101/7 104/15 104/21 106/21 106/22
107/9 109/2 109/18 109/24 117/13
118/17
couldn't [4]   20/19 115/23
counsel [4]   54/3 4/6 62/19 62/20
County [2]   77/7 95/4
couple [9]   60/15 60/16 89/8 89/10
89/11 91/5 96/21 102/9 107/1
course [4]   24/20 55/13 75/3 75/6
coursework [1]   70/5
court [39]   1/1 1/22 1/22 5/25 6/1
15/20 22/9 26/15 33/12 33/25
34/12 37/18 39/20 45/12 45/18
46/9 46/15 46/16 47/6 47/15 47/21
48/21 63/19 69/16 70/19 74/11
74/12 83/19 84/24 87/2 87/6 88/12
93/15 93/24 94/19 95/13 117/5
120/3 120/13
Court's [1]   6/11
courthouse [1]   25/18
courtroom [1]   5/24
courts [15]   1/23 34/2 34/8 34/12
34/16 34/21 40/5 44/15 44/16
45/16 45/18 45/20 45/21 45/23
67/11
courts' [1]   34/2
courtyard [1]   100/1
covers [1]   98/4
crack [1]   72/1
create [2]   59/10 59/12
created [4]   79/22 93/25 93/25
98/10
creates [1]   14/17
creating [1]   76/11
crime [3]   15/13 76/11 77/8
criminal [8]   1/3 4/3 32/19 62/17
67/13 73/12 76/16 76/23
criminalists [1]   77/5
CRM [1]   1/12
cropped [1]   90/11
cross [10]   3/4 3/5 3/8 5/9 24/2
44/11 52/7 86/9 112/3 112/9
cross-examination [7]   3/4 3/5 3/8
24/2 44/11 52/7 86/9
cross-examine [2]   112/3 112/9
crossfire [1]   95/6
crowd [33]   6/5 7/20 7/23 9/13
10/7 10/15 12/2 12/3 12/3 12/6
12/9 13/5 13/6 13/23 14/1 14/8
14/16 14/21 16/5 16/6 25/6 32/25
33/3 33/8 35/4 35/9 35/11 35/14
35/25 36/2 39/10 53/5 58/1
crowds [3]   13/25 25/8 35/2
cues [2]   80/21 80/21
cuff [2]   23/5 23/11
cumulative [2]   17/22 17/22
curious [2]   67/3 67/25
current [6]   27/7 31/6 31/7 59/17
61/16 75/12
Currently [1]   70/22
cut [1]   102/7
cutoff [1]   118/18
CV [1]   24/22

## D

danger [5]   11/17 11/22 13/24 14/2
39/6
dangerous [1]   38/2
dark [1]   78/22
data [3]   22/25 45/8 45/11
date [2]   118/18 118/21
Dated [1]   120/10
DAUBERT [10]   1/9 5/5 5/13 5/13
44/16 44/18 63/11 63/15 95/17
95/20

David [1]   2/3
day [11]   10/21 6/24 11/20 12/22
15/22 16/1 16/22 17/24 30/4 43/10
44/1 46/24 50/3 99/7 120/10
days [3]   34/9 57/17 75/4
DC [6]   1/5 1/16 1/24 5/24 25/12
53/13
deadly [2]   7/15 11/21
dealing [3]   26/22 67/16 67/17
dealt [1]   25/7
Dean [2]   107/17 108/23
Dearborn [1]   1/13
death [1]   11/23
decades [1]   32/2
deceive [1]   79/21
deceptive [1]   79/22
decide [6]   23/9 34/3 39/21 40/24
43/15 85/15
deciding [4]   5/11 43/15 43/18
82/4
decision [7]   26/11 27/6 46/11
61/1 83/4 83/9 104/19
decisions [3]   33/25 34/2 34/21
deemed [1]   29/22
deep [5]   13/2 13/5 14/8 79/17
79/21
deeper [1]   36/9
defendant [7]   1/7 2/3 9/20 9/21
9/25 9/25 27/20
Defendant's [3]   88/20 89/4 100/5
DEFENDER [7]   2/3 2/7 4/14 4/18
63/2 63/6 65/9
defense [12]   5/6 5/15 15/14 15/17
17/2 43/12 47/13 63/22 76/16 92/6
112/11 113/21
define [1]   29/3
defined [2]   29/19 29/25
definitely [2]   67/8 87/12
definition [6]   29/17 30/24 33/11
33/11 33/14 35/22
definitional [1]   32/14
definitions [1]   32/13
definitive [1]   28/9
definitively [1]   54/15
defying [3]   65/1 91/20 111/24
degree [12]   19/6 26/7 59/13 59/25
60/2 60/17 60/21 60/24 69/23
69/25 70/1 70/10
degrees [2]   61/9 70/2
deliberately [1]   66/20
deliver [1]   94/4
delivering [1]   94/22
demonstrate [4]   15/11 63/14 94/1
112/22
demonstrative [2]   76/13 76/19
department [1]   32/22
depend [2]   31/15 31/18
dependent [2]   52/17 53/3
depending [7]   21/11 29/25 32/22
50/19 51/1 53/20 85/8
depends [2]   12/6 52/11
depict [3]   74/6 96/25 99/6
depicted [1]   97/19
deployed [3]   14/15 15/1 87/17
deposition [1]   67/12
depth [1]   29/10
describe [8]   6/16 8/15 8/16 10/19
12/17 69/22 72/24 112/19
described [2]   31/12 113/14
describing [2]   21/9 21/22
descriptively [1]   111/20
designers [1]   73/16
detail [1]   102/21
detailed [2]   86/3 96/15
details [3]   28/18 78/23 79/2
determine [11]   10/1 15/21 15/23
33/21 38/7 54/12 57/17 84/17 88/5
96/7 97/4
determined [2]   97/25 105/3
determining [1]   105/2
develop [1]   81/10
developed [1]   74/22

developing [3]   73/2 73/5 95/24
device [2]   46/18 14/16
40/19 48/22
devices [13]   7/21 8/6 12/1 12/2
12/9 12/3 13/7 13/9 14/20
14/22 35/7 86/18
diagram [2]   71/7 81/10
dictating [1]   43/15
did [57]   7/17 24/22 25/2 27/23
27/23 32/10 32/23 39/22 44/7 45/3
50/24 55/3 56/1 60/17 60/20 60/21
63/12 68/8 68/10 71/2 71/17 72/13
74/25 75/6 75/7 75/8 75/11 75/14
76/22 77/3 82/5 82/10 83/13 85/16
86/22 87/22 87/23 88/21 89/10
90/7 90/11 91/21 91/22 92/16
93/22 94/13 97/4 97/9 101/12
101/21 102/25 105/11 108/1 108/23
109/8 109/9 113/22
didn't [19]   6/18 27/20 37/22
54/10 67/21 74/24 84/3 85/12 88/8
91/24 92/3 95/9 95/14 96/13 97/13
99/17 102/5 102/7 112/2
difference [5]   17/11 23/22 68/22
79/9 102/18
different [49]   8/16 10/19 10/22
10/23 12/24 14/4 14/9 15/18 17/13
22/3 28/20 29/10 30/9 32/5 35/17
36/7 40/9 46/24 52/23 52/24 52/25
53/14 53/16 53/16 53/16 53/20
57/9 72/13 73/4 77/7 77/12 80/9
81/20 86/25 91/13 92/22 94/12
94/13 97/9 100/17 103/12 103/15
103/15 106/3 106/6 110/16 110/16
110/17 113/8
differential [1]   72/17
differently [1]   32/25
difficult [4]   10/1 19/2 82/24
86/2
difficulty [2]   20/4 112/24
dig [2]   28/18 36/8
digital [3]   71/2 73/12 93/25
dimensional [2]   67/15 71/4
dimensions [2]   81/12 116/4
direct [9]   3/4 3/5 3/8 5/9 6/14
41/15 49/16 69/20 100/22
directed [2]   9/5 9/7
direction [3]   38/6 100/4 105/17
directions [1]   49/23
directly [9]   16/8 16/16 40/4
41/14 64/7 64/9 64/25 91/19
111/24
disagree [1]   45/17
disclose [1]   115/5
disclosed [1]   42/18
disconnect [1]   20/13
discovering [1]   75/16
discovery [4]   5/10 37/19 38/6
86/25
discrete [1]   33/8
discriminate [1]   14/6
discriminately [1]   14/12
discuss [1]   24/15
discussed [3]   5/25 61/16 92/12
discussing [2]   15/18 26/23
disk [1]   62/1
disperse [1]   32/24
disrespect [1]   67/5
dissertation [1]   61/4
distance [3]   104/13 115/23 118/10
distances [1]   113/7
distinct [1]   13/25
distinction [1]   40/18
distinguish [1]   13/25
DISTRICT [8]   1/1 1/1 1/10 1/23
2/4 2/8 65/9 77/7
disturbance [5]   16/18 24/8 24/9
24/16 52/23
disturbances [1]   25/2
divert [1]   19/24
DNA [1]   45/25
do [99]   5/16 5/17 5/22 7/17 8/21

**D**

do... **[94]**   10/10 11/2 11/9 11/16
14/11 19/4 19/17 21/4 21/9 24/7
27/14 32/14 32/20 33/21 33/23
34/19 37/24 38/6 41/16 43/1 46/7
46/25 47/8 47/10 49/12 51/19 52/4
54/19 56/13 56/15 57/11 57/15
57/16 58/20 59/12 59/14 59/16
59/23 60/20 61/14 61/25 67/6
67/10 67/15 67/19 67/24 68/13
70/3 71/1 73/1 73/7 73/11 74/6
77/21 77/24 77/25 78/2 78/14
79/10 79/23 81/13 82/6 87/10 89/1
89/14 89/16 89/19 90/12 93/15
94/14 95/1 95/15 95/21 96/13
96/17 97/16 97/17 101/19 103/17
103/20 105/4 106/14 110/18 112/4
113/24 116/10 116/14 117/12
117/21 117/24 118/21 119/3 119/4
119/8
**doctorate [1]**   60/24
**does [34]**   11/3 11/4 11/11 11/12
11/12 11/16 14/17 17/4 23/5 31/5
31/6 37/5 40/13 48/21 53/22 53/23
56/24 59/21 67/10 68/15 69/5
70/23 78/17 79/4 84/7 89/7 90/9
94/22 96/24 107/14 107/24 108/1
110/13 111/3
**doesn't [16]**   14/18 34/6 35/4
38/23 45/5 57/18 66/3 67/24 69/8
89/1 96/22 99/1 111/16 113/4
115/4 118/10
**doing [19]**   5/2 6/4 7/11 14/8 22/9
35/4 35/6 38/1 41/13 51/9 76/11
79/25 81/17 84/5 94/8 102/12
105/4 110/2 112/17
**DOJ [2]**   1/12 1/15
**DOJ-CRM [1]**   1/12
**DOJ-USAO [1]**   1/15
**domain [1]**   70/20
**don't [74]**   7/18 17/19 20/11 21/7
22/7 23/5 23/13 27/19 32/9 37/20
38/10 41/2 41/18 43/10 44/16
44/16 44/24 44/25 44/25 45/2
45/17 45/24 46/6 46/24 47/10
47/12 47/18 50/14 51/18 51/20
51/23 51/24 54/11 55/22 56/3
58/24 60/2 61/9 61/20 62/10 63/12
64/12 69/8 69/9 79/12 79/23 84/13
88/1 89/3 90/7 90/11 92/19 93/21
94/5 98/18 99/3 101/19 102/18
103/2 103/3 104/11 104/15 105/9
106/7 110/5 113/5 113/6 113/24
115/3 115/6 115/17 116/11 116/13
117/14
**done [16]**   6/9 6/10 14/20 15/20
15/23 17/24 24/8 55/21 59/15 70/2
72/5 78/18 90/21 92/12 96/11
102/1
**doors [2]**   98/17 105/18
**dots [5]**   99/4 99/10 99/15 99/21
107/16
**dotted [1]**   98/3
**doubt [2]**   22/16 44/25
**dovetails [1]**   22/25
**down [30]**   14/21 26/14 27/16 34/14
34/15 35/14 36/15 39/3 40/7 40/8
42/12 48/24 49/20 54/16 66/9 72/9
78/8 79/7 81/15 85/6 91/16 92/17
92/20 92/21 97/2 101/18 102/20
107/7 107/11 115/6
**downtown [1]**   53/8
**downward [1]**   7/14
**dozens [1]**   77/13
**Dr [2]**   63/11 67/9
**Dr. [29]**   5/5 5/7 5/8 5/18 6/8
6/16 9/10 16/22 17/23 18/4 18/9
20/2 20/5 24/4 25/21 30/11 31/5
36/14 37/3 37/13 43/10 44/13
49/18 52/9 54/19 60/15 61/11
61/19 62/8

**Dr. Best will [1]**   17/23
**Dr. Rylant [24]**   5/5 5/6 5/14
18/9 20/2 20/5 24/4 25/21 30/11
31/5 36/14 37/3 37/13 43/10 44/13
49/18 52/9 54/19 60/15 61/11
61/19 62/8
**Dr. Rylant is [2]**   6/8 18/4
**Dr. Rylant On [1]**   5/8
**Dr. Rylant to [1]**   5/18
**Dr. Rylant's [1]**   16/22
**draft [1]**   28/1
**draw [3]**   44/23 47/2 113/9
**drawing [3]**   45/3 70/7 111/21
**drill [1]**   39/3
**drive [5]**   15/1 15/4 61/24 61/25
62/2
**driving [1]**   15/5
**dubious [1]**   115/18
**due [3]**   18/13 54/25 119/1
**duration [1]**   47/11
**during [11]**   6/22 21/22 25/5 58/5
58/7 59/8 61/7 77/11 78/7 84/4
96/4
**duties [1]**   25/14

**E**

**each [15]**   5/12 17/3 43/19 46/10
59/4 72/14 76/20 77/19 86/3 97/6
97/20 100/7 108/20 109/17 109/21
**ear [1]**   21/16
**earlier [5]**   16/20 26/14 53/18
54/10 58/6
**earliest [1]**   81/8
**early [5]**   15/17 70/15 76/17
**ears [2]**   18/24 86/1
**easier [5]**   27/17 36/16 67/14 79/4
81/25
**easiest [3]**   89/14 89/18 100/10
**easily [2]**   78/25 100/3
**easy [3]**   28/14 28/15 67/19
**education [2]**   61/9 69/22
**effect [7]**   17/23 19/14 21/10
21/17 22/12 50/2 100/25
**effective [2]**   73/9 81/18
**effectively [2]**   33/2 94/20
**efficient [2]**   71/21 83/14
**effort [1]**   9/22
**eight [1]**   73/15
**either [5]**   9/11 17/7 50/19 51/2
88/13
**elaborate [1]**   10/10
**element [2]**   65/18 71/3
**elevates [1]**   57/7
**Elizabeth [1]**   2/7
**else [13]**   22/20 52/5 54/17 61/21
65/5 90/21 105/13 112/4 116/7
118/3 118/13 118/13 119/15
**elsewhere [2]**   21/21 99/25
**embedded [1]**   90/9
**eminent [1]**   70/19
**emotional [11]**   18/10 26/10 27/5
54/22 56/23 56/25 57/3 57/6 57/9
57/14 58/18
**encourage [1]**   22/13
**encouraged [1]**   84/18
**end [3]**   77/14 81/17 90/17
**endangering [1]**   41/14
**endeavor [1]**   106/8
**ended [2]**   95/6 98/12
**energy [1]**   70/17
**enforcement [47]**   6/20 7/4 7/7
10/13 10/16 10/22 10/24 14/5 14/5
14/19 15/25 16/8 21/14 21/24 24/7
26/8 27/4 28/25 29/1 29/3 29/13
29/18 30/4 30/12 30/18 30/24 31/7
31/8 31/23 33/18 36/21 52/11
52/16 52/22 53/12 53/23 53/24
55/21 56/1 56/2 56/4 56/4 56/8
61/1 64/7 74/23 75/11
**engage [2]**   19/19 61/4
**engaged [2]**   13/22 28/12
**engagement [1]**   73/23

**engineering [1]**   69/24
**enhance [2]**   77/20 78/20
**enhanced [2]**   90/20 111/12
**enhancement [7]**   66/8 78/17 79/11
79/15 87/23 103/11 107/6
**enhancements [14]**   88/10 89/10
90/5 90/10 90/24 91/2 92/16 100/7
100/15 100/19 101/8 101/12 102/7
107/4
**enhancing [1]**   73/7
**enough [6]**   30/16 36/10 44/9 68/18
101/2 118/2
**entails [1]**   80/2
**enter [1]**   57/7
**enterprise [1]**   67/11
**entire [9]**   13/23 33/8 35/4 35/14
47/11 61/1 67/11 69/18 98/15
**entitled [2]**   112/11 120/5
**entrance [1]**   99/11
**environment [1]**   59/10
**equally [1]**   82/15
**equipment [1]**   75/10
**equipped [1]**   45/19
**erred [1]**   68/5
**error [1]**   50/23
**escorted [1]**   116/17
**especially [1]**   19/5
**essentially [2]**   6/19 30/8
**establish [5]**   5/8 5/19 5/21 5/22
22/6
**estate [1]**   70/16
**estimate [1]**   48/11
**estimated [3]**   84/21 98/9 98/25
**estimates [1]**   117/22
**et [2]**   11/20 57/8
**et cetera [1]**   57/8
**Eugene [4]**   2/4 2/6 4/15 63/3
**evaluate [4]**   41/20 42/21 43/2
44/4
**even [14]**   21/7 26/23 38/17 45/18
46/2 46/6 46/21 53/5 67/23 69/7
72/8 77/13 86/1 112/18
**event [2]**   46/2 84/4
**events [25]**   7/4 15/19 15/25 16/21
17/24 17/25 18/1 18/4 29/2 42/13
42/15 42/16 51/12 63/25 73/5 74/4
74/7 79/12 86/17 89/13 111/6
111/10 111/13 111/16 112/19
**ever [7]**   25/11 25/14 72/12 103/2
103/3 104/8 106/8
**every [11]**   15/21 33/3 45/19 51/18
58/9 73/3 74/1 74/8 76/7 94/12
99/7
**everybody [3]**   28/14 32/7 89/21
**everyone [7]**   4/24 13/18 20/5 32/9
48/22 81/5 82/18
**everyone's [2]**   116/1 116/14
**everything [6]**   15/21 18/17 21/24
58/2 71/8 77/16
**evidence [19]**   10/2 12/1 15/11
17/6 23/13 23/14 28/19 44/11
46/19 63/23 74/15 74/18 75/17
76/14 76/19 86/16 104/24 111/5
112/10
**evidentiary [1]**   43/16
**evolved [1]**   26/13
**evolving [1]**   61/16
**exact [3]**   47/14 81/22 103/14
**exactly [11]**   9/18 12/5 32/10
37/21 59/19 80/19 85/24 90/23
108/20 109/1 113/25
**exaggeration [1]**   37/12
**examination [15]**   3/4 3/4 3/5 3/5
3/8 3/8 3/9 6/14 24/2 44/11 49/16
52/7 69/20 86/9 110/8
**examine [2]**   112/3 112/9
**example [25]**   7/13 8/18 11/3 11/8
11/14 19/12 21/13 32/15 34/9
34/15 35/14 36/17 36/24 39/10
46/4 51/4 54/2 58/6 68/21 69/4
71/19 71/22 71/25 72/4 77/18
**examples [12]**   7/12 7/21 8/11 10/3

**E**

examples... **[8]**   26/9 27/18 34/6
35/8 40/5 42/3 53/6 57/8
**excellent [1]**   68/20
**except [1]**   43/16
**excessive [46]**   6/22 7/5 8/13 9/24
10/17 17/8 26/9 28/10 28/12 28/17
28/21 29/2 29/16 31/24 32/15
32/19 33/10 33/12 33/21 35/22
35/25 36/18 36/22 37/2 38/10 39/3
39/8 40/11 41/24 42/5 42/10 42/12
42/14 42/23 42/24 43/9 44/3 45/1
45/3 45/24 52/16 52/23 53/15
54/14 54/18 69/11
**exclude [2]**   23/17 46/18
**exclusion [10]**   18/12 21/17 26/25
54/20 54/24 57/24 58/12 58/14
58/19 60/18
**Excuse [1]**   114/22
**exercise [3]**   57/1 57/4 101/6
**exhibit [12]**   88/20 89/4 96/18
100/5 100/8 100/9 101/5 103/4
103/13 105/22 106/21 107/10
**Exhibit 14 [2]**   96/18 107/10
**Exhibit 16 [1]**   100/9
**Exhibit 17 [1]**   101/5
**Exhibit 18 [1]**   103/4
**Exhibit 21 [1]**   106/21
**exhibits [4]**   42/18 42/19 88/18
100/7
**exist [1]**   57/18
**existed [1]**   31/15
**existence [1]**   70/14
**exists [1]**   73/10
**exit [4]**   15/3 15/4 15/5 49/21
**exiting [1]**   99/12
**expect [3]**   18/16 21/23 58/12
**expected [3]**   12/7 18/13 54/25
**experience [24]**   24/8 24/18 26/10
27/5 29/6 29/10 29/15 30/16 52/20
52/21 57/1 57/23 58/10 58/14 59/3
59/4 59/21 67/20 67/22 67/23 68/7
71/16 71/20 77/12
**experienced [19]**   6/19 7/3 8/12
15/20 26/7 28/25 29/1 29/3 29/17
30/3 30/12 30/17 30/24 33/4 43/8
52/15 52/22 53/12 57/17
**experiences [1]**   59/3
**experiencing [2]**   16/22 58/18
**experiments [1]**   59/13
**expert [39]**   5/12 26/22 27/11 42/1
42/21 43/11 44/4 44/14 44/23 45/8
45/16 45/19 45/22 46/1 63/20
66/20 66/24 67/1 67/3 67/4 67/24
68/1 68/3 68/7 69/4 84/10 84/15
85/24 86/2 93/20 94/2 94/6 95/15
95/16 95/19 111/2 111/5 113/3
113/4
**expert's [1]**   94/15
**expertise [10]**   67/2 67/17 85/8
85/18 94/3 94/17 94/22 95/21
104/16 104/16
**experts [7]**   44/18 44/19 45/15
45/22 75/2 87/13 116/11
**explain [10]**   16/2 17/9 18/18 55/2
80/1 81/18 82/10 82/13 84/20 94/7
**explained [1]**   26/14
**explosive [4]**   8/6 14/15 14/22
86/18
**explosive-type [1]**   8/6
**expressed [1]**   6/1
**extensive [1]**   24/13
**extent [7]**   43/16 66/11 78/23
82/12 83/15 104/3 111/11
**external [1]**   62/2
**extreme [2]**   35/10 35/14
**extremities [1]**   14/22
**eye [1]**   84/6
**eyes [1]**   18/24

**F**

face **[8]**   8/11 14/2 14/24 50/20
54/3 54/4 54/13 54/18
**facing [1]**   13/24
**fact [16]**   27/24 28/13 41/19 71/7
75/1 77/21 78/13 81/18 81/25 82/4
83/3 83/8 94/19 99/3 99/6 118/9
**factor [2]**   81/22 82/4
**facts [2]**   54/11 83/5
**factual [1]**   112/8
**faculty [1]**   76/18
**failings [1]**   6/9
**fair [8]**   31/9 31/17 31/21 36/10
44/9 68/18 113/19 118/20
**fake [1]**   79/17 79/21
**fall [11]**   6/7 16/13 65/22 65/25
69/2 81/21 92/11 100/23 101/1
101/3 112/6
**falling [1]**   93/1
**familiar [1]**   102/1
**fancy [1]**   67/16
**far [9]**   30/8 48/24 80/25 81/12
85/8 86/1 90/10 106/16 116/6
**Fat [11]**   63/18 64/3 64/6 64/25
66/12 66/18 67/10 67/10 70/14
73/17 73/20
**fear [1]**   57/10
**features [1]**   105/17
**federal [16]**   2/3 2/7 4/14 4/18
25/15 29/13 63/2 63/6 65/8 74/10
74/13 93/14 93/17 95/1 95/5 95/13
**feel [3]**   18/25 87/20 94/14
**feet [5]**   16/15 104/21 104/23
108/10 108/14
**felt [2]**   75/5 96/13
**fencing [1]**   6/6
**few [8]**   25/23 26/5 42/7 55/18
75/11 75/21 100/19 101/14
**field [1]**   75/2
**fight [12]**   19/8 19/8 58/8 58/10
58/22 58/23 59/5 59/6 103/20
103/24 104/4 116/15
**fighting [5]**   14/11 66/16 85/4
112/25 116/2
**figure [5]**   23/21 30/12 43/24
53/11 90/24
**figured [2]**   100/10 108/7
**figuring [2]**   72/5 117/24
**filled [1]**   107/17
**filling [1]**   107/17
**filmed [2]**   98/15 104/6
**filter [1]**   102/17
**filters [1]**   19/20
**final [1]**   11/21
**finally [1]**   79/6
**find [6]**   36/21 38/7 64/8 72/13
79/23 80/21
**finder [4]**   81/18 82/4 83/3 83/8
**finders [2]**   71/7 94/19
**finding [3]**   81/25 87/8 108/8
**findings [2]**   85/13 97/8
**fine [7]**   46/10 47/17 47/23 62/5
68/1 111/14 113/15
**finish [3]**   60/5 61/22 81/10
**fire [1]**   33/1
**firearm [2]**   11/23 12/16
**fired [1]**   36/2
**first [32]**   6/12 6/16 8/16 24/6
26/4 28/1 33/22 34/23 55/2 55/18
63/21 63/22 63/23 70/19 71/19
76/5 77/16 77/23 78/16 86/15
87/21 87/24 89/7 90/4 90/13 91/8
96/23 96/24 100/9 100/16 106/12
111/4
**five [12]**   13/14 60/7 63/18 63/23
64/1 66/18 69/15 110/12 110/12
118/16 119/10 119/12
**flags [1]**   102/22
**flashes [2]**   96/7 96/8
**flight [6]**   19/8 19/8 58/8 58/11
58/22 58/23

**floor [1]**   1/13
Flores-Haro **[1]**   95/4
**Floyd [1]**   35/1
**focus [5]**   22/20 42/3 58/20 110/13
110/19
**focused [2]**   18/21 67/11
**focuses [1]**   43/12
**focusing [4]**   19/11 63/15 79/15
118/17
**fog [1]**   40/20
**fold [1]**   9/16
**folks [2]**   13/21 116/22
**follow [1]**   109/6
**follow-up [1]**   109/6
**following [3]**   67/3 112/1 112/2
**Fontan [10]**   1/15 3/4 3/5 3/8 4/8
36/24 52/4 60/4 62/21 118/21
**foot [4]**   107/23 108/4 115/22
115/22
**footage [12]**   9/17 57/20 57/21
85/10 91/18 92/6 98/1 98/4 98/11
99/22 110/3 111/23
**footnote [11]**   27/15 27/15 27/16
27/24 28/8 54/10 55/15 55/15
55/15 89/25 90/4
**footnotes [1]**   86/23
**force [73]**   6/22 7/5 7/15 8/13
8/15 8/16 8/18 10/17 11/21 12/11
16/5 16/6 17/8 26/9 28/10 28/12
29/2 29/14 30/9 30/10 31/24 32/15
32/19 33/10 33/14 33/21 35/17
35/22 36/18 36/22 37/10 39/8
40/11 41/25 42/5 42/10 42/12
42/14 42/23 42/24 43/9 44/3 44/14
45/1 45/4 45/24 52/16 52/24 53/2
53/15 61/1 61/5 61/7 63/25 66/6
69/5 69/11 86/17 87/8 87/10 87/14
87/16 87/18 87/19 88/1 89/13
95/12 111/6 111/15 111/17 112/15
112/18 112/18
**foregoing [1]**   120/4
**forensic [2]**   76/11 94/2
**form [9]**   86/21 87/22 87/24 89/11
90/6 90/15 91/8 91/22 115/7
**formally [2]**   25/9 25/9
**former [19]**   7/3 26/7 27/4 29/1
29/3 29/18 30/4 30/12 30/17 30/24
31/7 31/23 36/21 52/10 52/15
52/21 53/12 53/23 53/24
**forming [2]**   91/21 102/25
**formula [1]**   83/21
**forth [9]**   14/23 18/22 24/20 29/23
31/17 33/24 37/22 59/16 90/1
**forward [2]**   41/6 65/3
**foundation [2]**   44/22 45/5
**four [3]**   75/4 103/15 103/15
**fourth [6]**   32/21 33/6 33/11 33/13
35/22 66/1
**frame [6]**   78/1 79/8 79/8 80/5
80/5 88/14
**frames [1]**   100/20
**frankly [1]**   67/5
**free [1]**   113/10
**freeze [3]**   88/14 89/1 100/20
**frequently [2]**   56/2 73/25
**front [12]**   9/1 13/4 13/21 14/21
37/9 48/7 49/8 49/11 95/18 115/9
115/14 117/20
**froze [4]**   88/22 88/25 88/25
107/25
**frozen [2]**   50/17 50/22
**full [1]**   101/23
**function [1]**   61/18
**funny [1]**   101/21
**further [3]**   108/9 110/5 115/2

**G**

**gain [1]**   78/6
**gang [1]**   59/6
**gas [18]**   12/12 12/12 24/21 24/21
32/24 33/1 33/4 33/7 34/16 35/17

**G**

**gas...  [8]**  38/14 38/20 39/10 40/8 40/15 40/19 86/18 87/17
**gave [2]**  58/6 85/7
**gear [1]**  38/20
**gears [1]**  118/19
**general [16]**  7/6 10/22 31/12 32/11 36/5 37/24 54/6 54/6 54/8 70/8 75/25 81/11 87/5 97/1 98/19 99/8
**generalities [1]**  59/24
**generally [8]**  54/9 59/24 72/24 72/25 79/19 80/21 98/14 102/25
**generic [1]**  28/2
**gentleman [2]**  95/3 95/5
**George [1]**  35/1
**Gestapo [4]**  16/3 16/3 16/9 64/10
**get [32]**  6/3 23/6 28/19 31/1 33/22 33/23 33/24 39/4 43/14 49/20 51/19 54/16 62/4 65/21 65/24 72/3 73/24 76/16 89/1 91/5 91/6 92/10 93/2 98/16 100/7 100/23 101/22 102/23 104/18 112/5 118/77 119/11
**gets [3]**  17/1 34/12 50/18
**getting [2]**  60/17 84/9
**Gilbert [9]**  96/17 96/19 97/22 103/5 105/23 106/1 106/23 107/1 107/10
**give [12]**  22/9 34/9 46/16 53/1 55/12 74/23 80/22 85/23 101/2 106/15 110/24 119/13
**given [13]**  6/11 6/20 7/3 8/13 17/11 53/6 61/11 75/20 75/23 84/22 99/9 110/12 110/16
**giving [5]**  5/18 23/11 43/5 61/15 68/6
**go [50]**  6/24 9/10 14/22 15/11 15/24 16/2 19/14 22/23 26/4 29/6 35/5 37/19 41/8 43/7 43/23 44/10 44/24 46/11 47/24 48/24 48/25 54/21 55/18 60/6 63/25 65/3 75/14 84/3 86/1 86/14 86/15 87/3 88/9 88/18 89/5 90/2 90/10 91/6 93/11 97/21 98/20 99/19 100/6 101/6 102/6 105/4 107/9 109/20 116/11 117/22
**goal [3]**  14/19 68/11 94/18
**goes [2]**  13/1 94/17
**going [78]**  6/12 8/17 16/25 20/12 22/2 22/5 22/22 22/24 23/4 23/15 23/16 25/22 26/4 27/4 36/7 36/14 36/15 40/23 41/23 42/3 42/6 42/8 42/16 42/19 42/24 42/25 44/1 45/13 45/14 46/3 46/9 47/24 48/18 51/15 58/2 58/10 58/11 59/5 59/18 60/5 62/3 66/24 73/8 76/8 76/10 77/3 77/10 77/20 77/24 82/3 82/18 84/8 84/19 84/20 86/13 86/13 86/15 88/10 88/20 89/21 91/18 91/25 92/8 93/11 93/12 94/7 95/25 98/6 100/4 100/9 100/19 101/14 102/9 103/14 112/21 112/22 117/20 118/18
**gold [1]**  117/11
**gone [1]**  24/20
**good [16]**  4/2 4/7 4/12 4/13 4/16 4/17 4/20 4/21 24/5 34/16 62/16 63/1 63/5 87/12 93/21 117/20
**got [8]**  64/14 76/18 80/23 82/13 83/5 94/13 100/19 115/8
**gotten [1]**  71/21
**government [22]**  4/6 4/8 4/9 16/7 16/17 22/22 42/18 49/3 62/20 62/22 68/9 69/16 112/3 112/4 112/9 116/20 117/13 117/19 117/22 118/18 119/13 119/17
**grabs [1]**  11/15
**grad [1]**  70/6
**gradations [1]**  87/19
**Grade [2]**  65/3 65/8

**grading [1]**  6/2
**graduate [1]**  29/25
**graduated [2]**  29/8 30/18
**graduates [1]**  30/15
**Graham [2]**  34/4 34/5
**grappling [2]**  22/8 33/18
**great [10]**  11/23 14/3 15/8 33/16 34/6 35/19 60/9 76/18 86/13 91/7
**grenade [2]**  7/22 31/14
**grenade-type [1]**  7/22
**grenades [2]**  10/5 34/18
**ground [5]**  65/22 65/25 92/11 100/24 112/6
**grounds [3]**  92/2 99/2 99/7
**group [6]**  8/7 9/3 12/25 13/1 34/17 64/3
**groups [1]**  58/21
**grown [1]**  70/21
**guess [37]**  24/16 25/4 25/9 25/19 25/20 26/17 27/8 29/10 29/17 31/20 31/25 36/20 40/15 43/3 54/20 55/9 55/19 57/13 57/20 60/22 61/14 64/18 67/22 67/25 82/3 83/18 84/9 89/14 90/15 91/21 100/21 104/1 104/15 106/6 109/8 109/16 116/13
**guessing [2]**  20/8 99/24
**guidance [2]**  49/22 118/3
**guide [2]**  34/21 110/13
**gun [3]**  35/13 95/10 95/11
**gunfire [1]**  21/15
**gunning [1]**  35/13
**guy [4]**  50/9 50/10 54/3 68/13
**guys [1]**  39/16

**H**

**had [30]**  7/9 7/25 8/1 8/2 13/13 15/12 24/8 32/16 50/1 64/17 70/4 70/6 70/18 71/20 73/25 75/3 77/18 80/15 81/9 94/3 95/7 96/3 103/2 104/24 109/23 113/20 115/1 116/16 116/17 117/21
**hadn't [2]**  71/20 81/9
**half [3]**  64/14 101/18 101/19
**hand [3]**  32/24 41/14 69/18
**hands [4]**  11/10 24/18 40/6 41/13
**hanging [1]**  51/13
**happen [1]**  79/6
**happened [5]**  17/7 54/16 94/11 97/3 101/1
**happening [11]**  8/23 66/10 71/8 78/7 79/13 80/4 80/10 82/16 88/7 102/14 103/20
**happens [1]**  59/24
**happy [6]**  37/18 46/16 47/20 82/2 110/24 116/25
**hard [14]**  9/17 18/2 22/2 39/4 40/24 41/20 42/20 43/25 61/24 61/25 62/2 64/13 114/1 114/8
**harm [2]**  8/5 40/10
**Haro [1]**  95/4
**has [29]**  5/15 14/6 17/21 23/14 26/13 26/14 27/24 29/9 31/16 32/7 43/5 44/13 44/14 46/25 51/21 57/3 59/9 63/20 64/4 64/6 69/6 70/14 70/22 74/8 111/12 111/14 114/10 116/20 118/8
**have [237]**
**haven't [2]**  47/19 113/25
**having [13]**  10/3 15/13 20/3 21/12 38/8 43/10 58/19 59/4 65/22 65/25 92/21 112/6
**he [85]**  15/21 15/23 16/2 16/8 16/13 16/22 17/14 17/16 17/21 17/21 18/3 20/9 20/10 22/23 23/15 23/16 27/23 27/23 38/1 41/23 41/25 42/11 43/4 43/5 43/5 44/6 44/15 45/1 45/2 45/4 45/10 45/23 46/22 46/22 48/13 49/5 49/10 50/4 50/19 50/19 50/20 51/1 51/2 51/2 51/10 51/11 51/16 54/16 54/17 63/20 65/4 69/8 69/11 80/25 88/2

88/5 88/6 88/22 88/23 92/23 92/24 92/24 92/24 93/4 95/5 95/9 95/11 98/11 98/12 98/12 98/13 98/14 98/18 100/3 100/1 111/8 111/15 111/16 112/1 112/2 112/8 113/3 115/1 116/6 116/10
**head [8]**  7/17 11/24 13/19 17/20 32/18 37/21 39/7 93/1
**hear [50]**  5/8 17/20 18/17 19/17 19/22 20/5 20/7 20/8 20/16 20/17 20/17 20/18 20/19 20/21 21/1 21/19 21/24 22/2 22/19 22/20 22/20 22/21 23/9 24/4 39/22 46/15 58/2 58/3 59/21 64/13 68/24 80/17 82/19 84/11 84/20 84/23 85/5 86/11 101/23 103/17 103/20 104/14 104/21 108/1 108/16 108/24 112/20 113/7 115/10 115/16
**heard [22]**  8/2 8/3 12/7 19/7 22/17 23/7 23/15 23/16 39/21 39/22 40/1 50/4 66/16 84/18 86/1 86/4 103/24 104/4 104/22 108/22 113/1 113/25
**hearing [11]**  1/9 5/5 18/21 20/10 21/15 21/15 21/20 63/11 86/3 95/17 95/21
**hearings [1]**  44/18
**heart [3]**  57/2 57/5 57/7
**heightened [1]**  58/7
**hell [1]**  41/8
**help [14]**  5/19 26/17 43/20 63/14 71/7 73/9 78/10 80/24 83/8 94/4 103/13 105/20 106/15 118/15
**helped [4]**  35/20 63/20 64/4 80/24
**helpful [16]**  5/5 8/22 9/4 10/18 13/20 27/2 33/9 39/16 47/8 47/12 47/17 80/2 81/5 81/7 88/17 106/25
**helping [2]**  67/11 67/11
**helps [3]**  19/13 65/14 85/13
**her [2]**  26/11 27/6
**here [42]**  4/3 4/23 5/4 5/10 8/25 13/21 17/5 22/15 37/1 38/19 38/21 39/21 41/1 41/2 41/20 42/3 42/23 43/4 51/24 54/11 62/7 62/8 62/17 66/24 67/4 67/16 69/1 69/3 70/23 76/14 82/18 85/2 89/3 89/19 90/13 90/18 94/8 97/8 98/4 111/7 111/18 115/8
**Hermansen [32]**  2/3 3/4 3/5 3/8 3/9 4/14 5/16 8/22 9/7 11/25 15/10 20/11 22/5 26/5 26/13 42/15 45/21 48/4 50/7 50/15 55/1 61/21 63/2 63/13 64/12 65/6 93/14 110/7 111/7 113/16 116/10 117/1
**Hermansen's [2]**  26/20 115/18
**Hi [4]**  24/4 62/21 65/8 86/11
**high [2]**  22/3 58/18
**higher [1]**  101/25
**highlighting [1]**  103/11
**highly [1]**  115/18
**him [15]**  5/1 9/8 15/13 17/16 20/11 20/12 26/20 45/11 47/1 49/12 68/25 84/2 94/4 112/3 113/6
**himself [4]**  50/2 111/15 111/22 113/2
**hindsight [1]**  27/25
**his [30]**  5/1 5/23 6/13 17/20 22/11 26/11 27/6 28/2 42/4 42/6 43/5 43/6 43/6 44/15 44/15 45/7 46/20 50/5 50/5 54/3 54/4 54/16 54/18 66/3 93/1 95/10 102/12 104/21 115/7 116/11
**hit [2]**  13/6 32/17
**hits [1]**  39/7
**hitting [1]**  14/10
**hold [1]**  23/5
**holding [2]**  40/6 41/13
**holdover [1]**  99/5
**holography [1]**  70/4
**Honor [65]**  4/2 4/7 4/13 4/17 4/21 5/16 5/20 6/24 9/6 9/14 14/4 15/9 17/14 20/2 22/7 23/2 23/24 24/1

## H

Honor... [47]  30/21 30/23 31/3
33/16 36/9 36/12 37/3 40/16 42/2
44/10 46/17 47/8 47/20 49/2 51/8
51/21 52/6 60/8 60/10 61/20 61/23
62/11 62/13 62/16 63/1 63/5 63/17
64/1 64/23 65/2 65/7 65/20 68/14
86/6 109/2 114/13 114/22 115/10
115/12 116/20 117/3 117/4 117/5
118/22 119/6 119/18 119/19
Honor's [2]  17/1 36/14
HONORABLE [1]  1/9
hope [5]  27/1 31/18 35/19 40/11
85/11
hoping [1]  96/23
hostile [1]  58/9
hours [6]  8/24 16/20 17/12 48/16
51/11 57/17
how [63]  6/9 6/10 7/19 10/24
13/16 13/25 15/24 27/11 34/8
35/15 38/25 39/9 46/6 47/14 49/20
50/6 52/10 52/17 53/22 53/24
56/18 56/19 60/4 61/4 64/15 68/13
68/16 68/16 70/14 71/6 71/12
71/12 71/16 71/16 72/22 77/20
77/20 78/1 78/17 80/2 80/25 80/25
81/1 81/12 82/5 82/10 82/13 82/25
83/17 84/21 85/8 85/15 85/24 91/9
91/22 93/25 94/23 97/4 98/18
104/12 113/4 114/12 116/6
however [3]  26/24 28/17 62/4
huge [1]  79/9
human [12]  18/12 54/24 56/3 56/5
56/7 56/10 56/18 56/20 59/6 59/7
60/1 108/7
hundreds [1]  50/2 77/13 82/23
hypothetical [1]  9/24
hypothetically [2]  10/13 84/17

## I

I'm [24]  20/2 21/1 21/8 37/3
45/20 56/11 64/12 65/2 65/11
65/12 65/16 88/8 88/25 97/13
100/14 102/5 104/9 106/8 109/12
115/10 115/11 115/12 117/4 118/22
i.e [2]  57/1 58/7
icon [2]  97/14 108/7
icons [1]  97/7
identifiable [1]  80/11
identified [1]  65/4
identify [6]  30/16 80/6 82/16
83/1 97/19 99/17
identifying [1]  85/11
idiots [1]  51/14
IL [1]  1/14
ill [1]  45/19
ill-equipped [1]  45/19
illustrate [2]  35/10 35/15
imagine [7]  32/4 41/3 41/11 114/1
114/5 116/3 116/8
immediate [3]  8/5 8/10 13/12
immediately [3]  8/1 12/21 13/4
imminent [5]  11/17 11/22 12/8
34/14 40/10
impact [5]  13/7 18/13 34/17 34/18
55/11
impacting [1]  14/23
implies [1]  73/23
importance [1]  19/6
important [12]  19/5 19/10 19/11
21/19 73/10 77/10 79/16 81/1
82/15 83/3 83/16 104/10
imposing [1]  40/10
impossible [2]  59/9 99/6
improper [12]  7/5 10/17 16/6 26/9
28/10 28/17 36/18 38/9 39/3 40/3
53/15 112/18
improperly [1]  12/10
imprudent [1]  17/7
inches [1]  81/15
incident [1]  19/12

incidents [3]  27/17 28/9 34/8
inconclusive [1]  81/19
include [2]  71/1 78/17
included [5]  5/23 64/11 77/5
includes [2]  66/8 70/5
including [2]  86/18 111/11
inconsistent [1]  15/12
increase [1]  57/2
increased [2]  57/5 57/5
increases [1]  57/8
indicate [4]  96/15 97/1 106/16
108/7
indicated [3]  23/8 47/17 100/2
indicates [3]  63/24 86/16 98/24
indicating [3]  97/9 101/16 111/5
indication [2]  50/1 97/3
indicative [2]  97/16 106/9
indiscriminately [2]  10/6 34/19
individual [31]  7/20 8/9 11/2
11/4 11/8 11/11 11/11 11/16 11/18
11/22 19/16 28/15 40/4 40/9 40/10
40/18 50/18 53/2 54/15 57/16
57/23 58/9 58/13 59/4 59/4 59/21
59/25 60/2 72/9 76/4 111/19
individual's [2]  10/24 11/15
individualized [2]  31/22 60/3
individually [2]  40/8 109/18
individuals [7]  22/16 23/6 37/11
39/21 57/23 109/15 119/10
inference [1]  47/2
inferences [1]  113/10
influenced [1]  52/19
information [15]  61/3 68/12 77/10
78/6 80/22 81/7 85/15 94/20
114/20 114/21 114/23 114/23 115/2
115/19 116/9
informed [1]  104/18
infrastructure [1]  70/18
initial [4]  23/11 23/19 77/11
108/8
initially [3]  28/1 28/13 102/11
injury [1]  11/23
iNPUT [7]  18/23 19/3 19/4 74/19
74/22 74/25 75/11
iNPUT-ACE [4]  74/19 74/22 74/25
75/11
inputs [1]  22/4
inside [2]  59/11 108/22
instance [3]  53/11 99/1 99/14
instances [1]  59/2
instantly [1]  89/2
instead [3]  6/6 17/18 66/20
instruction [1]  11/4 22/8
instructor [2]  24/20 24/21
intend [3]  5/21 5/22 119/4
intended [3]  15/11 28/9 67/6
intending [1]  111/8
intends [1]  16/7
intent [2]  37/23 79/20
interest [1]  78/9
intermediate [2]  12/11 12/15
intern [1]  62/23
internet [1]  89/2
interns [1]  4/10
interpreted [2]  50/25 54/14
interrupt [4]  20/3 88/8 97/13
102/5
interrupted [1]  52/3
interrupting [2]  36/11 38/4
invent [1]  79/2
investigate [2]  54/10 74/24
investigated [1]  81/20
investigation [2]  78/14 110/14
investigations [1]  76/12
investigative [2]  106/10 106/13
investigator [1]  65/3
investigators [1]  75/23
involve [1]  56/1
involved [8]  21/23 43/14 58/15
58/15 58/16 59/7 95/23 96/10
involves [1]  56/20
is [782]

isolated [1]  81/3
issue [12]  8/14 8/15 81/22
104/18 118/2 119/9
issues [4]  63/15 63/15 63/16
81/18
it [372]
items [3]  71/11 71/23 72/15
its [2]  112/10 112/12
itself [4]  14/1 69/13 70/8 105/18

## J

jacket [2]  50/10 50/18
Jackson [2]  25/5 25/18
January [2]  57/22 108/21
January 6 [2]  57/22 108/21
JARED [28]  1/6 4/4 20/17 27/18
27/24 51/10 62/18 63/24 65/21
66/2 66/3 66/17 69/11 80/25 84/18
85/6 86/16 89/12 91/19 92/10
104/7 108/7 108/12 111/5 111/23
112/5 112/14 113/1
Jared's [1]  102/20
Jersey [2]  65/9 65/18
job [1]  28/18
jobs [1]  117/12
Jones [3]  93/15 93/19 95/1
Joshua [3]  3/7 63/18 69/10
judge [4]  1/10 41/1 41/21 45/14
judging [1]  7/17
judgment [2]  33/1 46/20
judgments [1]  45/9
jump [6]  25/21 26/21 28/24 32/14
86/13 93/12
jumping [1]  93/11
June [1]  82/11
jurisdiction [1]  29/25
jurisdictions [1]  29/21
juror [1]  68/12
jurors [9]  68/11 84/16 84/17
84/19 84/22 85/15 85/22 103/14
117/11
jury [15]  22/8 42/6 42/16 47/2
66/10 66/15 93/5 94/7 94/10 95/18
106/8 113/9 113/17 115/7 117/20
just [135]
juvenile [1]  75/24

## K

keep [1]  53/22
keeps [1]  61/16
key [3]  48/20 78/15 98/24
kick [1]  89/2
kicking [1]  11/19
kill [20]  16/13 22/12 22/17 65/21
65/24 65/24 66/4 66/4 68/25 92/10
93/2 103/17 103/17 103/21 103/21
112/5 112/14 112/14 112/20 112/20
kind [33]  8/18 12/10 12/14 12/20
14/22 18/19 19/16 19/20 21/16
22/25 24/11 26/14 28/13 32/3 32/6
34/21 36/15 53/18 56/25 58/24
59/14 71/13 74/8 74/9 77/22 83/12
83/21 87/16 87/23 90/12 92/9 95/6
100/1
Kirio [2]  4/11 62/24
knew [6]  98/11 98/12 98/12 98/13
98/14 105/12
know [137]
knowing [5]  9/2 43/20 46/3 46/22
91/11
knowledge [3]  31/16 32/3 104/12
knowledgeable [1]  45/1
known [1]  25/4
knows [1]  15/20
Kumho [1]  67/20
Kurt [8]  2/3 4/14 5/16 10/4 10/8
20/16 20/21 63/2

## L

LA [1]  53/8
lab [1]  59/13

**label [1]** 101/16
**labeled [4]** 26/24 107/18 107/23 108/3
**laboratory [1]** 59/10
**lack [1]** 67/22
**landmark [1]** 106/15
**landmarks [3]** 80/11 81/2 105/5
**LANE [3]** 1/6 4/4 62/18
**language [5]** 18/16 37/6 38/5 39/23 39/24
**laptop [1]** 64/18
**large [5]** 25/8 25/8 75/13 95/8 102/22
**largely [1]** 60/1
**larger [4]** 79/2 79/4 88/14 102/15
**Las [1]** 76/10
**laser [1]** 74/4
**last [6]** 32/2 63/12 64/20 66/12 95/3 106/21
**later [13]** 17/12 48/13 48/15 48/15 48/16 48/18 48/19 50/9 77/14 91/5 92/20 110/16 117/25
**law [52]** 6/20 7/3 7/7 10/12 10/16 10/22 10/24 14/5 14/5 14/18 15/24 16/8 21/13 21/24 22/10 23/10 24/7 26/8 27/4 28/25 29/1 29/3 29/13 29/18 30/4 30/12 30/17 30/24 31/7 31/8 31/23 33/12 33/17 36/21 52/10 52/15 52/22 53/12 53/21 53/23 53/24 55/21 56/1 56/2 56/4 56/4 56/7 61/1 64/7 74/23 75/10 75/24
**laws [3]** 31/9 31/10 53/19
**lawsuit [1]** 95/4
**Lawyers [1]** 76/16
**layperson [1]** 95/16
**lead [1]** 8/12
**learn [7]** 29/6 34/8 74/18 75/5 78/3 78/10 78/11
**learned [3]** 53/20 67/18 72/6
**learning [1]** 103/8
**least [7]** 14/1 37/16 38/11 47/9 61/12 119/5 119/9
**leave [13]** 11/10 12/7 17/18 22/22 38/13 38/13 38/22 38/23 39/23 40/1 41/15 41/16 48/22
**leaving [1]** 119/5
**Lee [4]** 2/7 4/18 63/6 63/13
**left [2]** 8/1 101/15
**legal [1]** 26/20
**legend [1]** 99/5
**legs [1]** 14/23
**lends [1]** 70/8
**lengthy [1]** 78/14
**lens [2]** 7/10 7/10
**less [6]** 12/15 19/10 33/2 40/15 46/22 81/21
**less-lethal [1]** 12/15
**let [16]** 4/25 18/7 27/10 32/13 37/11 47/24 48/24 50/21 50/23 55/12 67/9 90/13 101/7 115/8 117/16 117/25
**let's [12]** 19/22 35/6 35/10 36/24 36/24 37/7 37/8 39/22 39/24 40/1 84/16 112/16
**lethal [1]** 12/15
**level [17]** 10/25 10/25 11/7 11/7 11/13 11/14 11/18 11/21 12/11 29/22 33/20 35/3 53/2 53/3 57/17 79/1 82/2
**levels [7]** 8/15 8/16 8/18 10/19 13/14 30/9 32/11
**liability [1]** 32/21
**like [64]** 5/7 5/18 6/2 6/24 9/25 10/20 12/15 16/3 16/4 20/22 21/5 26/9 31/13 35/13 37/13 37/15 38/9 40/25 41/12 42/3 42/17 45/13 47/15 47/21 51/11 54/2 55/7 55/9 56/14 57/15 68/10 69/6 70/4 71/24 73/15 74/7 75/5 81/22 81/23 82/9

**likelihood [1]** 58/19
**likely [10]** 26/10 42/9 58/13 63/24 69/5 85/4 86/17 89/12 111/6 111/9
**limitations [2]** 7/9 43/16
**limited [5]** 21/20 26/14 26/23 61/18 119/12
**limits [1]** 21/19
**LINDSAY [1]** 1/22 120/3 120/12
**line [18]** 12/21 12/22 13/3 13/8 13/12 14/9 16/15 33/20 37/9 66/7 77/18 80/12 80/19 98/3 99/9 100/2 107/20 109/9
**lines [2]** 99/23 99/25
**lining [1]** 17/19
**Linwood [1]** 108/22
**list [7]** 55/9 86/24 87/1 87/6 87/9 91/23 110/12
**listed [3]** 43/5 86/23 87/6
**listen [2]** 21/13 85/19
**listened [1]** 101/24
**listening [2]** 46/14 104/2
**literature [1]** 29/19
**litigation [1]** 70/20
**little [30]** 12/23 24/6 24/17 25/1 27/16 36/15 38/25 40/22 40/24 43/25 44/20 52/9 52/10 55/2 68/19 78/19 81/4 88/13 92/9 93/12 94/12 97/14 100/25 101/16 102/16 103/25 106/11 108/7 108/10 112/23
**live [1]** 24/15
**lived [1]** 59/2
**lives [1]** 41/14
**living [2]** 68/15 77/21
**load [4]** 18/10 54/23 56/24 57/14
**local [1]** 29/13
**location [4]** 47/14 74/7 74/9 85/5
**locations [3]** 81/19 96/15 113/9
**logistics [1]** 70/18
**Lompoc [1]** 24/24
**long [7]** 21/22 24/20 70/14 76/6 84/9 85/1 115/22
**longer [8]** 26/18 27/3 27/3 27/9 53/25 114/7 116/7 116/8
**look [36]** 7/9 7/19 9/22 28/18 34/7 34/23 34/23 34/25 35/15 41/24 42/3 43/19 43/23 44/24 45/14 52/25 54/17 55/7 55/12 68/25 69/2 71/20 71/23 71/25 73/25 79/8 81/19 83/23 90/7 91/12 103/14 105/15 106/13 109/8 109/9 117/20
**looked [5]** 42/22 44/1 44/2 102/22 109/17
**looking [19]** 9/18 18/21 26/17 27/25 37/16 45/2 45/4 46/5 46/23 55/23 55/24 65/17 80/5 80/10 105/5 109/7 109/23 110/11 115/15
**looks [5]** 37/13 37/15 54/18 87/16 88/22 97/15 107/3
**Lorenzo [3]** 93/15 93/19 95/1
**loss [1]** 116/13
**lost [2]** 83/12 88/21
**lot [20]** 18/14 29/15 34/25 35/8 35/21 36/6 43/4 44/1 51/15 71/1 73/7 75/5 75/10 77/20 83/11 92/12 94/14 94/17 94/22 117/19
**lots [2]** 58/2 64/23
**loud [1]** 48/23
**loudspeakers [1]** 38/12
**low [2]** 14/21 101/21
**lower [9]** 12/15 14/21 85/6 86/19 91/13 91/14 97/2 98/16 101/15
**lower-left [1]** 101/15
**lowest [1]** 11/13
**LRAD [1]** 48/21
**luxury [1]** 78/14

83/11 83/24 87/16 87/19 88/1 89/13 94/11 94/11 94/15 96/13 98/25 102/22 105/7 105/8 105/14 107/3 109/18 113/6 114/17 115/4 116/1 116/15 116/23

**machine [1]** 35/13
**made [13]** 16/8 16/10 46/11 51/2 85/1 90/6 90/24 100/7 100/15 101/8 102/18 103/11 116/20
**magically [1]** 79/2
**magnification [1]** 79/1
**main [2]** 2/8 16/12
**major [1]** 68/22
**majority [1]** 21/14
**make [34]** 22/15 23/22 33/1 37/7 43/23 45/6 46/11 46/20 52/13 56/6 79/4 79/9 79/20 81/6 81/25 83/4 83/19 84/7 87/23 88/13 89/11 89/15 89/18 92/22 93/9 101/12 104/18 108/25 110/19 112/8 113/11 116/11 116/18 118/2
**makes [4]** 75/9 84/8 85/2 89/23
**making [12]** 26/11 27/6 43/17 45/8 45/16 61/1 79/3 80/3 87/7 94/18 94/23 117/19
**manage [1]** 19/4
**managing [1]** 25/6
**manipulation [4]** 79/17 79/18 79/19 79/24
**many [19]** 7/23 8/3 13/2 18/1 18/1 29/9 29/9 35/1 40/5 40/5 40/20 44/15 56/19 68/7 71/12 71/12 72/22 74/25 78/1
**map [12]** 71/7 71/10 81/10 81/19 81/21 81/24 82/17 83/1 83/2 83/7 83/23 84/2
**mapping [11]** 71/5 71/15 80/24 81/17 82/5 82/14 83/6 83/12 85/13 88/4 95/24
**maps [1]** 73/6
**Maria [1]** 24/25
**marketing [1]** 75/13
**mash [1]** 68/10
**mass [4]** 22/3 34/17 40/8 40/19
**master [2]** 70/1 70/11
**materials [3]** 87/2 87/5 87/6
**matter [10]** 23/10 31/5 31/6 53/22 53/23 68/4 78/12 114/17 118/10 120/5
**may [24]** 23/22 27/18 31/14 32/25 33/1 40/17 40/23 41/14 41/22 42/1 43/19 45/4 60/10 68/19 72/8 84/14 85/22 88/12 99/24 111/15 114/5 114/14 116/5 116/24
**maybe [15]** 25/17 31/14 33/9 36/15 47/13 50/7 52/22 52/24 57/7 78/4 108/16 116/9 117/13 118/10 118/18
**me [95]** 4/8 4/10 4/25 5/6 5/6 5/18 6/18 6/24 8/22 9/4 9/5 9/16 10/11 10/20 12/17 12/23 17/4 18/7 20/7 20/8 20/16 21/5 23/5 23/12 23/17 24/4 26/17 27/10 31/20 32/13 32/15 33/2 33/9 34/1 34/11 36/8 37/11 39/16 40/25 41/20 42/20 43/1 43/25 44/20 45/25 46/14 47/24 48/18 48/24 50/15 50/21 50/23 51/25 55/7 55/12 55/12 55/23 60/23 62/4 62/10 63/13 63/14 68/21 69/3 73/24 82/19 86/11 87/16 90/7 90/8 90/13 111/3 111/4 112/7 113/22 114/1 114/8 114/22 115/8 115/9 115/14 115/25 116/1 116/3 117/18 117/18 117/19 117/22 117/25 118/4 118/12 118/14 118/14 118/25 119/13
**mean [34]** 17/20 23/4 30/18 32/15 33/14 35/4 39/19 42/6 42/7 44/10 44/13 44/24 48/17 48/18 49/19 51/18 53/2 53/6 56/24 62/1 67/21 67/24 78/17 79/18 81/8 87/10 88/8 94/12 97/13 102/5 102/7 102/18 104/3 104/15
**meaning [5]** 7/15 8/1 12/15 33/20 36/23

**M**

**means [4]**   18/16 29/4 30/13 33/12
**meant [5]**   32/10 55/2 56/7 108/6
108/7
**measure [10]**   57/13 57/13 57/15
82/7 82/10 84/3 84/4 115/24
116/13 117/23
**measured [2]**   81/15 115/23
**measurement [1]**   114/2
**measurements [25]**   81/6 81/16
81/22 81/23 82/1 82/6 82/9 82/10
82/12 82/14 83/13 83/16 83/20
84/21 84/22 85/9 96/1 113/22
114/6 115/6 116/11 117/6 117/8
117/13 117/14
**measuring [2]**   114/6 116/12
**meat [1]**   8/18
**mechanism [1]**   34/18
**mechanisms [1]**   57/9
**meeting [1]**   20/20
**member [1]**   33/3
**members [1]**   35/25
**memorized [1]**   55/22
**memory [1]**   50/17
**mens [1]**   15/13
**mentioned [1]**   94/25
**mentions [1]**   19/23
**met [2]**   5/24 29/24
**meter [1]**   108/19
**method [2]**   14/14 14/25
**methodology [2]**   55/3 55/11
**mic [1]**   64/13
**Michael [2]**   25/5 25/18
**microphone [2]**   64/18 85/25
**microphones [5]**   85/17 86/4 113/4
113/5 113/8
**middle [7]**   9/13 10/6 10/15 14/16
37/5 37/7 54/3
**midrange [1]**   78/24
**might [23]**   22/19 22/20 22/20
22/21 23/16 31/14 73/4 73/6 78/22
88/17 89/1 89/2 89/22 94/14 98/7
103/23 103/23 105/14 106/25
107/25 110/18 111/19 118/15
**military [1]**   35/13
**mimic [1]**   59/12
**mimics [1]**   59/19
**mind [7]**   8/11 19/2 23/2 26/24
40/18 50/5 96/17
**minimal [2]**   29/11 29/21
**minimum [2]**   29/24 30/1
**minor [4]**   24/16 24/17 25/2 25/5
**minus [1]**   81/15
**minute [2]**   15/22 55/12
**minutes [2]**   48/15 60/5
**misapplication [1]**   15/6
**misheard [1]**   56/11
**missed [1]**   50/7
**missing [1]**   47/10
**misspoke [1]**   49/10
**misunderstand [2]**   26/21 27/10
**model [7]**   71/2 93/25 94/1 94/5
95/24 95/25 96/7
**modeling [6]**   71/14 73/12 74/5
76/3 96/11 96/13
**modern [2]**   32/5 57/18
**modified [2]**   6/18 28/4
**moment [17]**   12/4 17/21 19/5 21/11
21/17 21/18 24/1 26/19 37/21
60/11 61/17 65/14 79/8 99/2 99/9
99/25 109/3
**more [39]**   10/11 17/4 17/10 19/11
23/12 23/18 25/4 26/15 26/22
27/12 28/2 29/10 33/8 39/9 47/14
60/4 60/7 60/15 61/6 70/24 71/21
71/23 72/18 74/18 74/23 78/2 78/4
78/10 78/24 80/4 81/18 81/23
83/13 88/12 91/5 96/18 102/9
104/17 112/23
**morning [12]**   4/2 4/7 4/12 4/13
4/16 4/17 4/20 4/21 5/4 24/5

62/16 118/5
**most [19]**   24/16 26/1 29/21 32/2
33/2 38/17 56/19 58/12 68/11
71/22 76/3 79/10 80/22 88/17
89/23 101/14 111/1 111/3 113/13
**mostly [2]**   73/6 76/17
**motion [2]**   100/25 101/2
**mouth [1]**   66/3
**mouthing [1]**   34/10
**move [6]**   31/1 31/2 41/17 46/12
54/19 92/8
**moved [4]**   12/24 65/10 65/11 73/18
**movie [1]**   97/15
**moving [7]**   16/14 18/7 41/8 41/9
41/10 102/16 108/12
**Mr [34]**   3/4 3/5 3/8 3/9 17/25
45/21 46/4 69/22 86/11 88/9 88/21
88/25 89/6 90/14 90/23 96/21
97/13 97/24 100/6 100/14 101/6
101/12 102/3 103/8 104/9 105/25
107/3 107/14 109/6 110/6 110/10
115/1 118/4 118/8
**Mr. [85]**   4/24 4/25 8/22 8/24 9/2
9/7 11/25 13/19 15/10 15/12 15/19
15/23 17/9 17/20 18/3 20/7 20/8
20/11 20/24 22/5 22/11 22/17
22/22 23/7 23/14 26/5 26/13 26/20
41/22 42/10 42/11 42/15 43/7 43/8
43/21 44/3 47/3 47/4 47/11 48/4
48/12 49/5 50/2 50/7 50/15 51/17
51/21 55/1 61/21 63/7 63/13 64/9
64/12 64/25 65/6 69/5 81/13 83/25
84/4 88/2 88/16 91/25 93/14 99/25
100/22 101/3 102/12 103/16 104/21
105/3 105/3 107/4 107/21 110/7
111/7 111/9 111/13 111/18 111/21
113/16 114/2 115/18 116/6 116/10
117/1
**Mr. Hermansen [23]**   8/22 9/7 11/25
15/10 20/11 22/5 26/5 26/13 42/15
48/4 50/7 50/15 55/1 61/21 63/13
64/12 65/6 93/14 110/7 111/7
113/16 116/10 117/1
**Mr. Hermansen's [2]**   26/20 115/18
**Mr. Wise [53]**   4/24 8/24 9/2 13/19
15/12 15/19 15/23 17/9 17/20 18/3
20/7 20/8 20/24 22/17 22/22 23/7
23/14 41/22 42/10 42/11 43/8
43/21 44/3 47/3 47/4 47/11 48/12
50/2 51/17 51/21 63/7 64/9 64/25
69/5 81/13 83/25 84/4 88/2 88/16
91/25 99/25 101/3 102/12 104/21
105/3 105/3 107/4 111/9 111/13
111/18 111/21 114/2 116/6
**Mr. Wise's [7]**   4/25 22/11 43/7
49/5 100/22 103/16 107/21
**Ms [6]**   3/4 3/5 3/8 60/4 114/11
118/21
**Ms. [14]**   36/24 52/4 63/13 89/25
91/16 96/17 96/19 97/22 103/5
105/23 106/1 106/23 107/1 107/10
**Ms. Fontan [2]**   36/24 52/4
**Ms. Gilbert [9]**   96/17 96/19 97/22
103/5 105/23 106/1 106/23 107/1
107/10
**Ms. Lee [1]**   63/13
**Ms. Wilbert [2]**   89/25 91/16
**much [13]**   16/5 18/23 22/1 22/1
46/21 53/24 58/3 60/4 64/16 71/20
91/17 102/18 104/14
**multiple [7]**   9/16 72/2 77/19
91/12 93/6 93/9 106/18
**Multnomah [1]**   77/6
**must [2]**   38/13 38/13
**mute [4]**   20/9 109/10 109/11
114/10
**muted [1]**   21/15
**muzzle [1]**   96/8
**my [56]**   9/22 26/6 26/19 26/24
27/7 27/11 27/12 27/12 28/1 28/2
28/18 28/25 32/6 33/6 34/1 36/10

37/21 38/6 40/18 41/24 43/17
46/17 46/22 47/12 48/7 50/17
55/7 55/8 55/12 59/2 60/21 60/24
61/1 61/3 61/14 61/17 64/18 65/12
67/1 67/22 70/9 75/4 77/12 82/3
82/8 85/18 89/2 96/23 111/7
114/25 114/25 115/21 116/16 117/6
123/18 119/8
**myself [4]**   43/19 44/25 89/20
115/21

**N**

**N.W [1]**   1/16
**name [7]**   4/5 19/23 28/2 28/4
62/19 95/3 95/3
**names [2]**   109/15 110/16
**narrative [4]**   73/10 78/16 94/18
94/22
**narrow [6]**   26/15 27/13 30/7 37/13
37/17 118/17
**Nashville [1]**   76/23
**National [1]**   75/18
**nature [10]**   6/12 66/9 67/4 68/20
70/7 79/12 95/12 103/23 109/24
112/16
**navigate [1]**   112/24
**Nazi [7]**   16/2 16/3 16/8 64/10
64/10 64/10 64/10
**Nazis [1]**   17/10
**near [5]**   13/7 46/4 47/3 83/25
107/17
**nearby [1]**   88/3
**necessarily [8]**   9/24 19/17 67/24
72/7 78/13 105/10 108/17 114/3
**necessary [4]**   21/11 69/9 69/10
115/5
**need [22]**   14/11 17/3 17/18 20/3
21/4 23/9 38/7 41/16 43/19 43/20
44/21 60/5 62/10 71/2 77/16 84/17
96/5 110/18 111/16 118/4 118/5
118/14
**needed [3]**   72/11 93/6 102/13
**needs [2]**   14/20 118/1
**negative [1]**   64/23
**neighborhood [1]**   95/7
**never [6]**   59/18 59/18 66/16 72/12
79/24 113/1
**new [3]**   65/9 65/17 77/14
**newer [1]**   31/14
**next [14]**   1/19 9/19 11/7 11/14
11/18 16/14 17/16 48/20 50/9 60/5
76/9 82/24 91/18 98/15
**nice [1]**   118/17
**nightstick [2]**   32/18 39/7
**nine [4]**   70/22 73/15 73/16 106/10
**no [44]**   1/4 11/2 11/5 23/14 25/13
25/16 26/17 27/3 27/3 27/9 28/13
34/13 37/25 39/12 40/10 42/17
42/17 50/23 51/2 53/1 53/25 54/8
54/8 56/9 56/18 57/15 61/10 61/23
62/12 62/12 65/10 66/23 67/5
74/22 77/15 81/8 84/15 87/21
99/15 114/7 115/22 116/7 116/8
118/9
**noise [4]**   22/1 58/2 58/3 104/14
**non [5]**   36/19 37/14 39/19 40/5
56/4
**non-complaint [1]**   36/19
**non-compliant [3]**   37/14 39/19
40/5
**non-law [1]**   56/4
**noncompliance [1]**   40/2
**noncompliant [5]**   39/24 50/20 51/1
53/7 53/7
**none [3]**   25/9 64/6 64/24
**normal [8]**   18/12 18/16 21/25 23/1
54/24 101/17 101/22 101/25
**normally [1]**   44/18
**northwest [1]**   98/17
**not [173]**
**note [1]**   63/7
**nothing [3]**   11/4 14/8 119/17

**N**

**notice [4]**  5/7/4 68/7 68/8 72/16
**November [3]**  1/5 119/2 120/10
**November 21st [1]**  119/2
**now [31]**  7/14 12/20 13/19 15/16
20/22 28/2 28/4 32/24 35/8 39/24
47/21 47/22 48/25 51/24 54/20
63/10 64/15 65/12 68/24 73/15
75/13 77/3 78/19 80/1 89/10 92/1
93/12 107/12 108/16 115/15 118/15
**nowhere [1]**  47/3
**nuance [1]**  34/3
**number [11]**  4/3 6/13 42/4 55/15
55/15 55/15 66/13 73/25 75/1 76/4
95/8
**NW [1]**  1/23

**O**

**object [1]**  102/13
**Objection [1]**  30/21
**objections [1]**  44/13
**objective [1]**  103/13
**obligation [1]**  45/6
**obscured [1]**  78/5
**observation [1]**  14/3
**observations [1]**  116/18
**observe [1]**  27/20
**observed [5]**  7/24 10/1 26/8 27/18
27/20
**obvious [2]**  22/1 101/14
**obviously [3]**  7/7 8/23 22/23
**occupied [2]**  66/17 113/1
**occur [1]**  98/6
**occurred [1]**  73/6
**occurring [6]**  6/22 8/13 9/18
18/17 36/3 91/3
**occurs [4]**  18/18 37/8 37/16 72/13
**October [4]**  5/25 26/2 54/22 61/14
**October 21st [1]**  5/25
**off [12]**  9/13 14/22 22/24 23/5
23/11 23/15 23/16 26/4 34/10
36/14 72/14 102/8
**offend [1]**  67/21
**offer [6]**  41/18 47/16 83/18
111/17 112/10 113/11
**offered [3]**  15/14 63/14 117/12
**office [7]**  2/4 4/19 65/9 65/12
77/4 77/7 77/12
**officer [76]**  6/19 6/20 7/4 8/10
8/12 8/12 10/13 10/13 10/17 11/1
11/3 11/8 11/15 11/17 11/19 11/22
14/6 14/10 14/10 15/25 16/8 17/6
17/16 24/23 25/11 25/14 26/8 27/4
28/25 29/2 29/3 29/18 29/22 30/2
30/4 30/6 30/13 30/18 30/25 31/7
31/8 31/23 32/4 32/5 32/17 32/20
32/22 32/23 33/19 33/20 36/21
36/24 36/25 39/6 42/5 42/13 42/23
43/9 51/3 52/11 52/16 52/22 52/24
53/12 53/16 53/24 55/8 59/15 65/5
86/3 87/15 100/23 104/22 107/17
108/22 111/18 111/18
**officer's [3]**  28/16 28/19 78/5
**officers [69]**  6/2 7/7 7/11 7/14
7/17 8/6 8/14 9/2 9/3 9/3 10/24
12/21 13/1 13/4 13/5 13/7 13/11
13/17 13/20 13/24 15/1 15/6 16/13
17/10 17/12 17/15 17/17 17/18
21/15 22/17 23/7 28/12 29/13 32/2
32/11 33/7 35/3 35/5 35/8 35/12
35/15 38/1 38/2 38/20 40/7 40/11
41/4 41/9 41/15 41/16 44/7 49/22
51/14 53/23 58/16 59/15 61/4
65/21 65/25 66/17 69/2 92/11 92/24
93/1 95/11 96/10 110/17 112/6
112/17
**officers' [1]**  7/18
**Official [3]**  1/22 120/3 120/13
**often [7]**  19/13 56/21 59/15 74/6
77/13 79/6 79/10
**oftentimes [1]**  78/3

**oh [5]**  65/11 88/5 88/15 107/11
**okay [80]**  5/17 13/20 18/6 20/14
20/21 20/22 20/22 21/3 23/3 23/25
24/4 24/11 26/1 26/4 27/14 27/14
27/22 28/3 28/6 30/3 30/17 31/3
36/10 36/12 43/21 47/7 47/24
48/19 49/7 49/14 50/21 52/2 52/9
52/15 52/21 53/22 54/19 55/18
56/6 56/22 60/9 60/22 61/3 61/8
61/19 61/21 61/24 62/6 62/14
64/20 69/14 69/19 70/12 77/12
82/19 82/22 83/24 84/16 86/8
86/11 86/13 88/8 89/4 89/10 91/4
91/15 92/8 92/8 92/16 92/25 93/3
93/19 101/9 102/6 104/10 106/20
107/9 109/14 115/16 118/25
**old [1]**  65/12
**once [6]**  5/9 28/18 29/24 34/12
81/23 106/22
**one [77]**  4/10 5/15 6/7 10/3 13/15
19/19 19/19 19/22 19/22 19/25
19/25 21/12 21/12 24/1 24/24 25/4
25/10 30/4 34/16 35/11 37/16
38/12 39/25 40/18 40/19 41/11
44/14 45/20 45/21 47/9 50/22
55/19 57/1 57/9 57/25 58/1 58/3
59/5 59/5 61/2 63/23 69/7 71/23
76/9 78/2 78/5 78/21 79/1 79/18
80/8 81/10 82/13 82/24 82/25
88/12 90/13 92/16 92/17 92/20
93/17 95/19 96/18 98/13 100/19
102/10 105/10 105/11 106/21
106/25 107/3 108/3 109/2 109/6
112/23 113/20 114/10 116/11
**ones [10]**  23/2 25/4 34/2 35/5
42/8 42/16 51/14 51/17 85/12
88/11 104/7 104/13
**only [9]**  41/4 46/9 48/10 49/12
50/22 64/13 88/11 104/7 104/13
**open [4]**  37/15 106/3 115/20 119/5
**open-source [2]**  37/15 106/3
**opened [1]**  28/13
**opining [4]**  27/4 27/22 28/11 44/6
**opinion [102]**  5/23 6/7 6/12 6/13
6/16 6/25 7/3 7/5 15/24 16/23
18/9 18/11 25/22 26/4 26/6 26/12
26/13 26/18 26/25 27/3 27/9 27/9
27/10 27/11 27/12 27/14 27/22
28/2 28/8 28/24 29/19 31/6 36/17
36/20 37/5 38/8 42/4 42/4 42/10
42/12 42/21 43/5 43/6 43/6 43/11
43/18 43/18 44/5 44/17 44/23 45/7
46/21 46/21 47/19 53/14 54/20
54/21 54/21 54/22 55/11 56/22
56/23 57/22 61/17 61/18 64/5
64/22 67/3 68/3 68/3 68/20 69/6
85/3 85/7 85/9 85/24 85/24 86/14
86/15 86/21 86/22 86/23 87/21
87/23 87/24 89/7 89/8 89/11 90/5
90/6 91/8 91/18 91/21 91/22 92/8
93/12 104/1 104/2 104/3 104/20
111/8 118/14
**opinions [9]**  25/21 25/24 44/15
61/12 61/15 102/25 111/21 113/15
115/7
**opportunities [3]**  73/25 74/1
74/25
**opportunity [6]**  70/19 81/9 114/17
115/4 116/23 119/13
**opposite [2]**  56/9 100/4
**optics [1]**  70/5
**option [1]**  7/15
**orange [2]**  50/10 109/7
**order [11]**  22/21 29/22 41/17
41/17 59/9 86/21 87/22 89/11 90/6
91/7 92/13
**ordered [1]**  22/21
**OREGON [13]**  2/4 2/8 4/15 4/18
63/3 63/6 65/10 65/12 70/1 76/14
76/16 77/5 95/5
**Organization [1]**  76/16

**organize [1]**  77/3
**organized [1]**  96/14
**organizing [1]**  104/16
**original [2]**  42/10 90/21
**other [56]**  5/13 6/5 7/21 7/22
8/24 11/5 13/13 14/25 18/9 19/7
19/21 25/7 32/24 33/13 34/1 34/7
39/25 41/13 42/1 46/10 46/23
51/14 57/10 59/7 59/13 61/15
61/20 69/1 71/5 72/14 73/6 75/10
78/6 80/20 81/1 82/15 84/24 91/2
95/1 95/14 97/20 98/10 99/24
102/7 105/15 107/6 109/8 109/9
109/23 110/20 111/13 113/12
116/12 116/19 118/3 118/8
**others [5]**  17/2 36/1 62/12 73/14
114/3
**otherwise [1]**  114/4
**our [37]**  4/10 4/18 15/23 17/24
18/23 18/24 18/24 19/2 19/3 19/4
19/9 21/10 42/18 43/12 51/9 62/23
63/22 67/18 68/10 68/14 69/17
70/18 70/21 71/18 79/11 81/9
85/13 90/7 94/6 95/18 97/8 104/16
108/8 114/18 116/21 118/24 119/6
**out [25]**  11/9 12/12 19/21 23/21
30/4 30/12 34/10 34/19 36/6 43/24
44/12 53/11 54/4 73/9 77/14 83/20
83/21 84/3 86/24 90/24 95/10
106/5 108/19 117/17 117/24
**outliers [1]**  59/25
**outline [1]**  108/2
**outside [2]**  73/20 108/23
**over [21]**  16/13 19/25 36/25 37/1
51/12 65/22 65/25 69/2 70/21
71/15 71/16 71/18 72/6 75/3 75/6
75/21 91/6 92/11 112/7 116/15
116/23
**overhead [5]**  7/14 17/1 51/22 66/6
69/12
**overhear [1]**  19/16
**overheard [1]**  20/1
**overload [1]**  19/4
**override [1]**  58/4
**overwhelm [1]**  58/4
**overwhelmed [2]**  7/8 18/23
**overwhelming [2]**  9/17 21/14
**own [4]**  45/22 59/2 59/4 112/10
**owner [1]**  75/12

**P**

**p.m [5]**  9/12 10/14 48/6 62/15
119/21
**page [5]**  1/19 27/3 28/14 55/14
88/19
**par [1]**  12/13
**paralegal [4]**  4/9 62/22 67/6
67/10
**paralegals [2]**  67/18 75/23
**pared [1]**  42/12
**part [28]**  14/1 14/13 14/14 15/14
15/17 19/8 21/25 25/14 27/14
27/22 28/7 28/8 28/17 45/12 60/17
70/9 79/1 81/8 81/16 82/14 82/15
82/25 83/6 85/13 99/4 102/1
102/25 104/20
**participated [1]**  73/20
**participation [1]**  94/6
**particular [23]**  37/4 39/18 41/19
43/1 43/23 55/3 55/10 55/11 57/13
72/1 73/9 73/23 78/9 80/14 85/4
85/25 86/22 94/1 99/4 99/18
102/10 115/5 115/6
**particularity [1]**  38/7
**particularly [2]**  30/13 56/19
**parties [4]**  5/9 21/23 23/9 113/10
**parties' [1]**  63/8
**partly [1]**  59/20
**parts [1]**  73/10
**party [8]**  15/14 15/17 19/14 19/15
19/20 21/10 58/6 73/9
**pass [1]**  100/3

**P**

passive [26] 8/1 8/4 8/8 11/7
12/5 12/8 14/16 15/7 16/23 16/24
34/20 34/24 36/19 38/9 39/2 39/2
39/12 39/19 39/19 39/23 40/2 40/4
50/20 51/1 53/6 53/7
passively [2] 12/4 16/23
past [8] 46/10 52/19 57/18 73/18
75/21 76/20 80/16 91/25
path [5] 15/3 15/4 98/9 98/25
98/25
patrol [1] 33/20
pause [8] 20/15 60/13 79/7 82/18
92/24 106/1 106/22 109/4
paying [2] 73/23 74/2
PDF [1] 90/15
peace [2] 29/22 30/1
peaceful [1] 35/11
peacefully [1] 32/17
peer [1] 55/4 55/16 59/9
peer-reviewed [3] 55/4 55/16 59/9
Pencil [9] 63/18 64/4 64/6 64/25
66/18 67/10 70/14 73/18 73/20
Pencil's [2] 66/12 67/10
people [43] 13/2 13/15 13/16
13/21 13/25 14/23 15/7 16/23
22/19 23/17 34/11 37/8 38/17
39/11 40/10 40/20 49/22 51/13
56/9 59/14 70/22 73/15 73/17
73/17 73/23 74/2 77/19 82/17 83/1
83/15 84/18 91/13 101/24 105/17
105/21 106/15 110/11 110/18
110/20 110/20 114/7 116/17 118/16
people's [1] 84/10
pepper [19] 8/10 9/11 10/4 10/5
12/12 12/14 16/24 36/19 37/1
37/15 40/4 40/8 40/9 40/14 40/19
50/9 50/16 86/18 87/17
per [1] 26/23
perceive [8] 6/21 7/4 7/25 8/12
9/24 29/2 29/15 54/9
perceived [3] 7/15 7/20 28/21
perceives [1] 52/16
percent [1] 70/21
perception [1] 52/19
perfect [5] 9/14 72/11 72/12 91/7
107/12
perform [1] 113/22
performed [2] 69/6 72/25
performing [1] 86/3
perhaps [6] 8/1 19/22 23/18 53/19
58/17 116/1
period [5] 37/17 47/12 80/5
103/15 103/22
periodically [1] 24/14
periods [1] 57/21
permissible [4] 111/4 111/25
112/7 118/12
person [14] 5/2 9/24 26/10 34/13
38/23 38/23 41/8 41/11 41/12 53/7
53/8 84/4 98/15 99/7
personal [1] 59/2
perspective [13] 9/19 9/23 10/12
17/5 34/4 43/17 50/19 51/2 52/23
53/14 70/5 70/6 70/8
perspectives [3] 7/13 72/2 103/15
pertain [1] 56/13
pertains [1] 98/23
Peyton [4] 2/7 4/18 20/19 63/5
phenomenon [1] 19/13
phone [12] 49/4 49/5 49/11 102/12
102/12 102/15 102/16 102/17
102/20 102/24 103/1 103/2
photo [2] 54/3 105/10
photograph [8] 71/10 84/1 96/14
105/6 105/8 105/9 115/2 115/24
photographs [2] 81/14 105/20
photography [1] 70/5
physical [8] 57/1 57/1 57/4 57/10
58/16 58/17 66/6 112/15
physiological [2] 60/25 61/7

physiology [1] 57/3
physiology [2] 9/25 9/24 113/4
113/5
picked [4] 51/17 85/11 85/25
104/8
picks [1] 17/16
picture [9] 41/1 41/1 41/21 71/9
82/18 82/25 83/4 102/23 117/10
piece [2] 47/10 50/8
pieces [1] 57/25
place [11] 17/13 19/17 33/4 50/3
51/12 51/13 84/2 84/5 95/24
105/21 106/15
places [1] 114/4
placing [1] 99/23
plaintiff [3] 1/4 1/12 96/9
plan [1] 43/10
plane [1] 96/3
planning [1] 70/18
plans [1] 106/9
planter [7] 65/22 66/1 69/2 81/1
92/11 105/7 112/7
play [12] 42/6 42/7 42/8 42/16
46/9 46/14 68/24 80/7 80/13
90/13 90/19
playback [1] 101/15
played [14] 48/8 49/1 49/15 50/12
51/7 90/18 92/22 100/12 100/17
101/10 101/23 103/6 106/24 107/1
playing [6] 101/17 101/19 101/20
103/22 106/17 106/18
plaza [1] 86/19 91/14 98/16
please [25] 4/5 6/16 7/1 10/21
18/15 36/25 52/13 56/3 62/19 64/2
69/22 89/4 89/5 89/24 90/2 96/18
97/21 98/20 99/19 100/5 101/5
103/4 105/22 106/22 107/10
plus [1] 81/15
point [30] 7/18 10/19 13/14 14/13
15/8 18/20 22/5 22/15 23/6 26/17
31/2 35/18 38/5 39/4 39/12 39/18
40/14 42/25 43/17 43/22 44/9
51/25 58/5 66/3 99/12 108/21
108/25 109/1 114/16 119/5
pointed [1] 102/24
pointing [1] 73/9
points [6] 25/7 80/6 80/12 91/12
105/5 112/8
police [59] 6/2 6/19 12/21 17/10
24/12 24/13 24/23 30/5 32/17
32/20 33/7 35/8 36/16 36/23 36/25
38/19 41/3 41/9 41/15 63/25 64/7
64/9 65/1 66/6 66/16 69/2 75/13
75/18 77/2 77/4 77/5 85/4 86/17
87/13 87/15 89/13 91/20 91/25
92/1 95/6 95/7 96/2 96/9 98/25
99/2 99/9 99/16 99/21 99/23 99/24
100/2 110/17 111/7 111/24 112/15
112/17 113/1 114/19 116/22
policies [3] 32/22 52/17 53/19
policy [1] 34/15
portion [5] 33/9 36/2 88/12 92/21
96/2
portions [3] 68/19 98/6 116/4
Portland [5] 2/9 4/18 63/6 77/1
77/5
posed [1] 37/25
poses [1] 34/13
posing [1] 39/6
position [7] 99/7 100/22 103/17
105/3 107/21 116/21 119/7
positioning [1] 105/2
possible [8] 15/22 28/20 51/24
66/11 104/17 110/12 112/14
possibly [2] 96/8 112/14
posted [5] 64/8 65/1 91/20 92/1
111/24
potential [1] 109/16
PowerPoint [1] 90/9
practically [1] 59/8
practice [1] 24/23
practices [2] 87/13 87/19

practitioners [1] 75/24
precede [1] 75/24
precise [1] 116/4
precisely [4] 9/2 71/24 72/7
98/18
precision [2] 81/15 82/3
predetermined [2] 15/3 15/4
prejudicial [1] 47/1
preliminary [1] 110/25
prepared [6] 6/8 23/23 37/19
51/19 83/17 87/2
preparing [1] 88/11
presence [1] 99/2
present [8] 12/20 68/11 77/4
82/12 93/5 98/5 114/9 117/10
presentation [6] 63/20 75/21
75/23 87/2 90/8 90/9
presented [4] 72/19 75/16 76/13
94/18
presenting [8] 8/5 8/9 12/8 61/17
76/10 83/8 84/24 85/12
presents [2] 11/17 11/22
presumably [2] 13/17 17/12
presumption [1] 118/16
presumptively [1] 119/12
pretend [1] 36/25
pretty [13] 11/25 24/13 24/17
29/12 31/21 32/16 38/15 38/18
39/11 53/3 53/9 57/21 102/23
preventing [1] 41/9
previous [1] 99/5
previously [1] 74/10
primarily [6] 24/22 70/16 73/4
74/23 75/13 87/25
primary [1] 94/2
prior [1] 68/9
prioritize [1] 19/5
prioritizes [1] 21/20
probably [17] 9/8 10/18 32/19
38/21 38/22 44/2 50/2 55/22 60/7
66/16 66/19 92/3 99/17 101/24
101/25 113/1 115/20
problem [3] 14/17 14/18 113/6
problems [1] 38/8
proceed [6] 5/1 47/14 47/15 63/12
69/19 116/25
proceeding [1] 5/11
proceedings [2] 119/21 120/5
process [6] 19/2 22/25 78/20
94/21 102/2 105/4
processing [1] 19/1
produced [1] 61/12
professional [1] 26/7
professionals [2] 74/23 75/11
proffers [1] 47/13
program [1] 76/2
progress [1] 48/10
Project [1] 75/19
projectile [9] 7/21 8/6 12/13
13/3 14/15 35/7 54/4 54/13 54/17
projects [2] 70/16 70/21
promptly [1] 119/9
properly [2] 15/3 95/9
property [1] 96/4
propose [1] 118/21
proposed [2] 5/12 49/4
proposition [1] 5/22
propositions [3] 5/7 5/18 5/21
protect [2] 41/6 41/17
protected [1] 114/23
protecting [2] 41/5 41/10
protection [1] 21/16
protest [14] 21/23 33/21 36/6
53/9 54/13 54/23 56/14 56/20
57/12 58/9 58/22 58/25 59/3 59/6
protester [2] 35/11 85/4
protesters [19] 7/23 7/25 7/25
8/4 8/7 12/25 13/1 13/4 15/1 15/5
21/24 34/20 36/19 37/14 40/6
51/13 58/15 66/15 98/16
protestor [1] 87/15
protestors [5] 18/11 35/11 81/12

**P**

**protestors... [2]** 92/2 112/25
**protests [5]** 25/3 25/8 34/25
56/16 58/15
**provide [6]** 11/3 47/5 64/25 71/10
96/4 96/15
**provided [13]** 71/12 72/22 85/3
85/10 87/7 91/24 91/24 92/4 92/6
99/22 109/15 110/3 110/11
**providing [4]** 25/15 35/14 88/14
113/21
**proximity [1]** 97/20
**prudent [1]** 113/24
**psychological [9]** 15/12 26/10
26/22 26/25 27/5 58/5 60/1 60/25
61/6
**psychological/emotional [1]** 26/10
**psychologically [1]** 58/13
**psychology [2]** 26/23 60/24
**public [8]** 2/3 2/7 4/14 4/18 63/2
63/6 65/8 114/20
**published [1]** 76/2
**pull [15]** 18/7 37/22 71/8 88/20
89/4 89/17 89/17 89/20 89/24
100/5 100/9 101/5 103/4 105/22
106/21
**pulled [2]** 47/9 47/9
**pulling [1]** 96/17
**pulls [1]** 11/16
**punching [1]** 11/19
**purely [1]** 111/20
**purpose [1]** 113/17
**purposes [8]** 29/18 31/6 33/13
44/21 46/3 46/21 71/4 116/19
**push [2]** 41/5 67/8
**pushing [4]** 14/10 15/2 17/19
111/19
**put [15]** 8/18 11/10 16/7 43/15
43/16 49/12 63/20 64/4 66/13
68/15 68/22 71/6 76/7 107/6
116/23
**putting [12]** 25/23 46/2 46/6
66/24 67/6 67/13 68/8 68/21 78/12
83/7 93/4 108/9

**Q**

**qualified [6]** 44/14 45/17 45/22
68/13 85/23 87/20
**qualify [1]** 109/19
**question [49]** 5/11 8/2 9/5 9/15
9/15 9/20 9/22 10/8 10/10 13/13
15/10 17/1 23/20 27/1 27/11 29/11
31/9 31/17 31/19 31/25 32/1 32/13
32/14 33/17 33/17 39/9 40/3 40/12
52/13 53/1 54/1 61/14 67/22 85/1
85/3 85/16 87/12 88/2 90/20 93/21
96/24 99/8 102/6 105/16 108/18
109/6 113/20 113/21 116/5
**questionable [1]** 69/3
**questions [12]** 26/5 36/14 39/15
52/4 56/15 60/8 60/16 60/16 61/20
81/11 96/21 110/5
**quick [3]** 60/10 89/16 90/13
**quickly [3]** 79/7 89/20 101/1
**quite [4]** 13/24 73/11 78/3 106/12

**R**

**rack [4]** 41/5 41/6 41/10 41/17
**racks [3]** 6/6 12/22 12/24
**radiologist [1]** 45/15
**radius [6]** 107/23 108/4 108/17
108/20 108/21 108/22
**raise [1]** 116/5
**raising [1]** 41/19
**Rami [2]** 4/11 62/23
**ramp [9]** 83/25 83/25 84/1 84/4
105/9 105/10 105/11 105/12 117/9
**RANDOLPH [1]** 1/9
**randomly [1]** 35/9
**range [3]** 29/5 76/18 101/22
**ranges [1]** 74/3

**rate [4]** 57/2 57/5 57/7 78/1
78/25
**rather [5]** 5/2 14/17 15/2 15/5
117/25
**rays [1]** 45/14
**rea [1]** 15/13
**reach [1]** 39/5
**react [1]** 61/4
**reaction [2]** 15/12 23/19
**reactions [1]** 23/11
**read [1]** 26/16
**readily [1]** 77/10
**reading [2]** 61/3 114/25
**ready [3]** 47/21 63/10 100/23
**real [5]** 70/16 74/7 74/7 89/16
89/20
**realize [2]** 92/25 96/22
**realized [1]** 108/11
**realizing [1]** 104/6
**really [15]** 5/11 14/1 14/18 29/14
37/19 39/16 68/13 78/10 83/2 93/8
93/21 101/21 102/13 102/18 116/5
**reason [9]** 17/8 22/16 23/20 38/19
39/18 50/4 66/22 108/10 115/22
**reasonable [21]** 10/16 15/24 17/6
26/6 28/21 29/1 34/6 37/10 38/17
42/13 42/21 42/23 43/9 45/8 45/11
52/10 54/6 54/7 54/12 83/16 88/6
**reasonably [11]** 6/21 7/4 12/6
26/8 28/16 31/22 36/17 42/5 42/11
42/13 54/14
**reasons [1]** 113/14
**recall [3]** 51/23 51/24 58/24
**received [2]** 66/2 103/3
**receiving [1]** 19/3
**recent [1]** 26/1
**Recess [1]** 62/15
**recollection [3]** 17/21 23/14
55/25
**reconnect [1]** 20/13
**reconstruct [1]** 73/12
**reconstruction [2]** 67/15 76/23
**reconstructions [1]** 67/16
**record [5]** 4/5 62/19 63/8 65/5
120/5
**recorded [2]** 72/7 108/19
**records [2]** 49/4 49/11
**Redirect [2]** 3/9 110/8
**reference [5]** 56/2 80/12 91/12
97/7 105/5
**referring [1]** 74/17
**refined [1]** 71/18
**refused [1]** 40/1
**refusing [1]** 41/15
**regardless [3]** 8/3 54/5 111/3
**regime [1]** 16/4
**regularly [1]** 114/19
**relate [1]** 63/19
**related [9]** 19/12 54/20 60/16
60/16 63/15 70/16 70/20 71/3
118/24
**relates [1]** 113/12
**relating [1]** 63/11
**relation [2]** 79/24 101/3
**relationship [2]** 43/22 111/12
**relative [1]** 24/16
**relatively [1]** 10/23
**relevance [1]** 8/25 69/17
**relevant [13]** 42/9 43/12 44/12
49/18 50/1 50/6 56/5 70/3 77/10
99/9 114/21 115/6 118/12
**reliability [1]** 77/25
**reliable [12]** 68/11 68/14 71/22
72/3 80/22 81/24 83/1 83/7 83/12
83/23 84/22 96/15
**reliably [3]** 80/6 81/14 84/5
**relied [5]** 52/20 58/21 71/10 87/7
96/2
**rely [8]** 42/19 45/8 45/11 45/16
55/3 86/22 87/22 111/10
**relying [1]** 18/5 46/22 47/2
**remember [13]** 21/7 25/23 37/21

50/10 82/24 93/16 93/21 94/5 95/1
95/1 95/9 95/16 104/6 115/16 116
**remembers [1]** 53/24
**remind [3]** 5/6 5/9 118/25
**remote [1]** 75/2
**repeat [3]** 21/4 52/13 64/20
**report [13]** 5/23 6/7 6/13 6/17
21/15 26/1 26/6 55/7 55/8 55/12
61/14 82/11 86/24
**Reporter [4]** 1/22 1/22 120/3
120/13
**reports [5]** 25/23 61/12 61/13
**represent [5]** 107/14 107/24 108/2
108/6 108/17
**representative [1]** 51/15
**representing [1]** 46/8
**request [3]** 5/1 63/9 113/23
**require [1]** 74/6
**required [1]** 23/10
**requirement [2]** 118/10 118/12
**requirements [2]** 29/21 30/1
**requires [1]** 22/11
**requisite [1]** 15/13
**research [5]** 22/9 36/5 55/16
59/15 61/2
**researched [1]** 59/2
**resist [1]** 11/12
**resistance [17]** 10/19 10/25 11/3
11/5 11/7 11/13 11/14 12/5 13/14
30/9 32/12 34/24 34/24 35/3 35/16
51/3 53/3
**resistant [1]** 16/24
**resisting [2]** 14/7 15/8
**resolution [1]** 78/1
**resolve [2]** 118/2 119/9
**resources [4]** 19/10 21/19 21/20
116/2
**respect [13]** 23/6 38/11 40/13
87/14 100/18 110/25 111/4 111/23
112/25 113/20 118/4 118/5 119/10
**respectfully [1]** 45/17
**respiration [2]** 57/5 57/8
**respond [2]** 85/2 114/14
**response [11]** 18/12 19/8 26/11
27/6 41/15 41/25 54/25 58/8 58/11
58/18 58/23
**responses [3]** 8/17 60/1 61/7
**responsible [1]** 25/6
**result [1]** 16/6
**resulting [1]** 81/19
**retired [1]** 31/16
**review [7]** 34/8 46/16 64/6 85/9
96/5 103/1 104/25
**reviewed [7]** 55/4 55/16 59/9 87/1
91/19 111/23 112/1
**reviewing [2]** 68/8 77/22
**revised [1]** 27/25
**right [54]** 4/12 4/20 4/23 5/4
12/25 17/16 22/14 23/3 35/23 37/5
46/8 47/21 52/3 53/6 62/7 62/25
63/4 63/10 65/11 65/17 75/15
79/18 83/14 84/9 84/11 85/21
86/13 89/3 90/22 90/23 91/1 93/6
98/1 98/2 98/15 99/3 99/16 101/21
104/2 106/6 108/4 110/7 110/24
115/15 117/11 117/16 117/16 118/3
118/15 119/8 119/8 119/15 119/16
119/20
**rights [3]** 33/6 75/22 95/5
**riot [6]** 37/5 37/7 38/20 56/14
59/8 59/10
**robber [1]** 95/10
**Rocha [4]** 1/12 4/9 62/22 114/11
**rocks [1]** 35/2
**role [2]** 34/1 45/16
**room [7]** 1/24 4/8 4/10 19/15
19/23 21/13 62/23
**route [3]** 98/6 98/16 98/17
**row [3]** 17/17 17/17 17/18
**RPR [1]** 120/12
**Rule [3]** 5/13 43/19 111/2
**rules [1]** 53/10

**R**

**ruling [1]**  94/5
**run [2]**  11/12 76/15
**running [1]**  89/8
**rust [1]**  50/18
**rust-colored [1]**  50/18
**Rylant [29]**  3/3 4/22 5/5 5/7 5/8
5/18 6/8 6/16 9/10 18/4 18/9 20/2
20/5 24/4 25/21 30/11 31/5 36/14
37/3 37/13 43/10 44/13 49/18 52/9
54/19 60/15 61/11 61/19 62/8
**Rylant's [1]**  16/22

**S**

**safe [1]**  59/10
**said [33]**  10/3 11/25 16/2 17/21
23/7 25/1 31/13 32/7 32/9 34/16
37/18 38/18 39/4 39/20 44/24
52/21 54/8 56/7 56/8 57/11 59/20
64/14 73/15 92/16 93/3 93/11
95/14 95/20 111/8 111/14 113/13
115/14 116/3
**salient [1]**  114/4
**same [26]**  17/12 27/2 28/14 32/3
32/7 32/9 32/11 37/10 44/2 44/9
57/6 63/12 72/8 80/4 80/10 80/13
88/19 97/24 101/6 103/14 103/22
106/11 108/20 109/1 112/21 112/22
**Santa [1]**  24/25
**Sarah [3]**  1/12 4/9 62/22
**satisfies [1]**  43/18
**saw [15]**  8/8 27/23 38/14 38/15
40/7 41/25 44/3 47/3 50/4 51/10
51/24 84/5 93/8 95/11 96/6
**say [49]**  9/23 9/25 13/20 14/9
16/12 18/2 19/22 22/17 30/12
31/21 31/21 33/6 34/6 34/13 34/24
35/7 35/24 36/20 37/8 38/3 38/9
40/22 41/11 41/18 41/19 42/21
44/25 48/7 49/25 54/18 58/21 60/3
62/10 67/2 68/5 68/25 69/10 73/24
82/1 86/1 86/2 87/10 88/10 88/11
104/12 108/16 111/1 112/16 115/17
**saying [17]**  16/15 17/18 35/21
35/23 41/8 41/20 45/14 50/25
54/12 54/15 64/10 79/5 108/14
108/21 113/3 116/13 119/3
**says [11]**  16/13 26/6 27/17 28/8
39/18 68/10 68/22 97/2 97/15
104/20 117/21
**scanning [1]**  74/4
**scare [1]**  95/10
**scenario [3]**  58/22 59/19 106/2
**scenarios [2]**  59/12 61/5
**scene [16]**  54/13 71/5 71/14 74/8
80/24 81/16 82/5 82/14 83/6 83/12
84/7 85/13 88/4 95/24 96/1 96/14
**scenes [3]**  73/12 76/11 77/8
**school [2]**  59/11 70/6
**science [1]**  59/23
**sciences [2]**  67/2 113/3
**scientific [2]**  18/18 59/17
**scope [3]**  30/7 30/14 30/20
**screen [11]**  47/25 47/25 50/17
50/22 79/4 88/14 90/18 96/7
102/15 102/21 117/6
**screenshot [1]**  90/8
**scrimmage [7]**  12/21 13/8 13/12
14/9 16/15 66/7 77/19
**scroll [1]**  107/11
**scrum [1]**  77/18
**se [1]**  26/23
**second [14]**  6/7 14/13 14/14 28/1
28/7 28/8 33/23 50/8 64/3 64/5
64/22 72/9 97/21 107/25
**secondarily [1]**  105/15
**seconds [1]**  107/1
**section [1]**  55/14
**secure [1]**  116/9
**secured [1]**  114/20
**security [9]**  25/15 99/13 113/25

114/1 114/5 114/9 114/23 115/19
**see [72]**  7/13 12/2 16/2 25/3
28/14 28/16 45/14 46/6 46/25
48/21 49/2 50/6 50/14 51/4 51/5
51/16 55/9 57/5 62/7 66/10 69/1
69/10 72/2 78/16 79/1 80/13 81/20
83/6 83/24 84/6 87/10 87/14 87/17
88/1 88/1 88/15 88/18 89/21 90/11
90/17 90/19 91/25 92/3 93/6 93/9
96/23 97/1 97/6 97/14 98/2 99/3
101/2 101/15 102/20 102/21 102/22
105/6 105/17 105/19 106/12 106/14
106/16 109/18 110/20 111/18 112/2
112/21 113/6 115/8 117/5 117/6
118/6
**seeing [7]**  80/8 80/9 87/8 93/1
100/17 102/14 105/16
**seeking [2]**  6/11 49/22
**seem [5]**  49/23 115/4 115/6
**seemed [1]**  109/18
**seems [5]**  20/22 31/20 44/10 116/1
118/12
**seen [17]**  9/20 15/24 17/25 41/22
43/8 47/19 51/21 51/23 71/6 73/11
78/20 78/25 79/10 96/7 100/1
100/4 111/22
**sees [1]**  10/14
**selective [6]**  18/14 18/22 35/5
55/1 55/14 55/17
**self [2]**  15/14 15/17
**self-defense [2]**  15/14 15/17
**semester [1]**  4/11
**send [2]**  51/25 61/23
**sense [12]**  13/18 13/23 18/20
18/25 22/1 58/1 84/7 84/8 85/1
89/23 110/19 117/19
**senses [3]**  18/24 19/3 67/2
**sensitive [1]**  115/19
**sensitivity [2]**  85/17 113/5
**sentence [1]**  64/21
**separate [2]**  61/12 61/13
**separately [2]**  17/4 23/4
**sequence [1]**  93/7
**sequentially [2]**  92/22 103/21
**serve [2]**  14/18 95/7
**service [1]**  29/23
**session [2]**  37/19 38/6
**sessions [2]**  75/3 75/5
**set [2]**  9/13 66/1
**several [6]**  70/6 75/21 78/21
92/22 94/1 109/15
**shake [1]**  13/19
**share [2]**  47/25 106/22
**shared [1]**  29/7
**sharing [1]**  47/25
**sharpen [1]**  102/17
**SHERRY [3]**  1/22 120/3 120/12
**shield [1]**  78/6
**shifting [1]**  19/9
**shifts [2]**  19/6 21/10
**shoe [1]**  54/16
**Shomstein [1]**  55/19
**shoot [2]**  12/12 53/7
**shooting [8]**  21/18 34/19 35/7
35/9 35/12 35/18 38/20 96/10
**shootings [2]**  21/14 59/16
**short [3]**  21/9 43/11 77/4
**shot [3]**  54/3 54/16 95/11
**should [18]**  17/6 17/8 18/12 22/10
27/25 28/4 31/21 33/8 36/20 39/21
54/25 63/25 94/21 94/24 98/23
113/18 117/25 119/12
**shouldn't [1]**  5/10
**show [27]**  16/25 22/15 23/13 23/21
42/9 47/20 48/18 48/23 49/5 51/9
58/21 64/7 66/3 66/5 66/15 82/17
88/12 96/22 106/8 111/11 111/12
111/17 112/8 112/12 112/19 113/18
113/19
**showed [3]**  64/9 64/25 95/7
**showing [5]**  69/17 83/2 112/3

112/8 114/2
**shown [1]**  23/14
**shows [4]**  23/14 48/13 49/4 64/4
112/4
**side [11]**  8/24 10/14 46/23 49/13
54/18 68/6 77/19 80/7 80/7 100/17
100/17
**sidewalk [1]**  72/1
**similar [8]**  9/21 10/24 11/24
12/13 57/4 67/14 75/21 105/11
**simple [1]**  108/24
**simply [6]**  11/11 44/25 111/10
111/11 111/17 112/18
**simulation [1]**  94/16
**simultaneously [4]**  19/3 28/22
72/16 94/15
**since [6]**  4/25 35/1 67/17 70/20
76/9 82/6
**single [2]**  45/19 99/7
**sir [2]**  5/3
**siren [2]**  22/24 23/15
**sit [1]**  51/24
**site [2]**  49/11 82/9
**sites [1]**  70/17
**situation [11]**  7/7 8/14 21/23
22/19 53/9 56/20 57/7 58/5 58/9
58/10 83/19
**situations [4]**  36/6 56/14 61/7
72/13
**size [1]**  105/12
**SketchUp [3]**  76/1 76/2 76/12
**skills [3]**  68/20 76/15 76/18
**slide [21]**  48/7 51/20 89/5 89/6
96/23 96/24 97/21 98/21 98/24
98/24 99/1 99/4 99/10 99/16 99/18
99/19 100/10 107/11 107/15 108/25
109/7
**slides [5]**  37/20 51/19 96/22 97/6
99/5
**slightly [1]**  72/14
**slow [5]**  78/8 79/7 100/25 101/2
101/20
**slow-motion [1]**  100/25
**slowed [4]**  92/20 92/21 101/18
107/7
**slowing [4]**  66/9 92/17 92/19
102/20
**small [3]**  79/1 102/12 102/17
**smaller [1]**  102/14
**smell [1]**  18/25
**so [353]**
**society [1]**  33/18
**software [4]**  74/21 74/22 75/12
76/3
**solid [2]**  98/3 98/4
**solving [1]**  14/18
**some [90]**  7/12 7/21 8/11 8/18
9/23 10/3 11/19 12/11 12/14 13/18
13/23 15/2 19/6 19/14 22/9 24/15
25/2 27/5 29/2 29/22 29/23 31/9
31/10 31/10 31/11 31/13 33/13
33/25 36/5 37/7 37/8 37/8 38/7
38/8 38/25 40/24 42/1 47/3 48/7
49/21 50/2 50/4 50/5 53/6 56/3
56/9 57/3 58/11 58/16 58/19 59/12
59/25 60/3 61/13 67/14 68/9 70/2
70/24 72/17 73/4 73/17 74/8 74/9
75/4 75/4 77/6 77/23 83/20 83/21
83/24 87/16 87/18 88/18 92/19
96/21 97/7 100/6 100/20 104/11
109/21 109/22 111/12 113/14
113/23 114/5 114/6 116/4 116/16
118/6 118/11
**somebody [22]**  11/1 14/6 14/7 14/8
21/13 29/6 29/9 29/11 29/24 30/15
31/16 32/16 34/10 34/13 35/18
35/18 41/7 57/6 58/17 71/25
106/14 112/14
**somebody's [1]**  54/13
**someone [33]**  7/10 7/16 7/24 8/9
9/21 9/25 14/9 18/17 22/13 29/8
30/4 30/5 30/18 31/5 31/7 31/22

**S**

someone... [17]   36/23 37/25 39/5
54/17 65/5 66/2 66/4 68/10 68/15
69/6 77/9 80/17 104/4 104/20
109/19 116/7 116/9
something [37]   8/23 11/2 11/9
11/24 16/4 22/20 28/15 31/23
43/20 45/11 50/8 52/5 52/16 54/12
64/17 64/18 67/24 72/5 72/12 76/7
78/5 79/8 80/8 80/9 85/22 87/20
88/14 89/15 101/24 102/1 106/7
106/10 108/8 112/4 116/15 117/23
118/1
sometimes [3]   10/23 79/3 79/21
somewhat [4]   12/13 13/5 13/12
14/11
soon [2]   95/11 119/10
sooner [1]   117/25
sorry [23]   20/2 21/1 21/8 37/3
45/21 56/11 64/12 65/2 65/11
65/12 65/16 88/8 88/25 97/13
100/14 102/5 104/9 109/12 115/10
115/11 115/12 117/4 118/22
sort [25]   6/6 12/12 12/14 15/2
19/14 23/5 23/11 23/19 27/5 29/23
38/4 43/15 44/22 58/11 58/16
58/19 67/5 71/14 74/3 79/12 81/20
84/3 92/25 101/22 105/19
sound [12]   21/16 44/22 45/5 58/4
69/6 85/8 89/7 101/21 108/19
108/20 113/5 113/5
sounds [4]   23/17 75/15 83/11 91/7
source [3]   37/15 106/3 106/17
sources [5]   80/4 80/5 97/7 103/23
106/6
South [1]   53/8
space [3]   13/18 71/4 115/21
speak [3]   67/9 69/12 74/1
speaker [1]   75/6
speaking [2]   17/15 76/8
special [2]   104/11 104/12
specialization [1]   61/2
specialized [1]   60/25
specific [16]   19/18 34/3 34/8
35/16 36/16 37/10 43/7 49/19 51/4
56/4 56/15 56/18 58/25 61/6 79/8
81/3
specifically [12]   31/18 33/19
36/8 39/20 51/17 52/25 66/6 69/12
73/24 74/19 87/4 98/2
specificity [1]   81/23
speed [7]   101/15 101/17 101/18
101/19 101/20 101/23 107/7
spend [1]   116/2
spit [1]   83/21
spot [1]   98/13
spouse [2]   19/23 20/1
spray [16]   9/11 12/12 12/14 36/19
37/1 37/1 37/15 40/4 40/4 40/8
40/9 40/14 40/19 50/16 86/18
87/17
sprayed [10]   8/10 16/24 36/19
37/14 37/25 40/20 50/9 50/18
50/20 51/2
spraying [1]   40/18
square [2]   16/4 106/16
staff [4]   70/22 73/15 75/4 77/6
stammering [1]   32/6
stamp [2]   72/17 97/10
stamps [6]   72/4 72/6 72/10 72/11
72/14 97/17
stand [3]   43/10 69/10 113/20
standard [4]   35/22 45/23 45/23
117/11
standards [1]   29/24
standing [32]   8/4 8/5 8/9 9/2
12/3 12/18 13/11 13/21 32/16
34/20 37/25 38/17 38/24 39/5 41/7
41/12 41/13 51/21 81/1 81/13
83/25 104/8 111/13 111/14 113/9
114/2 114/3 114/7 116/6 116/7

116/7 116/8
start [13]   5/6 5/17 5/20 17/19
18/19 24/6 24/12 34/17 35/13
80/19 105/2 106/13 116/12
started [4]   6/3 70/15 92/9 98/12
starting [3]   4/6 9/11 62/20
starts [2]   35/12 101/21
state [7]   4/5 25/17 25/19 50/5
62/19 74/10 74/12
statement [2]   28/19 113/19
states [9]   1/1 1/3 1/10 4/3 29/12
56/23 62/17 114/18 114/22
statutory [1]   114/21
stay [1]   86/14
step [5]   11/9 36/25 37/1 71/25
76/5
steps [1]   115/20
stick [1]   112/16
sticking [1]   54/4
still [14]   14/6 22/8 23/9 26/12
35/4 38/17 38/23 62/23 67/22
68/19 68/20 82/19 118/7 119/11
stimulus [1]   18/23
stinger [8]   9/11 9/12 10/5 10/15
12/1 16/20 35/24 36/1
stipulate [1]   117/12
stipulation [1]   49/4
stipulations [1]   49/3
stood [1]   54/17
stop [1]   19/15
stories [2]   73/2 75/17
story [1]   85/14
strategy [1]   26/20
streamlined [1]   43/11
Street [4]   1/13 1/16 2/5 2/8
stress [18]   18/10 19/6 21/18 23/1
54/22 56/20 56/23 56/25 57/1 57/3
57/5 57/6 57/10 57/14 57/17 58/7
58/13 59/7
stressful [3]   22/19 56/21 57/7
stressors [1]   56/25
stretch [2]   23/12 23/18
strike [5]   7/16 11/24 17/4 111/3
113/22
strikes [12]   7/14 17/1 23/12
23/17 35/7 51/22 66/6 68/21 69/3
69/12 111/4 112/7
striking [2]   7/14 7/16
structured [1]   25/9
struggle [1]   40/23
struggling [3]   38/25 39/9 68/19
studied [1]   34/25
studies [10]   55/25 56/2 56/5
56/13 56/15 56/18 58/20 58/25
59/1 59/18
studio [4]   63/18 64/6 70/14 73/18
study [9]   55/11 55/19 55/21 55/24
59/8 59/9 59/14 59/18 60/18
studying [2]   34/1 59/11
stuff [2]   28/20 30/16
stumbling [1]   32/3
subject [2]   45/19 108/12
subjects [2]   95/25 96/16
submitted [1]   82/11
submitting [1]   26/15
subsequent [1]   86/25
such [7]   11/23 25/10 33/16 33/17
59/20 72/15 104/17
sufficient [1]   115/1
sufficiently [2]   35/19 96/14
suggest [2]   67/22 108/25
suggesting [2]   45/5 108/18
Suite [2]   2/5 2/9
summary [2]   21/9 93/5
super [1]   67/16
Supervisory [2]   4/14 63/2
supplemental [2]   22/10
support [4]   42/4 43/5 63/22 90/25
supports [1]   46/5
suppose [2]   62/1 118/9
supposed [7]   22/23 37/18 38/19

39/11 39/13 48/22 116/12
supreme [1]   4/6
sure [41]   8/20 9/14 9/25 13/16
13/24 18/16 22/15 25/19 27/19
28/23 30/11 31/20 32/7 38/18
40/20 45/16 52/14 53/11 53/22
55/9 55/10 55/25 55/25 56/6 65/4
73/22 83/17 83/19 87/21 88/17
89/15 93/23 94/18 94/23 99/14
106/9 109/16 111/1 116/11 118/2
118/7
surveillance [6]   96/4 97/16 97/18
97/25 98/1 98/4
surveys [1]   59/14
survival [2]   19/7 19/9
SW [1]   2/8
SWAT [1]   95/8
swinging [1]   87/15
switch [2]   84/8 118/19
switched [1]   106/6
sworn [2]   72/19 72/22
symposium [2]   74/15 77/4
synced [2]   65/23 84/25
synching [1]   72/4
synchronization [11]   63/21 66/8
72/3 80/1 81/10 87/25 88/4 91/2
92/13 92/17 100/16
synchronize [7]   68/13 71/22 72/15
78/3 80/6 80/15 80/17
synchronized [12]   68/17 68/23
72/7 72/16 78/4 88/3 91/8 100/18
103/8 106/3 106/18 112/20
synchronizing [6]   66/25 67/18
71/19 73/8 80/3 97/17
system [1]   72/8

**T**

TABLE [1]   2/11
tackling [1]   11/19
tactic [1]   14/14
tactics [4]   7/12 31/10 31/16
53/18
take [6]   29/14 35/10 64/5 91/16
114/25 119/3
takeaway [1]   104/10
taken [3]   24/18 59/8 62/15
takes [3]   32/7 32/9 67/23
taking [3]   19/17 51/12 83/6
talk [11]   24/6 27/17 36/16 73/1
82/1 82/2 83/15 87/4 92/9 96/23
99/14
talked [8]   30/8 52/10 57/21 61/13
79/15 93/24 99/20 109/7
talking [33]   8/23 9/1 9/4 13/15
13/15 15/16 16/19 16/20 30/7
31/18 33/10 38/10 39/1 39/1 40/25
41/1 41/21 46/10 47/18 50/16
53/22 58/14 70/23 77/7 88/19
92/23 98/9 99/11 107/16 107/19
108/3 117/9 117/14
tall [1]   80/25
tape [1]   82/9
tapping [1]   70/24
targeted [2]   32/25 33/8
Tase [2]   34/11 34/13
Tasers [2]   34/10 75/10
task [1]   69/7
tasked [1]   25/15
Taylor [5]   1/15 4/7 4/9 62/21
62/22
tear [14]   12/12 24/21 24/21 32/24
33/1 33/4 33/7 35/17 38/14 38/20
39/10 40/8 40/15 40/19
technical [3]   20/3 68/20 69/7
technique [1]   15/6
techniques [3]   14/5 14/11 71/18
technology [3]   31/11 57/19 59/17
tell [12]   20/12 36/25 42/24 48/22
60/22 63/13 74/15 77/1 85/19
90/19 100/14 113/17
telling [6]   11/8 11/9 11/9 11/10
79/14 94/20

**T**

tells [1]   11/1

temporal [1]   17/11

tender [2]   23/23 86/6

Tennessee [1]   76/23

tens [1]   13/16

tenses [1]   11/16

terms [12]   10/23 18/18 29/14 30/8 34/5 36/6 39/2 76/4 83/3 87/18 88/10 105/18

terrace [13]   9/1 16/11 48/25 49/6 49/9 81/2 81/4 85/5 85/7 86/20 100/1 114/4 114/6

test [1]   57/16

tested [1]   34/12

testified [9]   44/14 45/22 74/10 93/14 93/17 94/25 95/15 95/22 113/17

testifies [1]   117/21

testify [9]   6/8 17/23 42/1 63/18 68/16 84/10 84/24 87/20 112/1

testifying [5]   30/15 67/1 87/6 113/7 113/7

testimony [38]   5/12 6/1 6/4 6/12 27/12 43/25 63/11 63/14 66/21 66/24 67/1 67/24 67/25 68/1 68/22 69/4 69/4 71/5 72/19 72/22 72/25 82/13 83/11 83/18 94/3 94/6 94/9 95/16 95/16 95/18 111/1 111/2 112/5 113/12 115/1 118/4 118/5 118/8

tests [1]   86/3

than [24]   5/2 10/11 12/15 14/9 14/17 15/2 15/5 26/15 27/13 32/5 35/17 52/24 55/23 61/6 67/14 71/23 72/18 78/2 84/24 91/2 101/25 108/9 117/25 118/8

thank [32]   4/23 5/3 21/2 28/6 28/23 31/3 61/19 62/8 62/13 62/14 62/25 63/7 65/18 69/23 70/12 86/5 86/12 89/5 90/2 91/16 96/19 97/22 98/21 101/5 106/20 107/1 110/6 110/23 114/10 119/16 119/19 119/20

thanks [5]   89/25 103/5 105/23 106/23 107/10

that [940]

That's [2]   80/16 108/5

their [29]   4/5 7/11 11/10 11/10 14/21 21/15 29/10 32/18 33/22 33/23 33/24 44/17 49/24 52/11 52/17 52/19 52/19 53/3 53/14 53/24 59/4 67/14 73/10 83/8 84/23 86/1 113/9 117/11 117/12

them [52]   11/9 11/10 11/10 12/23 13/22 15/2 15/5 15/19 15/20 16/5 19/11 22/13 24/17 32/17 34/9 34/11 34/18 35/1 37/16 39/7 40/8 41/5 41/16 43/24 47/22 55/7 55/23 56/1 58/18 59/12 66/25 75/8 76/17 78/3 78/16 79/4 82/17 83/2 83/7 83/8 83/17 93/6 93/7 94/20 95/10 97/17 109/18 109/21 109/22 110/18 113/18 117/14

themselves [5]   38/18 41/6 41/10 41/17 95/9

then [76]   5/8 8/17 9/19 11/21 12/21 12/25 13/1 16/6 16/14 16/20 18/9 19/19 19/22 19/23 23/1 24/14 27/3 28/24 29/17 30/3 30/3 30/17 31/20 31/21 34/14 39/23 43/20 44/19 48/20 51/18 55/25 59/13 61/18 62/8 68/8 68/25 69/19 70/6 73/11 77/1 78/1 78/7 78/12 79/6 80/5 80/12 81/4 83/20 87/22 88/6 88/18 89/21 91/7 91/7 92/24 92/25 93/1 95/17 96/6 97/15 98/23 100/3 100/18 100/25 101/4 102/4 102/11 103/11 103/18 105/13 106/13 106/18 107/6 107/9 109/23 112/23

theory [7]   15/15 15/17 38/12

41/11 75/18 119/4 119/7

thereby [1]   85/8

therefore [2]   83/21 84/2

these [63]   7/22 12/2 12/13 13/2 13/6 13/20 14/4 14/14 14/20 14/22 14/25 15/3 17/4 23/4 24/19 27/17 28/9 29/2 34/18 34/25 35/24 35/24 42/3 42/6 42/13 42/15 42/15 43/4 43/24 44/24 51/11 51/12 51/15 53/13 53/23 54/10 55/16 55/18 56/13 58/6 59/6 59/11 60/1 68/13 68/23 74/1 81/18 82/14 85/6 86/22 89/10 90/15 91/1 93/1 97/6 97/18 97/19 100/6 103/8 116/10 117/12 117/14 117/21

they [107]   5/7 6/5 7/7 7/8 7/9 7/11 8/1 8/1 8/3 11/2 11/12 12/4 12/8 12/8 12/12 12/17 13/5 13/10 13/11 14/2 14/23 15/4 17/12 17/18 17/19 22/21 22/21 26/21 33/4 33/5 33/8 33/21 33/22 34/18 38/15 38/22 38/23 39/11 39/12 39/12 39/13 39/13 39/16 39/22 40/1 40/7 41/5 41/6 41/9 41/12 41/14 41/16 42/18 44/19 48/23 49/12 49/12 49/12 49/20 49/21 49/23 52/17 53/9 53/25 56/18 56/19 57/17 59/12 59/16 59/17 62/3 66/13 67/14 68/7 71/25 75/1 75/3 75/8 75/11 75/12 76/7 76/16 76/17 76/18 78/16 79/5 79/11 81/21 83/5 84/20 86/3 94/8 94/21 94/23 94/24 94/24 95/8 100/18 101/25 104/6 108/23 109/18 113/9 113/11 113/17 116/11 116/12

thing [17]   6/10 14/25 19/10 35/13 41/4 57/6 67/5 67/19 78/25 80/16 84/3 88/11 89/14 97/24 102/19 105/19 113/24

things [53]   6/4 6/6 6/9 7/22 19/2 19/11 28/22 29/7 29/15 31/12 31/13 38/9 58/7 58/9 59/11 63/19 63/19 65/15 66/9 70/2 71/6 71/8 73/19 77/14 77/20 77/24 78/8 78/10 78/22 79/6 79/10 79/12 80/17 80/19 80/23 82/12 82/16 84/6 89/18 92/4 94/1 100/19 101/14 102/9 104/15 105/6 105/7 105/8 105/15 105/20 113/6 114/7 116/12

think [118]   6/18 9/10 11/25 12/10 12/19 14/3 15/8 17/3 17/14 20/3 23/4 23/10 23/21 26/13 26/15 29/5 31/1 31/2 31/9 31/17 31/25 32/9 35/18 35/20 35/21 37/22 38/6 38/21 38/22 39/9 39/16 40/13 40/14 41/2 41/22 41/22 42/22 44/2 44/25 45/17 45/18 45/24 46/19 47/10 50/23 51/18 52/3 54/4 54/6 60/6 61/11 63/10 64/17 66/19 66/23 66/24 67/25 68/2 69/9 69/9 71/18 74/17 74/22 75/3 75/10 77/1 79/19 81/8 81/17 82/15 83/16 84/14 85/2 85/18 86/24 87/12 87/25 88/11 88/21 88/25 89/6 89/21 89/23 90/7 90/20 91/1 92/21 94/12 94/21 95/18 102/18 103/3 103/8 104/3 104/10 105/9 105/13 107/25 108/3 111/14 111/25 112/11 112/24 113/2 113/13 113/18 113/19 113/24 114/10 115/1 115/2 116/24 117/19 117/23 118/5 118/19 118/20 119/11

thinking [2]   7/11 39/17

thinks [2]   112/9 112/11

third [8]   15/14 15/17 26/25 54/19 61/14 65/20 92/8 98/20

third-party [2]   15/14 15/17

this [206]

those [94]   7/23 8/11 8/18 10/4 12/11 13/16 13/25 14/11 16/2 16/7

16/10 16/11 16/15 21/20 23/2 29/2 29/24 37/2 38/10 39/21 41/14 43/5 43/9 43/19 45/3 45/9 45/13 48/23 51/19 55/6 55/22 56/15 56/19 57/8 59/15 63/21 63/22 64/6 66/14 66/14 66/17 68/16 69/15 70/2 72/19 73/16 73/17 78/10 78/15 78/15 79/10 80/5 80/7 80/13 80/19 81/6 81/16 81/23 82/12 82/13 83/2 83/5 85/11 87/9 87/23 87/25 89/11 90/16 90/16 91/24 92/4 92/20 92/23 93/9 97/9 97/16 101/4 103/17 103/20 104/8 104/15 105/14 105/20 106/17 108/16 109/17 109/21 110/19 111/9 112/1 114/3 114/6 115/20

though [6]   26/24 37/4 44/9 47/10 67/23 88/10

thought [2]   31/23 95/9

thousands [3]   13/2 13/16 50/3

threat [4]   8/10 12/9 34/14 37/25

three [9]   8/24 51/11 60/7 61/11 61/12 67/15 75/3 75/6 86/22

through [24]   7/9 7/10 9/8 15/19 23/4 29/6 37/20 49/3 55/18 60/6 63/25 76/14 81/14 86/1 86/14 86/15 87/3 88/3 88/18 93/12 95/20 100/6 101/6 109/21

throughout [8]   15/25 16/21 17/24 24/14 24/19 29/12 47/11 47/11

throw [1]   14/15

throwing [2]   13/9 35/2

thrown [11]   7/22 8/7 10/6 10/15 12/1 12/3 12/9 12/10 13/3 13/6 14/21

Tiananmen [1]   16/4

tied [1]   54/16

time [60]   5/25 9/4 12/23 16/10 16/14 17/17 18/4 21/14 37/17 43/21 44/13 47/12 48/17 48/17 48/20 53/21 57/21 60/4 63/12 66/25 68/25 69/1 69/2 70/20 71/18 71/19 72/4 72/6 72/6 72/10 72/11 72/14 72/17 76/6 78/7 78/16 80/4 80/10 80/13 80/18 96/18 96/24 97/1 97/5 97/10 97/16 101/2 103/15 103/22 105/11 106/11 106/12 106/17 108/11 112/21 112/22 114/8 116/2 116/15 118/2

timed [1]   71/24

timeline [2]   73/5 73/5

times [15]   8/4 12/25 16/12 35/1 37/8 44/15 57/22 73/6 75/21 77/13 91/12 101/17 101/17 115/20 115/21

timing [11]   65/24 68/23 93/8 97/19 101/3 109/24 109/25 112/9 112/10 112/11 112/12

today [11]   4/25 5/2 26/12 29/7 30/8 31/13 37/23 62/9 70/3 70/9 118/3

together [18]   25/23 63/20 64/4 66/13 66/25 67/6 67/13 68/8 68/13 68/21 68/23 71/9 75/1 78/12 80/7 85/14 93/5 116/24

toggling [1]   89/25

told [1]   46/20

Tombstone [1]   32/4

tone [2]   101/21 101/23

tones [1]   78/24

too [6]   16/5 18/23 58/3 98/24 102/2 104/14

took [3]   50/3 98/16 105/15

tool [5]   76/5 76/12 80/20 106/10 106/13

tools [6]   14/4 31/11 73/3 74/23 77/8 78/14

top [2]   21/25 97/14

topic [5]   75/16 76/11 76/13 76/19 77/12

topics [1]   5/12

totalitarian [1]   16/4

totality [1]   6/20

**T**

totally [1]  108/13
touched [2]  78/19 103/25
tough [1]  32/1
tours [1]  116/21
toward [1]  16/15
towards [6]  15/1 15/2 15/2 15/5
   15/5 51/3
train [1]  76/17
trained [8]  10/12 10/16 52/17
   52/24 54/5 73/14 73/16 73/24
trainer [2]  71/21 73/22
trainers [5]  33/23 33/23 33/24
   33/24 34/1
training [23]  6/19 24/7 24/8
   24/13 24/14 24/19 29/11 29/23
   29/24 32/8 32/9 32/22 34/15 52/11
   52/20 53/13 53/25 74/16 74/17
   75/2 75/2 76/19 84/13
trainings [2]  73/20 75/14
transcript [2]  1/9 120/4
transcripts [1]  68/9
transparent [1]  108/13
transportation [1]  70/17
travel [1]  85/8
travels [1]  104/13
treated [1]  5/10
tree [3]  40/6 40/7 41/12
trespassing [1]  33/5
trial [15]  5/8 5/19 5/21 5/23 6/2
   12/19 25/6 25/18 40/24 42/3 43/6
   51/19 76/15 76/18 77/21
trials [1]  68/9
trickles [2]  34/14 34/15
tried [2]  86/24 97/1
trier [2]  77/21 78/13
tries [1]  19/5
trigger [1]  58/11
triggered [2]  41/25 58/23
Trimble [1]  76/3
tripped [4]  65/22 65/25 92/11
   112/6
true [4]  28/22 59/5 87/13 120/4
try [13]  15/21 19/4 19/25 22/9
   35/15 47/25 50/23 59/12 78/8
   80/24 99/17 117/17 119/13
trying [21]  7/19 21/12 22/6 23/20
   23/21 27/8 30/11 30/14 30/23 39/3
   41/5 43/22 51/19 53/11 80/12
   81/22 90/23 99/6 102/10 105/13
   108/25
turn [3]  20/25 47/22 48/24
turning [6]  6/2 8/15 93/1 99/12
   100/4 101/3
turns [1]  92/24
twice [1]  76/10
two [27]  13/15 24/24 28/21 32/2
   43/10 48/15 56/25 57/9 57/25
   65/21 65/25 66/25 72/15 76/7 78/4
   80/4 80/7 88/3 92/10 93/17 96/9
   97/9 97/18 100/17 103/16 103/18
   112/6
type [11]  7/22 8/6 14/20 24/19
   30/10 34/23 35/16 35/17 45/7
   73/23 87/18
types [3]  36/7 45/9 59/15

**U**

U.S [1]  1/23
U.S.C [1]  114/21
ultimate [3]  43/6 43/6 113/15
ultimately [3]  7/16 33/22 33/25
uncertainty [1]  108/11
unconscious [2]  18/13 54/25
under [18]  5/13 19/6 22/19 23/18
   23/18 33/3 42/4 45/6 46/6 46/19
   46/21 54/22 55/14 56/20 56/21
   58/13 67/19 111/2
undergraduate [2]  69/23 70/3
underlay [2]  71/10 96/15
underlying [1]  97/8

understand [30]  13/14 18/20 19/13
   52/14 55/20 56/3 56/6 56/11 58/1
   71/8 71/9 77/24 78/15 79/5 81/24
   82/17 83/3 87/17 87/21 93/7 94/23
   102/11 103/14 103/23 114/8
understanding [18]  26/19 27/7
   27/12 28/25 29/8 30/3 32/5 32/11
   61/3 61/17 70/8 71/4 79/9 82/8
   90/14 111/7 114/18 118/23
understood [12]  22/15 79/19 83/5
   91/15 94/9 96/8 96/11 98/9 99/19
   103/19 105/1 113/2
unethical [1]  79/23
unique [2]  71/24 80/11
uniquely [1]  45/21
UNITED [8]  1/1 1/3 1/10 4/3 29/12
   62/17 114/18 114/22
University [2]  69/24 70/1
unlawful [1]  95/12
unless [3]  34/13 50/3 64/9
unlikely [3]  67/1 104/4 108/15
unnecessary [1]  33/14
unpack [2]  18/14 27/15
unreasonable [3]  35/12 54/9
   113/23
until [3]  31/13 36/8 47/13
unusual [1]  77/15
up [58]  10/4 11/7 11/16 12/25
   15/9 17/19 18/7 19/25 28/4 32/17
   36/5 37/7 37/22 39/7 47/9 51/5
   52/9 54/17 56/23 60/5 61/22 68/10
   69/2 72/4 76/9 80/12 80/19 81/11
   84/21 85/11 85/14 85/25 88/20
   89/4 89/17 89/17 89/21 89/24 91/9
   92/13 94/25 95/6 95/7 96/17 97/4
   97/14 98/13 100/5 100/9 100/23
   101/5 103/4 104/8 105/22 106/21
   109/6 113/5 113/5
update [1]  24/18
updated [1]  24/14
upon [3]  45/8 46/22 55/20
upper [9]  16/11 48/25 49/5 49/9
   81/2 81/3 85/5 86/19 100/1
ups [1]  66/9
us [33]  4/24 18/2 18/11 20/17
   34/21 38/21 38/22 54/23 57/12
   62/9 62/23 63/8 63/20 64/4 74/15
   77/1 78/10 79/13 79/14 80/6 80/22
   80/24 80/24 91/12 91/13 93/9
   100/14 100/20 101/7 104/5 104/25
   105/20 106/15
USA [5]  80/17 80/18 93/15 103/18
   103/21
USAO [1]  1/15
use [51]  7/21 9/11 10/23 12/11
   17/9 29/14 30/9 34/16 35/24 36/24
   37/11 39/10 44/14 55/3 57/11
   57/13 61/1 61/5 61/7 63/25 66/5
   69/5 73/22 74/25 76/5 78/20 79/24
   80/20 81/14 85/15 86/17 86/18
   87/2 87/8 87/10 87/13 87/16 87/18
   88/1 89/13 94/4 95/12 106/10
   111/6 111/15 111/16 112/15 112/18
   112/18 116/1 116/14
used [22]  6/5 14/11 15/3 16/5
   30/10 33/7 33/15 35/17 39/24 53/2
   55/11 75/10 76/13 76/24 79/21 80/16
   82/6 82/11 93/25 97/7 101/2
   105/10
user [1]  50/23
uses [1]  14/5
using [17]  12/14 14/4 18/2 28/2
   32/24 33/2 33/13 34/17 35/6
   35/21 37/9 64/18 66/20 75/17
   76/12 109/17
utilize [1]  94/19
uttered [2]  104/5 108/12

**V**

vague [1]  39/2
valuable [1]  106/12

value [1]  94/23
variances [2]  76/21 86/17
   89/12 111/6
various [2]  6/9 116/21
varying [1]  103/22
Vegas [1]  76/10
vehicle [1]  96/3
Veizaj [1]  108/23
verify [1]  80/23
version [2]  26/1 95/24
versus [14]  4/4 31/7 34/4 34/5
   34/24 40/19 62/18 67/4 68/20 69/4
   69/6 93/15 94/16 101/17
very [31]  7/6 9/4 10/25 14/9
   17/24 27/2 34/3 34/5 35/5 35/16
   35/17 39/2 41/20 41/23 43/11
   48/23 54/1 64/13 66/19 71/24 72/3
   79/6 80/18 81/2 82/24 88/5 95/8
   101/1 105/7 105/11 117/20
victims [1]  110/13
video [136]
videos [90]  16/25 18/3 37/15
   37/20 37/22 42/7 43/4 43/7 43/19
   43/24 44/12 45/11 45/13 46/9
   46/16 47/5 47/9 47/21 48/23 51/9
   61/24 62/3 63/20 63/21 63/22 64/3
   64/5 64/7 64/9 64/24 64/24 65/23
   66/5 66/11 66/13 66/14 66/25 67/7
   67/13 67/14 67/18 68/16 68/23
   72/15 77/13 79/22 80/7 80/12
   80/15 82/23 83/2 83/7 83/23 84/25
   86/23 86/25 87/1 87/9 87/22 87/23
   88/3 88/13 90/16 90/24 91/8 91/9
   91/23 91/24 92/17 92/20 93/4 93/5
   93/9 94/10 97/9 97/10 97/18 97/19
   103/9 103/12 104/2 104/6 105/20
   106/3 106/11 110/10 112/1 112/2
   113/18 113/19
view [22]  7/18 10/17 15/25 17/7
   18/20 23/12 41/24 42/5 43/9 45/13
   58/5 67/4 78/5 78/6 84/6 94/9
   94/15 106/14 110/25 115/18 118/14
   119/11
viewed [6]  15/19 42/10 42/11
   42/24 43/4 44/7
viewer [1]  79/4
viewers [1]  100/22
viewing [6]  42/13 45/10 69/11
   69/11 77/11 99/22
views [2]  78/4 106/19
violated [1]  33/7
violence [3]  36/3 37/8 103/20
violently [1]  36/1
visual [6]  73/2 73/5 75/16 75/17
   80/21 80/21
visualization [6]  70/24 71/1
   75/17 76/5 77/8 95/23
visualizing [1]  70/17
voice [1]  104/21
volume [1]  22/3
vs [1]  1/5

**W**

wait [3]  47/13 56/6 118/6
waiting [1]  118/7
walk [1]  19/15
walked [2]  115/21 115/23
walking [1]  71/25
wall [2]  80/25 105/7
want [46]  5/17 10/11 16/12 22/14
   24/6 25/21 27/15 27/19 28/7 28/24
   36/4 37/24 38/22 40/7 43/11 47/16
   48/21 52/4 52/5 52/13 54/19 55/3
   55/18 56/6 56/22 62/4 68/12 77/24
   83/15 83/17 83/18 84/16 84/19
   85/23 87/3 89/20 90/7 90/10 100/6
   113/11 117/1 117/10 117/24 118/1
   118/13 118/21
wanted [5]  23/20 56/12 69/15
   90/19 116/10
wants [5]  5/6 46/16 111/11 112/3
   113/10

**W**

**warning [1]**  8/3
**warnings [1]**  8/2
**warrant [1]**  95/8
**was [176]**
**Washington [7]**  1/5 1/16 1/24 5/24 25/12 53/13 95/4
**wasn't [8]**  22/23 38/1 47/4 49/8 49/9 55/10 91/1 113/17
**watch [12]**  47/13 57/16 77/13 77/15 78/4 82/22 89/14 89/20 91/11 93/6 101/7 104/5
**watched [3]**  57/22 91/9 100/10
**watching [8]**  58/17 64/23 77/9 77/17 92/5 93/4 98/1 106/10
**way [35]**  9/12 10/15 11/12 11/19 21/22 39/25 44/8 46/6 50/5 51/2 62/1 63/12 68/2 68/24 71/22 72/6 73/1 73/8 80/17 81/18 81/25 83/7 83/23 84/9 85/2 85/2 85/17 98/13 98/19 104/17 108/17 108/24 111/12 112/17 113/23
**ways [5]**  6/4 6/5 77/3 78/21 109/23
**we [351]**
**we'll [9]**  12/19 16/22 17/20 52/9 57/5 61/23 71/5 101/7 105/2
**weapons [3]**  24/19 34/17 36/7
**wearing [1]**  38/20
**week [2]**  24/20 76/10
**week-long [1]**  24/20
**weeks [1]**  57/18
**weight [1]**  44/11
**weird [1]**  44/20
**welcome [3]**  26/20 38/21 115/25
**well [48]**  8/2 10/16 11/5 13/20 17/3 17/23 23/3 24/12 24/21 25/4 25/18 25/23 26/13 26/19 28/5 28/9 29/5 29/21 30/7 33/22 35/20 37/6 38/18 43/14 44/6 53/18 54/2 57/25 59/23 60/24 62/22 62/22 63/8 64/4 68/18 71/15 73/17 74/4 77/6 81/3 83/11 97/20 100/23 105/5 112/13 112/25 117/21 119/16
**well-known [1]**  25/4
**well-trained [1]**  10/16
**went [6]**  75/4 83/20 87/1 95/20 108/19 109/21
**were [110]**  6/4 6/10 7/8 7/8 7/11 7/11 7/12 7/12 7/21 7/22 7/25 8/4 8/4 8/6 8/11 9/13 10/3 10/6 12/17 12/22 14/25 16/10 16/11 21/7 22/16 23/7 25/6 25/7 25/9 25/19 28/1 33/4 33/5 33/6 34/1 36/19 37/14 38/12 38/16 38/17 50/2 50/14 50/16 52/17 54/5 55/6 55/10 57/22 58/15 64/8 64/24 66/16 70/2 72/10 72/10 72/14 72/16 79/3 79/25 80/14 81/12 81/17 81/20 82/8 82/11 83/1 84/18 84/22 85/10 85/12 87/6 87/9 90/5 90/24 91/23 91/24 92/1 92/2 92/3 93/19 94/4 96/8 96/10 98/9 99/5 99/15 99/16 99/22 99/23 102/7 102/10 104/6 104/7 108/12 109/6 109/15 109/16 109/22 109/24 110/3 110/10 110/11 110/11 110/16 110/17 110/20 111/13 114/3 114/7 118/9
**weren't [3]**  37/19 38/16 115/12
**west [16]**  10/14 16/11 48/6 48/25 49/6 49/8 49/11 49/13 81/2 81/3 85/5 86/19 86/20 97/2 98/16 100/1
**what [234]**
**whatever [3]**  111/19 113/10 113/11
**when [61]**  7/3 8/23 9/18 9/18 11/1 13/15 14/1 14/4 14/15 15/3 16/13 19/19 30/12 33/8 33/10 34/10 34/17 35/6 38/3 38/8 39/1 44/18 50/17 53/5 53/20 54/5 54/16 54/17 58/7 60/20 60/21 62/10 65/20 66/2 66/3 66/14 71/25 72/15 80/7 80/19

81/8 81/9 87/7 87/10 87/10 88/11
88/23 92/7 92/1 92/25 93/1 93/2
101/18 105/2 105/3 105/11 112/19
115/20 115/21 117/20 118/25
**whenever [2]**  58/1 58/8
**where [112]**  6/8 8/22 9/1 9/18 11/18 11/22 12/1 12/2 12/17 13/5 13/9 15/19 15/21 15/23 16/5 18/3 18/22 19/14 21/7 21/10 21/11 21/17 24/15 24/22 25/7 25/18 27/24 32/25 33/1 33/4 33/5 33/21 33/23 34/7 34/7 34/18 35/8 35/25 36/2 38/17 39/4 39/5 39/10 39/16 40/5 41/16 43/21 43/21 44/3 45/20 45/21 46/4 47/3 47/3 47/10 48/11 49/20 49/21 50/8 51/17 51/21 54/5 58/9 59/14 66/23 71/8 72/13 73/23 74/2 75/5 78/24 79/20 81/13 81/21 83/1 83/20 84/1 84/3 86/21 88/13 88/15 90/17 91/13 98/4 98/11 98/11 98/12 98/12 98/13 99/8 99/9 99/23 102/14 102/23 104/6 104/7 105/8 106/2 107/17 111/13 111/13 112/13 113/9 113/20 114/2 114/3 114/7 116/6 116/6 116/7 116/17 118/6
**whereas [1]**  11/17
**whether [45]**  5/12 8/3 12/4 12/4 12/6 21/12 23/6 23/10 23/14 27/4 28/11 29/13 31/5 31/6 31/15 31/22 31/23 39/21 42/21 43/8 43/18 44/4 44/12 44/21 45/7 45/10 46/3 46/5 46/20 46/25 52/15 53/8 54/12 59/5 59/7 67/12 69/3 85/3 85/19 94/6 95/16 109/18 111/9 112/17 116/14
**which [43]**  4/11 5/23 9/2 9/3 12/9 25/4 28/24 29/24 34/17 37/22 38/10 39/24 39/25 41/3 41/11 41/25 48/5 54/22 56/11 57/2 58/11 59/5 59/8 66/8 67/18 69/5 70/4 70/19 83/24 85/11 85/11 87/4 87/4 90/24 90/25 91/18 91/21 92/9 93/24 100/1 116/4 116/9 117/10
**while [3]**  19/3 59/11 86/19
**white [1]**  107/16
**who [50]**  5/15 7/25 8/10 11/1 13/9 13/18 14/6 14/7 14/16 15/7 16/23 17/16 17/18 22/16 23/6 29/8 30/5 30/15 30/18 31/16 32/16 33/3 34/2 34/20 35/5 37/25 38/14 40/4 40/10 41/7 52/4 52/24 56/20 58/15 58/17 59/16 68/15 69/6 78/13 84/18 94/2 98/15 101/24 109/19 110/17 110/18 110/20 112/25 113/16 116/7
**whoever [1]**  85/6
**whole [3]**  29/14 73/3 76/18
**whose [1]**  54/3
**why [18]**  16/2 17/21 18/18 20/11 21/22 32/3 32/5 36/20 36/21 39/24 45/15 49/18 50/25 54/8 56/11 63/11 83/12 114/8
**widely [1]**  76/3
**Wilbert [4]**  4/9 62/23 89/25 91/16
**will [58]**  5/9 5/20 14/22 15/18 15/24 17/23 18/18 19/16 19/24 21/9 23/1 23/13 27/12 27/16 27/16 29/9 34/9 36/15 42/7 43/6 46/11 47/5 48/7 48/25 53/1 54/21 57/2 57/4 58/3 60/2 62/7 63/7 63/14 63/17 66/5 66/15 67/9 68/1 69/9 69/9 69/12 73/24 77/18 78/15 82/13 85/14 86/6 89/2 89/3 97/6 97/6 101/6 108/16 111/1 117/16 119/6 119/8 119/12
**Willamette [1]**  2/5
**willing [1]**  89/19
**Wilson [1]**  1/12
**windows [1]**  105/18
**wise [82]**  1/6 4/4 4/24 8/24 9/2 13/19 15/12 15/19 15/23 17/9 17/20 17/25 18/3 20/7 20/8 20/24 22/17 22/22 23/7 23/14 27/18

27/25 41/22 42/10 42/11 43/8 43/7 43/22 44/7 45/3 47/4 47/11 48/12 50/2 51/10 51/17 51/21 62/18 63/7 63/24 64/9 64/25 65/21 66/2 66/4 66/17 66/25 69/5 69/11 80/25 81/13 83/25 84/4 84/18 85/6 86/16 88/2 88/16 89/12 91/19 91/25 92/10 99/25 101/3 102/12 104/21 105/3 105/3 107/4 108/8 108/12 111/5 111/9 111/11 111/18 111/21 111/23 112/5 112/14 113/2 114/2 116/6
**Wise's [7]**  4/25 22/11 43/7 49/5 100/22 103/16 107/21
**wisely [1]**  33/15
**within [4]**  7/8 7/20 32/2 95/25
**without [10]**  21/16 36/5 40/3 40/25 41/20 46/3 46/22 86/2 111/20 111/21
**witness [13]**  23/23 63/24 86/7 86/17 89/12 111/6 111/8 111/11 111/14 111/25 113/13 116/21 117/21
**witness' [1]**  110/25
**witnessed [2]**  69/5 111/9
**WITNESSES [1]**  3/2
**won't [2]**  6/11 43/14
**wonder [2]**  99/4 116/14
**word [8]**  17/9 66/20 73/22 79/18 79/21 79/24 84/14 109/17
**words [21]**  7/22 11/5 17/2 18/14 19/7 22/12 34/11 66/16 71/6 85/6 85/11 85/20 101/4 103/17 104/5 104/8 108/12 108/16 108/23 108/24 113/1
**work [22]**  19/15 25/2 48/9 50/24 70/3 70/7 70/7 70/9 70/19 71/3 72/24 73/7 74/6 77/23 79/23 79/24 81/9 81/17 94/14 94/15 94/17 117/17
**worked [10]**  25/2 52/22 53/8 53/9 53/12 70/16 71/14 71/19 72/19 73/17
**working [6]**  7/8 49/3 53/5 71/16 73/4 73/6
**works [1]**  104/12
**world [6]**  41/11 74/7 76/4 115/22 116/4 116/8
**worn [6]**  66/13 80/15 84/24 85/10 106/3 113/8
**worry [1]**  89/3
**worse [1]**  18/1
**worst [1]**  12/7
**would [172]**
**wouldn't [5]**  29/14 54/7 78/13 104/14 117/22
**wow [1]**  54/18
**writing [1]**  29/25
**written [1]**  86/14
**wrong [7]**  6/10 38/1 44/7 112/10 112/11 116/3 119/14
**wrote [2]**  27/11 94/13

**X**

**X-rays [1]**  45/14

**Y**

**Yantis [1]**  55/20
**yard [1]**  95/10
**yeah [45]**  10/12 20/10 20/12 20/23 23/1 27/2 31/20 42/8 42/20 43/14 49/10 49/20 49/21 50/16 55/9 61/25 64/17 64/22 67/8 72/13 73/1 75/9 76/15 77/3 80/3 84/3 89/1 89/8 89/17 89/19 89/23 93/8 95/3 95/17 98/12 99/17 99/24 102/9 103/13 104/3 104/25 106/16 107/12 108/1 118/20
**year [3]**  26/2 74/1 76/20
**years [18]**  24/19 29/9 30/6 31/13 31/15 32/4 53/13 67/17 67/17 67/23 68/7 70/15 75/6 75/11 75/22 76/8 76/8 76/21

**Y**

**yelled [2]**  65/21 66/16
**yelling [4]**  65/24 66/4 85/6 101/4
**yellow [7]**  106/16 107/14 107/17
107/17 107/20 107/20 108/1
**yells [3]**  92/10 93/2 112/5
**Yep [1]**  82/20
**yes [56]**  5/3 5/20 7/1 10/9 10/21
16/21 17/14 20/6 24/5 24/10 25/4
26/3 30/10 48/1 48/2 50/11 50/25
52/6 52/20 55/5 60/12 60/19 64/2
65/7 65/20 69/23 72/21 73/15 74/9
74/12 74/14 74/19 75/15 75/20
76/24 80/16 81/8 82/21 84/12 89/9
93/18 100/16 103/10 106/4 107/5
107/8 107/22 107/24 110/4 110/15
110/22 114/15 117/3 117/4 117/7
119/6
**yet [2]**  22/8 81/9
**you [535]**
**you're [1]**  29/5
**your [163]**
**YouTube [2]**  97/9 97/18
**YT1 [1]**  97/8
**YT2 [1]**  97/8

**Z**

**zagged [1]**  98/18
**zigged [1]**  98/18
**zoom [9]**  4/25 5/1 63/8 65/4 78/9
79/1 91/6 102/13 102/14
**zooming [3]**  88/13 102/15 102/19